# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **LORI BILEWICZ,** | ) | |
| **and all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CLASS ACTION COMPLAINT** |
| **vs.** | ) | |
| | ) | **CIVIL ACTION NO: 13-10636** |
| **FMR LLC; FMR LLC INVESTMENT** | ) | |
| **COMMITTEE;** | ) | |
| **and John and Jane Does 1-25,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## Table of Contents

I.      NATURE OF THE ACTION ................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................2

III.    PARTIES ............................................................................................................2

    A.      Plaintiff ..................................................................................................2

    B.      Defendants ..............................................................................................3

IV.     FACTS ................................................................................................................5

    A.      The Plan. .................................................................................................5

    B.      The Structure and History of The Plan's Investment Offerings Demonstrate Rampant Conflicts of Interest. ................................................................5

    1.      FMR's self-interest is the only plausible explanation for the Plan's one hundred percent proprietary fund investment array. ......................................5

    2.      The profileration of funds in the Plan caused the Plan and participants to incur unusually high expenses, to the benefit of FMR. ......................................8

    3.      The pattern of adding new Fidelity Funds to the Plan demonstrates severe conflicts of interest. ..........................................................................11

    C.      Defendants Maintained The Plan's Investment In High-Fee Fidelity Target Date Funds When FMR Affiliates Offered Lower-Fee And Better-Performing Target Date Funds. ...........................................................................19

    D.      Peer Mega Plans Have Much Lower Fee Structures. ..................................22

    1.      Peer mega plans pay much lower aggregate plan fees. ................................23

    2.      Peer mega plans have moved away from mutual funds to less expensive commingled and single client investment funds. ......................................24

    E.      Defendants' Breaches Of Duty Caused Losses To The Plan And Its Participants. ..27

V.      ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS ............30

VI.     CLASS ALLEGATIONS ....................................................................................35

VII.    CLAIMS FOR RELIEF ...........................................................................................................37

VIII.   DEMAND FOR JURY TRIAL  ...........................................................................................39

IX.     PRAYER FOR RELIEF  ...........................................................................................................40

Plaintiff Lori Bilewicz ("Bilewicz") individually and as a representative of a class of similarly situated persons, brings this action on behalf of the FMR LLC Profit Sharing Plan ("Plan") against FMR LLC ("FMR"); FMR LLC Investment Committee ("FMR Investment Committee"); and John and Jane Does 1-25 (collectively, "Defendants"). FMR LLC is more commonly known as Fidelity Investments.

## I. <u>NATURE OF THE ACTION</u>

1.     This case is about a company's self-dealing at the expense of its own workers' retirement savings. Defendants were required by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to act solely in the interest of the Plan's participants when making decisions with respect to selecting, removing, replacing, and monitoring the Plan's investments. Rather than fulfilling these fiduciary duties, among the "highest [duties] known to the law," *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982), by offering Bilewicz and the other investors in the Plan only prudent investment options at reasonable cost, Defendants selected for the Plan and repeatedly failed to remove or replace proprietary mutual funds ("Fidelity Funds") managed and offered by FMR subsidiaries. These funds were not selected and retained as the result of an impartial or prudent process, but were instead selected and retained by FMR as investment options in the Plan because FMR, its subsidiaries, and its owners benefited financially from the inclusion of these investment options. By choosing and then retaining these proprietary investment funds as the menu of investment options for the Plan and employees of Defendants such as Bilewicz, Defendants enriched FMR, its subsidiaries, and owners at the expense of FMR's own employees.

2.     Notably, at least one of Defendants' major fund family competitors outsources its retirement plan's fund selection process precisely to avoid the conflicts of interest that are the gravamen of this case. *See* http://www.investmentnews.com/article/20130113/REG/301139999

("For instance, at TD Ameritrade Inc., the company's own 401(k) is run by Great-West Retirement Services, and assets are held by a Great-West affiliate. 'We do get questions from workers who say, "Wouldn't it make sense for us to hold those assets?"' said Skip Schweiss, president of TD Ameritrade Trust Co. 'This keeps us away from potential conflict where we could be earning revenue on employee assets,' he said.") (last viewed February 18, 2013).

3.      This is a civil enforcement action under ERISA, and in particular under ERISA §§ 404, 406, 409, 502(a) (2), 29 U.S.C. §§ 1104, 1106, 1109, 1132(a) (2). Plaintiff Bilewicz brings this action on behalf of the Plan for losses to the Plan and for disgorgement of unlawful fees and profits taken by Defendants.

4.      This class action is brought on behalf of participants and their beneficiaries in the Plan who invested in Fidelity Funds established and maintained by FMR and its subsidiaries and affiliates via the Plan from March 20, 2007 through the present ("Relevant Period").

## II. JURISDICTION AND VENUE

5.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e) (1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a) (2) and (3).

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e) (1), 29 U.S.C. § 1132(e) (1).

7.      Venue is proper in this district pursuant to ERISA § 502(e) (2), 29 U.S.C. § 1132(e) (2), because Defendants' principal place of business is located in this district.

## III. PARTIES

A.      **Plaintiff**

8.      **Plaintiff Lori Bilewicz ("Bilewicz").** Plaintiff Bilewicz is a resident of Milton, Massachusetts. Bilewicz participated in the Plan and invested in Fidelity Funds in the Plan during the

Relevant Period, including the Fidelity Freedom 2040 fund, which charged fees that were significantly higher than those carried by comparable funds available from Vanguard Group, Inc., Pyramis Global Advisors (an FMR subsidiary), and even another Fidelity Freedom Index 2040 fund.

9.      Plan participants, including Plaintiff Bilewicz, were not provided any information, or access to information, regarding the substance of the deliberations – if any – of Defendants concerning the Plan's menu of investment options during the proposed class period. Bilewicz otherwise has no specific knowledge of the substance of those deliberations. Bilewicz discovered her claims shortly before commencing this action.

**B.      Defendants**

10.     **FMR LLC ("FMR").** FMR is a financial services conglomerate, also known as Fidelity Investments. It serves more than 20 million individual and institutional clients, as well as 5,000-plus financial intermediary firms. FMR manages nearly 500 investment funds, boasting some $3.7 trillion in assets under administration, including managed assets of $1.6 trillion. Its executive offices are located in Boston, Massachusetts.

11.     FMR is the Plan sponsor and a party in interest to the Plan under 29 U.S.C. § 1002(14). FMR or its subsidiaries also provided trustee, record-keeping, and administrative services to the Plan, and was thus a fiduciary to the Plan, under 29 U.S.C. § 1002(21), because it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

12.     FMR, acting by and/or through its Board of Directors, is a fiduciary within the meaning of ERISA, and thus subject to the fiduciary standard of care, because it appoints, monitors, and removes the members of the FMR Investment Committee that administers the Plan.

13.     Further, FMR, acting by and/or through its Board of Directors, exercised discretionary authority and/or discretionary control respecting management of the Plan, exercised authority and/or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. As such, FMR is a fiduciary within the meaning of 29 U.S.C. § 1002(21) (A).

14.     FMR, at all applicable times, has exercised control over the activities of its employees, internal departments and subsidiaries that performed fiduciary functions with respect to the Plan, and, on information and belief, can hire or appoint, terminate, and replace such employees at will. FMR is, thus, liable for the fiduciary breaches alleged herein of its employees, internal departments and subsidiaries.

15.     Finally, FMR, as a corporate entity, cannot act on its own without any human counterpart. In this regard, FMR relied directly on the other Defendants, named herein, to carry out its fiduciary responsibilities under the Plan and ERISA and the acts of FMR's officers and employees alleged herein are the acts of FMR.

16.     **FMR LLC Investment Committee ("FMR Investment Committee").** The FMR Investment Committee and its members were (and are) responsible for selecting, evaluating, monitoring, and maintaining the Plan's investment options. The identities of the FMR Investment Committee members are not presently known by Bilewicz. The FMR Investment Committee is a fiduciary of the Plan under 29 U.S.C. § 1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. The identities of members of the FMR Investment Committee were not disclosed to participants such as Bilewicz.

4

17.     **Doe Defendants.** Doe Defendants include additional Plan fiduciaries whose names and identities are not presently known to Bilewicz, including the identities of the members of the FMR Investment Committee during the proposed class period. Bilewicz will substitute the real names of the John and Jane Does when they are known to Bilewicz.

## IV. FACTS

### A.    The Plan.

18.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A)

19.     The Plan is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

20.     The Plan covers eligible employees of FMR and its subsidiaries and affiliates.

21.     The Plan had 55,862 participants and/or beneficiaries as of December 31, 2011.

22.     The Plan had total assets valued at approximately $8.5 billion as of December 31, 2011.

23.     The FMR Investment Committee and its members were (and are) responsible for selecting, evaluating, monitoring, and maintaining the Plan's investment options.

### B.    The Structure and History of The Plan's Investment Offerings Demonstrate Rampant Conflicts of Interest.

#### 1.     FMR's self-interest is the only plausible explanation for the Plan's one hundred percent proprietary fund investment array.

24.     There are many non-FMR-branded, reasonably priced and well-managed investment options in the 401(k) plan marketplace available to the Plan. Such options include registered mutual funds, exchange-traded funds, non-registered commingled funds such as bank collective or common trusts and insurance company pooled separate accounts, and separately-managed single client funds.

5

25.     No one investment management firm is good at everything. Some investment management firms excel at providing fixed income investment products, others at equity investment products, and still others at international and emerging market investment products. Prudent fiduciaries for large plans understand this and accordingly take a "best of breed" approach in assembling menus of retirement plan investment options for their retirement plan investors, carefully and diligently searching among the various vendors in the retirement plan investment product market to construct a suitable and appropriately low-cost and diversified array of investment options. *See* Russell Investments, *Seven Attributes of an Excellent Defined Contribution Plan*, (Feb. 2012) at 2.[1]

26.     Thus, only 10% of 401(k) plans restrict their investment offerings to a single fund family in their plan. *See* Deloitte Consulting LLC, Annual 401(k) Benchmarking Survey (2011) at 49, Figure 7.2 ("401(k) Survey"). Here, Defendants offered Plan investors as their retirement investment options **only** Fidelity Funds, thus keeping all fee revenue generated by the Plan's investments for FMR. Prudent and unconflicted plan fiduciaries know or should know that no one investment fund family provides the very best investment fund options across all asset classes.

27.     For example, the General Motors Savings Plan Master Trust ("GM Savings Trust", a master trust comprised of the assets of three defined contribution plans sponsored by General Motors Corp.), which as of 2011 held approximately $13.8 billion in assets, invests in various mutual funds and collective trusts offered by State Street Bank and Trust Company, PIMCO, Neuberger

---

[1] Russell Investments is a retirement plan consultant and investment manager. Its clients include Aetna, Inc., AT&T, Inc., Barclays Bank, Caterpillar, Chrysler Group LLC, Coca-Cola Bottling Co., Delta Airlines, Inc., and Toyota Motor Pension Fund, among others. http://www.russell.com/US/about_russell/default.asp (last viewed March 14, 2013).

Berman, Capital Guardian, Ariel, Alliance Bernstein, Fidelity Investments, and Pyramis Global Advisors ("Pyramis").[2]

28.     Further, only 12% of retirement plans report a plan investment option menu consisting of 76%-100% proprietary investment funds – that is funds affiliated with the particular retirement plan's record-keeping vendor. *See* 401(k) Survey at 49, Figure 7.3. Here again, the Plan has a 100% line-up of proprietary Fidelity Funds. Presumably the number of plans that use 100% proprietary funds is even smaller than the 12% who report using between 76% and 100% in the aforementioned reports. Again, Defendants benefited directly from this unusual arrangement.

29.     Fidelity established Pyramis in 2005 to compete for institutional pension plan business. Pyramis does not offer mutual funds. Rather, it offers and manages nonregistered, institutional commingled funds, which are substantially similar to mutual funds except that these commingled funds carry generally lower fees and costs than those charged by comparable Fidelity Funds. Pyramis also offers separately-managed accounts, which offer the same investment strategies and asset classes as mutual funds and commingled funds, except that there is only one client retirement plan invested in the fund. Separately managed accounts provide very large clients such as retirement plans with assets exceeding $1 billion ("mega plans") the opportunity to negotiate even lower retirement investment-related fees.

30.     Given the foregoing facts, it is completely implausible that Defendants acting as prudent, diligent fiduciaries would construct an investment menu for their employees' retirement plan consisting exclusively of approximately 160 of FMR's own mutual funds.

31.     Likewise, it is utterly implausible that each and every one of the approximately 160 Fidelity Funds in the Plan was chosen and retained pursuant to a rigorous evaluation, screening, and

---

[2] *See* 2011 Form 5500, Annual Return/Report of Employee Benefit Plan, General Motors Master Savings Trust, at page 1 of addendum to Schedule H, Line 4J.

monitoring process involving, for instance, an appropriately detailed comparison to similar funds

offered by competitor investment fund vendors to see how Fidelity Funds compared to other

vendors' funds with respect to costs, fees, performance history and other relevant metrics.[3] Rather,

as described further below, the 100% proprietary fund line-up from a single fund family is the result

of self-dealing by FMR.

> **2.     The proliferation of funds in the Plan caused the Plan and participants to incur unusually high expenses, to the benefit of FMR.**

32.     Defendants selected and maintained an excessive number of funds in the plan, with

adverse consequences for Plan participants. The top decile of defined contribution retirement plans

reports an average of 27 funds. 401(k) Survey at 49, Figure 7.1. Among the top 200 largest defined

contribution plans, the average number of fund offerings is 22. *See* Rick Baert, *DC Plans Snag a Bigger

Piece of the Top 1000*, Pensions & Investments (Feb. 4, 2013); *see also* Russell Investments, *Seven

Attributes of an Excellent Defined Contribution Plan*, (Feb. 2012) at 2 (average defined contribution plan

offers 22 investment options). The Plan here, by contrast, on average offered over 160 funds during

the Relevant Period, all proprietary Fidelity Funds.

33.     Another survey of sponsors of large defined contribution retirement plans (of which

401(k) plans are a subset) found that most sponsors of large 401(k) plans agree that "a relatively

small menu of carefully chosen investment options should yield the best results in a DC plan." *See*

Northern Trust, *The Path Forward: Designing the Ideal Defined Contribution Plan*, (Oct. 2010), at 8 (listing

---

[3] *See, e.g.,* https://dcprovider.com/greatwest/PDF/Reish_White_Paper_Prudence_Standard.pdf
("Thus, to meet the prudent process requirement, fiduciaries must thoroughly investigate the
investment options to obtain relevant information and then base their decisions on the information
obtained. This means considering competing funds to determine which fund should be included in
the plan's investment line-up. As explained by the DOL in the preamble to the qualified default
investment alternative regulations, '[a] fiduciary must engage in an objective, thorough, and analytical
process that involves consideration of the quality of **competing providers and investment
products**, as appropriate.'") (emphasis in original) (citation omitted) (last viewed February 18, 2013).

surveyed plan sponsors at page 16). Of 50 surveyed plan sponsors, 90% said a defined contribution plan should have fewer than 20 investment options. *Id.* at 9. Only 4% said a plan should have more than 30 investment options. Independent consultants who advise employers on defined contribution plans prefer even fewer investment options. *Id.* at 9.

34.     Indeed, maintaining a vast array of investment options in defined contribution plans, as Defendants caused the Plan to do here at all material times, is a legacy of the 1990s, when the prevailing trend in retirement plan management was to offer participants a superabundance of investment options within their retirement plans. Retirement plan industry leaders do not regard this smorgasbord approach today as "best practices" for fiduciaries such as Defendants that build and maintain retirement plan investment menus. *See* Russell Investments, *Seven Attributes of an Excellent Defined Contribution Plan*, (Feb. 2012) at 2. Instead of maintaining a myriad of retirement plan investment options, then, "excellent plans are collapsing options into major categories. For example, instead of growth, core, and value large cap equity fund options, [excellent plans] are combining these choices into a single diversified large cap option." *Id.* In short, FMR unfortunately and improperly has kept the investment management practices of the Plan stuck in the 1990's, to the benefit of Defendants and to the detriment of Bilewicz and the Plan and in violation of ERISA. To wit, as of December 31, 2010, the Plan offered plan participants 36 large cap equity funds as investment options —a bewildering array of overlapping and redundant investment choices for Plan participants like Bilewicz.

35.     Research shows that too many fund choices leads plan participants to over-concentrate in equities, to their detriment. *See* Maureen Morrin, Susan Broniarczyk, J. Jeffrey Inman, and John Broussard (2008), *Saving for Retirement: The Effects of Fund Assortment Size and Investor Knowledge on Asset Allocation Strategies*, JOURNAL OF CONSUMER AFFAIRS, 42 (2), 206-222. Actively-managed equity funds generally charge the highest fees of any asset class, and did here, and thus generate

9

substantially more fees for Defendants than index and bond funds would have. As of the end of

2010, 88% of the Plan's mutual funds were actively managed Fidelity Funds, which held

approximately 84% of Plan assets. This benefited Defendants via increased fee revenue at the direct

expense of Bilewicz and the Plan.

36.     Further, by spreading Plan money across so many different investment funds,

fiduciaries like Defendants cannot (and Defendants here did not, in violation of their duties to

Bilewicz and the Plan) take advantage of break points in fee schedules or the opportunity to bargain

with an investment manager for a large mandate for a single fund. "Break points" in a fee schedule

mean that the fee on assets above each break point is further discounted or that the overall fee is

lower if the assets invested meet the break point level (depending on the arrangement). In this

respect, too, the Plan's configuration of investment fund offerings (again, a menu made up entirely

of proprietary FMR mutual funds) benefited Defendants at the expense of Bilewicz and the Plan, as

Defendants' failure to leverage Plan assets to achieve available fee schedule break points meant more

fees paid by Bilewicz and the Plan and higher investment fund fee revenues for FMR.

37.     Had the Plan's investment offerings in 2010 been streamlined and consolidated into

major asset classes (*i.e.*, large cap growth, large cap value, etc.), the consolidation of 145 (84%) of the

Fidelity Funds would have allowed the Plan to avail itself of the two highest institutional fee break

points available from Pyramis for Pyramis' institutional collective funds. In only 11 (6%) cases was

the Plan's investment in a Fidelity Fund so small that it would fail to qualify for the lowest available

break point of the closest comparable Pyramis fund. And if Defendants were to follow the standard

of an "excellent plan," as described by Russell Investments (*Seven Attributes of an Excellent Defined

Contribution Plan*, (Feb. 2012) at 2.), a leading retirement plan consultant, even lower fees could be

obtained. For example, consolidating approximately 77 of the large cap and sector equity funds in

the Plan into a single diversified large cap option would create a pool of approximately $2.887 billion

in assets as of December 31, 2010. With that much bargaining power, a prudent and loyal fiduciary could likely negotiate a fee with Pyramis or another institutional asset manager of 20 basis points or less. Whereas in actuality the asset-weighted fee paid by the Plan for these 77 equity funds was approximately 72 bps. Had the Plan and its participants paid instead 20 basis points on the $2.887 billion in large cap equity assets, instead of the $20.7 million in estimated fees that the Plan did pay, the Plan and its participants would have saved approximately $15 million, a savings of approximately 75%, in 2010 alone.

38.      In sum, by deluging the Plan's investment option menu with an overwhelming array of often-overlapping funds, Defendants created and maintained an outmoded and unduly expensive (to Bilewicz and the Plan, that is) retirement plan investment structure that redounded to the financial benefit of FMR and was wholly inconsistent with the practices of peer plans and modern fiduciary standards more generally.

3.      **The pattern of adding new Fidelity Funds to the Plan demonstrates severe conflicts of interest.**

39.      During the Relevant Period, Defendants caused the Plan to pour money into dozens of newly-established Fidelity Funds with little or no track record for the apparently self-interested purpose of propping up or "seeding" such new funds.

40.      Mutual funds generally need at least $50 million in assets under management to attain modest profitability.[4] The sooner a mutual fund manager reaches that tipping point, the sooner the manager earns profits. Further, the early investors in a mutual fund are the hardest to attract. The more money in a mutual fund, the easier it becomes to market it. Thus Defendants at all material times had and acted on a strong incentive to build up fund assets in newly-minted Fidelity

---

[4] *See* http://www.forbes.com/2009/02/05/mutual-fund-startup-intelligent-investing_0206_mutual_fund.html) (last viewed on February 17, 2013).

Funds as quickly as possible – and the Plan has been a critical source of seed money for new Fidelity Funds for many years. As detailed further below, this should not have been so. The availability and use of a captive mega retirement plan, that is a plan with assets over $1 billion (in fact no less than $4.5 billion during the Relevant Period), to seed new products has inured to the benefit of Defendants greatly over the years at the expense of Bilewicz and the Plan.

      41.     Prudent fiduciaries generally do not select funds with a performance history of fewer than three years because shorter periods do not provide enough evidence that the fund is delivering expected returns within its guidelines or mandate and with acceptable risk and volatility parameters.[5] A recent article published on the 401khelpcenter.com website authored by Donald Stone, Accredited Independent Fiduciary,[6] states that ERISA fiduciaries should follow several criteria in selecting funds:

- **Assets under management**: The product should have at least $75 million under management (large plans may need to set a higher minimum, and plans should avoid comprising more than 5% of the assets of any given fund).

- **Performance relative to a peer group and appropriate benchmark**: The product's performance should be evaluated against the appropriate benchmark and peer group's median manager return, for 1-, 3- and 5-year cumulative periods. Funds or managers chosen should typically be top quartile performers for all periods, and existing funds in the menu should be in the top two quartiles.

- **Minimum track record**: The product's inception date should be greater than three years, and the managers should have a minimum of three years managing the proposed asset class (if not the specific product) with a verifiable track record (composites are acceptable).

---

[5] *See, e.g., Fiduciary Process Best Practices*, www.unifiedtrust.com/documents/FiduciaryBestPractices.pdf ("In general, the [prudent] fiduciary will select funds with at least a three-year operating history.") (last viewed on February 17, 2013). *Prudent Investment Practices: A Handbook for Investment Fiduciaries*, www.sec.gov/nb/comments/akendal033105-hand1.pdf ("The performance of a manager/fund may vary depending on which ending time periods are used to analyze performance. Therefore, it is important to look at performance for a number of market cycles or time periods to gain an accurate assessment of the manager/fund's performance.") (last viewed on February 17, 2013).
[6] *See* http://www.401khelpcenter.com/401k/stone_investment_selection.html#.US8HZaWlLjI (last viewed on February 17, 2013).

- **Expense ratios/fees**: The fund's expense ratio or manager's fees should not be above the median of its peer group (exceptions may be made for funds or managers that consistently provide superior performance).

42.     It is widely accepted retirement plan management practice to review historical investment fund performance prior to making investment decisions and as part of the ongoing retirement plan investment monitoring process required by ERISA. According to leading financial institution American Funds, "When choosing an investment manager, one of the most important factors you should consider is the manager's ability to generate consistent results over the long term." "The first step is to use a screening process that will eliminate from consideration anyone whose record of results is below average. There is only one appropriate yardstick for measuring the professional abilities of any investment management group. That yardstick is their actual record of investment results over a series of meaningful periods. This means that you must look at the record not just for one period, but for a series of periods — otherwise, you have no measure of consistency." "Consistency is the name of the game. Remember that your goal is to find a manager that has consistently achieved good results over a series of 10-year periods. How many 10-year periods? If I were sitting on your side of the table, I would ask to see the candidate's record for at least the latest 10 rolling 10-year periods — and preferably over longer periods so you can assess how the manager performed in a prolonged down market and in a variety of economic environments." Leading money managers state that decision makers should consider 10 year periods prior to investing, yet Defendants here did not even require so much as a one year track record when it came to investing the Plan's retirement monies in proprietary FMR mutual funds.[7]

43.     Conflicted fiduciaries like Defendants here, who want to help their company start new funds and provide the seed capital to get it going, risk retirement plan assets for their own

---

[7] *See* www.americanfunds.com/pdf/endowments/rp-034_select.pdf (last viewed on February 17, 2013).

benefit. This is exactly what Defendants did routinely during the Relevant Period, to the detriment of Bilewicz and the proposed class.

44.     The Plan provided critical seed money for Defendants to start and market Fidelity Funds. Defendants routinely selected Fidelity Funds within a year or less of inception to be included in the Plan investment portfolio. Not counting the Freedom Funds (a suite of target date funds offered by Fidelity Investments), according to the Plan's annual financial statements, 14 (31%) of the Fidelity Funds added to the Plan since 1999 were added in the same year the fund was created. 21 (47%) of the Fidelity Funds added to the Plan since 1999 were added to the Plan in the year after the fund was created. Thus, in many cases the Plan Fiduciaries had less than one year of performance to consider before they added the fund to the Plan.[8] Only three (7%) of the Fidelity Funds added to the Plan since 1999 had a performance record since inception date as long as two and a half years. These three funds were all low-fee treasury bond index funds, which do not produce the high fee margins for FMR that it receives from actively managed equity funds, which were uniformly added to the Plan much sooner after inception.

45.     In sum, Defendants repeatedly violated the sound fiduciary prohibition against adding unproven, newly-minted funds to a retirement plan. And they did it with proprietary FMR funds at least 38 times since 1999, including the Mid Cap Enhanced Index Fund in 2007, in which Bilewicz invested through the Plan.

46.     Defendants also routinely violated the fiduciary practice of avoiding excessive investment (which is to say, greater than 5% of a particular mutual fund's total assets) of Plan

---

[8] Bilewicz does not have sufficient data at this time to determine the precise date on which one Fidelity Fund was added to the Plan. Nor does she have sufficient information to determine the gap between Plan investment and fund creation for seven of the Fidelity Funds added to the Plan since 1999. She notes, however, that the date the instant fiduciaries decided to add a given fund to the Plan will be even earlier than the date the fund was in fact added, and thus had an even shorter track record as of the decision date.

14

monies in particular FMR proprietary mutual funds. Again, they violated this principle repeatedly

and exclusively for the financial benefit of FMR. The large positions taken by the Plan in new FMR

funds is further evidence of Defendants' practice of seeding and feeding the Fidelity Funds with the

Plan's retirement savings. As set forth in detail in the following paragraphs, in one instance the

Plan's investments represented almost 37% of a particular Fidelity Fund's total assets; in three

instances the Plan's investments represented over 20% of particular Fidelity Funds' total assets; in 10

instances the Plan's investments represented over 10% of particular Fidelity Funds' total assets; and

in 21 instances, the Plan's investments exceeded 5% of particular Fidelity Funds' total assets – still a

significant figure as a matter of fund management. In all these cases, the Fidelity Fund in question

had been in existence for fewer than three years. For some of the aforementioned Fidelity Funds,

the Plan's oversized ownership interest in the funds' total assets continued for several years after

inception – demonstrating that the Plan's investments in the newly launched Fidelity Funds over the

years that follow their additions to the Plan play a critical role in helping to develop Fidelity's new

mutual fund strategies for the benefit of Fidelity but to the detriment of Bilewicz and other investors

in the Plan.

47.     As set forth in detail in the following paragraphs, an examination of the Fidelity

Funds added to the Plan since 1999 demonstrates the depths of Defendants' self-dealing in this

regard and their violation of three important fiduciary standards identified above, namely: not

investing Plan monies in unproven funds; not allowing Plan monies to constitute an unduly high

percentage of a particular investment fund's asset base; and not investing in commingled funds with

less than $75 million in assets.

48.     FMR created the Mid Cap Enhanced Index Fund on December 20, 2007.

Defendants added the Mid Cap Enhanced Index fund to the Plan in 2008. As of year end 2008, the

Plan represented 3 - 7% of the fund's assets (as reported on February 28, 2008 and 2009), which was significantly less than $75 million both years.

49.     FMR created the Global Commodity Stock Fund on March 25, 2009. Defendants added the Global Commodity Stock fund to the Plan the same year. As of year end 2009, the Plan represented 4% of the fund's assets and by the end of 2010, 12% of the fund's assets (as reported October 31st of each year).

50.     FMR created the Emerging Market Europe, Middle East, Africa Fund on May 8, 2008. Defendants added the fund to the Plan the same year. As of year end 2008, the Plan represented 4% of the fund's assets of only $38.4 million, by the end of 2009, 8% and by the end of 2010, 12% of the fund's assets (as reported October 31st of each year).

51.     FMR created the 130/30 Large Cap Fund on March 31, 2008. Defendants added the fund to the Plan the same year. As of year end 2008, the Plan represented 2% of the fund's assets and by the end of 2010 of only $27 million, 6% of the fund's assets (as reported November 30th of each year).

52.     FMR created the International Enhanced Index Fund on December 20, 2007. Defendants added the fund to the Plan in 2008. As of year end 2008, the Plan represented 3 - 6% of the fund's assets (as reported on February 28, 2008 and 2009), which was significantly less than $75 million both years.

53.     FMR created the Small Cap Enhanced Index Fund on March 20, 2007. Defendants added the fund to the Plan in 2008. As of year end 2008, the Plan represented 2 - 18% of the fund's assets (as reported on February 28, 2008 and 2009), which was significantly less than $75 million both years.

54.      FMR created the Global Strategies Fund on October 31, 2007. Defendants added the fund to the Plan in 2008. As of year end 2008, the Plan represented 15% of the fund's assets, by the end of 2009, 11% and by the end of 2010, 8% (as reported December 31st of each year).

55.      FMR created the Large Cap Core Enhanced Index Fund on April 19,2007. Defendants added the fund to the Plan in 2008. As of year end 2008, the Plan represented 5 - 6% of the fund's assets (as reported on February 28, 2008 and 2009).

56.      FMR created the International Growth Fund on November 1, 2007. Defendants added the fund to the Plan in 2008. As of year end 2008, the Plan represented 12% of the fund's assets (as reported October 31, 2008), which was significantly less than $75 million.

57.      FMR created the International Real Estate Fund on September 8, 2004. Defendants added the fund to the Plan the same year in 2004. As of year end 2006, the Plan represented 7% of the fund's assets (as reported July 31, 2006).

58.      FMR created the Blue Chip Value Fund on June 17, 2003. Defendants added the fund to the Plan the same year in 2003. As of year end 2003, the Plan represented 7% of the fund's assets, by the end of 2004, 10% and by the end of 2005, 22% of the fund's assets (as reported July 31st of each year), which was significantly less than $75 million both of the first two years.

59.      FMR created the Real Estate Income Fund on February 4, 2003. Defendants added the fund to the Plan the same year. As of year end 2008, the Plan represented 6% of the fund's assets (as reported July 31, 2008).

60.      FMR created the Value Discovery Fund on December 10, 2002. Defendants added the fund to the Plan in 2003. As of year end 2003 and 2004, the Plan represented 8% of the fund's assets, which was significantly less than $75 million both years, by the end of 2005, 22% and by the end of 2006, 7% of the fund's assets (as reported July 31st of each year).

17

61.     FMR created the Large Cap Growth Fund on November 15, 2001. Defendants added the fund to the Plan in 2002. As of year end 2004, the Plan represented 37% of the fund's assets and by the end of 2005, 20% of the fund's assets reported the next month (as reported January 31st of each year), which was significantly less than $75 million both years.

62.     FMR created the Mid Cap Growth Fund on November 15, 2001. Defendants added the fund to the Plan in 2002. As of year end 2003 and 2004, the Plan represented 7% of the fund's assets, which was significantly less than $75 million both years, and by the end of 2005, 5% of the fund's assets (as reported on the January 31st following each of those two years).

63.     FMR created the Mid Cap Value Fund on November 15, 2001. Defendants added the fund to the Plan in 2002. As of year end 2004, the Plan represented 12% of the fund's assets (as reported the next month, January 31, 2005), which was significantly less than $75 million.

64.     FMR created the Stock Selector Large Cap Value Fund on November 15, 2001. Defendants added the fund to the Plan in 2002. As of year end 2004, the Plan represented 21% of the fund's assets, which was significantly less than $75 million, and by the end of 2005, 10% of the fund's assets (as reported on the January 31st following each of those two years).

65.     FMR created the Select Pharmaceuticals Fund on June 18, 2001. Defendants added the fund to the Plan in 2002. As of year end 2004, the Plan represented 8% of the fund's assets (as reported two months later on February 28, 2005), which was significantly less than $75 million in both 2002 and 2005.

66.     FMR created the Small Cap Discovery Fund on September 26, 2000. Defendants likely added the fund to the Plan earlier; however, due to the lack of complete financial statements we were only able to pinpoint that it was in the Plan by 2002. As of year end 2002, the Plan represented 10% of the fund's assets, by the end of 2003, 14%, which was significantly less than $75 million both years, and by the end of 2005, 7% of the fund's assets( reported April 30th of each year).

18

67. Defendants never selected a fund for the Plan that was not affiliated with FMR during the Relevant Period.

68. In the Relevant Period, Defendants never maintained a fund in the Plan that was not affiliated with FMR.

69. Every single fund added to the Plan since 2002 was a Fidelity Fund that had been in existence fewer than three years, and often less than a year.

C. **Defendants Maintained The Plan's Investment In High-Fee Fidelity Target Date Funds When FMR Affiliates Offered Lower-Fee And Better-Performing Target Date Funds.**

70. Fidelity Investments offers a suite of target date funds. A target date fund is one that purports to provide a model asset allocation based on a given investor's projected retirement age.

71. Fidelity Investments calls its target date funds Freedom Funds. These funds supposedly follow model asset allocations and reallocations for the purpose of arriving at an optimal retirement date, *i.e.*, target date. Fidelity offers the following Freedom Funds within the Plan: Freedom Income, Freedom 2000, Freedom 2005, Freedom 2010, Freedom 2015, Freedom 2020, Freedom 2025, Freedom 2030, Freedom 2035, Freedom 2040, Freedom 2045, Freedom 2050. (Bilewicz was invested in the Freedom 2040 Fund through the Plan during the Relevant Period, and was thus harmed as alleged herein.) After the target date is reached, the given fund continues to rebalance its portfolio until it matches the Freedom Income Fund. The farther away the target date, the greater the fund's allocation to equities.

72. The Freedom Fund asset allocation and glide-path models are based, in part, on the historical performance of various asset class indices such as the S&P 500, the Barclays Capital Aggregate Bond Index (formerly the Lehman Aggregate Bond Index), and others.

73. The vast majority of the underlying Fidelity Funds in which the Freedom Funds invest, however, are actively managed funds. In other words, the actual investments that make up

19

the asset base of the various Freedom Funds are not consistent with the ostensible index-based model upon which the Freedom Funds are constructed.

74.     Because the Freedom Funds are populated with other FMR-sponsored, high-fee, actively-managed funds, the average investment management fee for the Freedom Funds has been 54 basis points. Other mega defined contribution plans have negotiated fees for funds in this asset class as low as 8 basis points. By way of example, Delta Air Lines, Inc., recently selected for its retirement plan a group of target date funds with an average cost of 12 basis points.

75.     By way of comparison, in 2009, FMR created an index-based suite of Freedom Funds, which were not offered as investment options within the Plan to Bilewicz or other Plan participants. Instead of investing in actively-managed funds, these index-based Freedom Funds invest in, as their name suggests, low-fee index funds. This had two salient effects. First, fees were reduced dramatically – the average investment management fees for the Freedom Index Fund series is only 9 basis points (83% lower average cost than the Freedom Fund K Shares selected by the Plan Fiduciaries for inclusion in the Plan). Second, the use of indexed products makes the actual investments consistent with the model asset allocation and glide path, which had been developed by FMR based on the performance of asset class indices, not actively managed funds. (From the beginning, the use of actively-managed funds in a model based on indices should have raised concerns for the Plan's fiduciaries.) From the 1st quarter of 2010 to the 2d quarter 2012, Plan participants paid approximately $10.3 million (85%) more to FMR for the dubious privilege of investing in the Freedom Fund K Shares during the 3 years from 2010 through 2012 than they would have had the Plan offered Freedom Index Funds instead.

76.     Pyramis, another FMR affiliate, also offers a suite of index-based target date funds at a lower cost than the Freedom Funds. These, too, were investment options not offered to Bilewicz and other participants in the Plan. The Pyramis Lifecycle Index series charges a management fee of

15 basis points (72% lower cost than the Freedom Funds selected by the Plan Fiduciaries). The performance of the Pyramis Lifecycle Index series v. the Freedom Fund actively managed series showed that Plan participants did not benefit from the active management over the time frame the Pyramis Index series was available. Although, one fund in the series outperformed the Pyramis Index series over the time period between 4th quarter 2007 and 2nd quarter 2012, Plan participants would have had approximately $33.5 million more in retirement savings had they been invested in the Pyramis Index series (based on 2010 year end balance in each respective Freedom Fund). [9] Making matters worse, Plan participants paid approximately $18.4 million (140%) more to FMR to invest in the Freedom Funds during the 5.25 years from 4th quarter 2007 through 2012 than they would have paid had the Defendants selected the Pyramis Lifecycle Index Funds for the Plan during that period.

77.      Consistent with their failure generally to consider institutional funds for inclusion in the Plan's investment options menu, and as explained in more detail below, Defendants failed to consider or select the institutional target date funds offered by Pyramis for inclusion in the Plan. Even one of FMR's senior investment officers recognized that the Freedom Funds were not suitable for a mega defined contribution plan such as the Plan here.

78.      According to Pyramis senior vice president Mark Friebel, the Fidelity Freedom Funds are targeted at smaller plans than the Pyramis target date funds. *See* Jenna Gottlieb, *Move Over, Mutual Funds, Here Comes Commingled*, PENSION & INVESTMENTS (Oct. 29, 2007). Unconflicted plan fiduciaries for very large defined contribution plans have taken advantage of the low-cost, target date

---

[9] Fund return cumulative comparison from 4th quarter 2007 through 3rd quarter 2009 includes the retail share class of the Freedom Funds. The first full quarter the K share was available was 4th quarter 2009. Fund return cumulative comparison assumes the Plan invested in the lower expense K share class as soon as 4th quarter 2009; therefore, the return comparison considers K share returns from 4th quarter 2009 through 2nd quarter 2012.

institutional products offered by Pyramis. In 2007, the fiduciaries for the General Motors Savings Plans ($20 billion in combined assets) switched from the actively-managed Freedom Funds, to Pyramis Active Lifecycle Funds. Virginia Munger Kahn, *Fidelity's Pyramis Gets Serious*, INSTITUTIONAL INVESTOR (July 18, 2008). When asked if switching from Fidelity Freedom Funds to Pyramis life-cycle funds was cannibalizing Fidelity's mutual fund sales, former Pyramis CEO Peter Smail, responded, "[i]f the customer wants institutional products, it will get them from somebody else if we don't offer them." *Id.* Unfortunately for the Plan and its participants, they did not have the option of getting institutional products from someone else, as it were, because Defendants control the Plan's investment options and they choose to maintain the Plan's investments in high-fee Fidelity Funds instead of less costly institutional products.

79.     As recently reported in the *New York Times*, Morningstar confirms that Freedom Funds in the Plan have routinely turned in worse returns than their major peers, not because of risk profile, but because FMR simply put too much investor money into actively managed FMR funds that do worse than their competitor funds. This not only decreased the returns offered by FMR's target date funds, it added more fees to the mix, to the detriment of Bilewicz and other retirement investors in the Plan. *See* Nathaniel Popper, *Target Date Funds at Fidelity Fall Short of Rivals,* NEW YORK TIMES, February 4, 2013.

**D.     Peer Mega Plans Have Much Lower Fee Structures.**

80.     Mega plans, that is, retirement plans with assets over $1 billion, have substantial bargaining power in the market for retirement plan investment products.

81.     A prudent and loyal fiduciary for a mega-plan uses the bargaining power of the plan to negotiate low fees from investment managers. *See Just Out of Reish: Class-ifying Mutual Funds*, http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537 (last viewed March 9, 2013) ("The fiduciaries also must consider the size and purchasing power of their plan and select the share

classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would

select under the circumstances. In other words, the 'prevailing circumstances'—such as the size of

the plan—are a part of a prudent decision-making process. The failure to understand the concepts

and to know about the alternatives could be a costly fiduciary breach.")

82.     The Plan has long been one of the largest defined contribution plans in the country,

exceeding $4 billion in assets every year of the Relevant Period and holding as much as $11.5 billion.

83.     The Plan is an outlier as compared to other mega defined contribution plans in at

least four distinct ways that inure to the financial benefit of Defendants and the financial detriment

of Bilewicz and the Plan: (1) the Plan pays higher all-in fees than peer mega plans; (2) the Plan uses

almost exclusively high-fee mutual funds instead of institutional products; (3) the Plan uses

exclusively funds from a single provider (*see* Part IV.B.1, *supra*); and (4) the Plan maintains dozens

more funds than does a properly managed large defined contribution plan (*see* Part IV.B.2, *supra*).

**1.     Peer mega plans pay much lower aggregate plan fees.**

84.     Mega defined contribution plans commonly pay a weighted average total investment

management fee of 25 basis points. Plansponsor, Plansponsor's 2011 DC Survey: Points of Hue.

Here, the Plan paid a weighted average investment managemet fee of approximately 69 basis points

in 2010. Had the Plan paid an average of 30 basis points a year in investment management fees

during the Relevant Period, it would have paid approximately $146.5 million in fees –almost $191

million less than what it actually paid on account of Defendants' self-dealing. The vast majority, if

not all, of the excess fees paid by the Plan and its participants was collected by FMR.

85.     By way of example, a long-time mega-plan client of FMR, Delta Air Lines, Inc.

("Delta") decided to transition from a retirement plan investment option menu consisting largely of

dozens of Fidelity Funds like the ones included in the Plan here (although even in that situation the

Delta plan investment option menu held several non-Fidelity Funds) to Barclays Lifecycle Index

Separately Managed Account Funds as well as various other Institutional Separately Managed Account Funds while maintaining Fidelity as the Plan's recordkeeper. In doing so, the Delta plan achieved significant savings, resulting in total all-in plan fees of approximately 38 basis points per year. The Delta plan's total assets were 36% less than the Plan at issue here, and because it had 21.5% more participants, the Delta plan was more costly to administer than the Plan. Yet the Plan pays approximately almost three times in fees what the Delta plan, which is a current retirement plan client of FMR, pays in plan-related fees.

> **2.** **Peer mega plans have moved away from mutual funds to less expensive commingled and single client investment funds.**

86.     Fidelity established Pyramis in 2005 to compete for pension plan business. Pyramis does not offer mutual funds. Rather, it offers and manages what are called commingled funds, which are substantially similar to mutual funds except that commingled funds are not legally organized in the same way as mutual funds and also carry generally lower fees and costs than those charged by comparable mutual funds. Pyramis also offers separately managed accounts, which are essentially the same as other investment management strategies except that there is only one client, *i.e.*, retirement plan in the fund. Separately managed accounts provide very large clients such as mega plans the opportunity to negotiate still lower fees.

87.     Among other things, according to Robert Reynolds, one-time Fidelity COO, Fidelity established Pyramis to remove the impediments to institutional-style management that accompany mutual funds, such as restraints on portfolio disclosure, "shorting" and other investment management techniques. *See* Virginia Munger Kahn, *Fidelity's Pyramis Gets Serious*, INSTITUTIONAL INVESTOR (July 18, 2008). Another reason for establishing Pyramis is that FMR mutual funds faced competition for institutional business because institutional funds charge fees about half of what mutual funds charge. *See* Aaron Pressman, *Fidelity Trolls for Bigger Fish*, Business Week (Aug. 15,

2005). For example, the median expense ratio of a commingled large-cap growth fund (as reported in 2007) is 56 basis points, whereas the median expense ratio of a similar mutual fund is 93 basis points. Jenna Gottlieb, *Move Over, Mutual Funds, Here Comes Commingled*, PENSION & INVESTMENTS (Oct. 29, 2007). Thus mega defined contribution plans such as those sponsored by International Paper Co. and Verizon Communications Inc., have used exclusively commingled funds rather than mutual funds. *Id.*

88.    Retirement plan consultants have been predicting that large defined contribution plans will replace mutual fund offerings with commingled funds. *See* Jenna Gottlieb, *Move Over, Mutual Funds, Here Comes Commingled*, PENSION & INVESTMENTS (Oct. 29, 2007). According to retirement plan consultants Hewitt Associates LLC and Merrill Lynch Retirement Group, larger defined contribution plans like the Plan have widely replaced mutual funds with commingled funds in their investment option menus for retirees. *Id.* Commingled funds are attractive to those who run large defined contribution plans because large defined contribution retirement plan fiduciaries can more easily negotiate fees and replace poor-performing managers with commingled funds than they can with mutual funds. *Id.*

89.    Indeed, Mark Friebel, a senior vice president with Pyramis, agreed that commingled funds could for this reason eventually displace mutual funds as the core investment option type for large defined contribution retirement plans like the Plan, especially at the "very large end of the market, or the top 200 DC plans." Friebel added, "I think the finance people [at very large defined contribution plans] completely understand the benefits of collective trusts (which include commingled funds). At some plans, the treasury people have more pull." Jenna Gottlieb, *Move Over, Mutual Funds, Here Comes Commingled*, PENSION & INVESTMENTS (Oct. 29, 2007). At FMR, apparently either the "treasury people" have no pull or else the Plan's fiduciaries are hopelessly conflicted. In any event, because of Defendants' aforementioned conflicts of interest, Bilewicz and the Plan paid

25

more in plan-related fees to Defendants than it should have, in violation of ERISA. This ERISA violation directly harmed Bilewicz and the Plan alike.

90.     After Pyramis was founded and within the Relevant Period, Defendants should have considered whether to invest Plan assets in Pyramis funds instead of maintaining Plan assets in more expensive and inferior Fidelity Funds, especially considering that the Plan is a multi-billion dollar retirement trust of the precise sort for which Pyramis products are designed. Fidelity Funds, in contrast, are products designed for the retail investor and the small to medium retirement plan market. Although the Fidelity Funds were successfully bundled with plan recordkeeping and other benefit administration services sold to mega plans in earlier years, mega plans have migrated away from mutual funds, including the Fidelity Funds, in recent years. But moving the Plan to Pyramis Funds would have cost FMR approximately $28 million a year in fees. So Defendants maintained their captive employees' retirement plan in high-fee mutual funds, to the detriment of Bilewicz and the Plan alike.

91.     Further, Pyramis offers separately-managed accounts of the sort described above. Very large plans like the Plan here can use separately-managed accounts to bargain for extremely low fees. Defendants never availed the Plan of this opportunity because every fee reduction that could have been obtained using the separately-managed account approach would mean fee dollars taken out of FMR's pocket.

92.     Although Defendants have been aware of the mega plan movement to institutionally managed investments like Defendants' affiliated Pyramis products, they refused for reasons of self-interest to follow that trend for their own Plan and employees. The Plan would have saved significant sums in fees had it invested in institutional funds offered by Pyramis rather than the high-priced Fidelity Funds offered to the Plan. Specifically, had the Plan been invested in Pyramis funds in 2010 rather than the Fidelity Funds, the weighted average fee for 2010 would have been

26

approximately 35 basis points. This does not account for the opportunity for a mega plan like the Plan to bargain for even lower fees, including for a separately-managed account or accounts. Given the Plan's massive bargaining power, Defendants here likely could have negotiated total plan-related fees of less than 30 basis points. If the Plan had been invested in comparable Vanguard mutual funds, for example, instead of the Fidelity Funds, it could have paid fees estimated at only 26 basis points for the year of 2010.

**E.    Defendants' Breaches Of Duty Caused Losses To The Plan And Its Participants.**

93.    The effect of high retirement plan fees on workers' retirement savings is quite significant. Higher fees not only reduce retirement plan assets but hinder the growth of savings through the opportunity costs of having less to re-invest. Under typical assumptions, the effect of an additional 1% in such fees can reduce the effective life of a retiree's savings balance by ten years.

94.    Figure 1 below illustrates the retirement plan balance of a typical retiree through the working/savings and retirement/spending phases of the retirement portfolio.

Figure 1



95.     Figure 1 depicts the portfolio trajectory for a typical employee invested in a retirement plan. In this example, an individual starts saving at age 25 and continues to participate until age 65. At that time, savings are withdrawn until the balance reaches $0. As illustrated, the effective life of the assets moves from age 88 to age 78 if fees are increased by 1%.[10]

96.     During the proposed class period, the Plan routinely invested in Fidelity Funds that charged Bilewicz and other investors in the Plan investment advisory fees that were higher than those charged by comparable funds. For example, in 2010 the Plan invested more than $50 million in each of 40 different Fidelity Funds (not including a money market fund and a suite of target date funds) ("Representative Fidelity Funds"). Those 40 funds represented approximately 57% of Plan assets. Of those 40 funds, 31 (78%) were in the bottom half of weighted expense ratio ranking –

_____

[10] A note about other assumptions in this analysis: The plan participant in this analysis earns $40 thousand per year and saves 5% annually towards retirement. Inflation is assumed to be 2.5%, which increases salary and annual contributions accordingly. Investment returns are assumed to be 9%, and at retirement in this analysis, the participant withdraws 70% of her projected salary on an inflation adjusted basis.

meaning their managers collected fees higher than 50% of peer group funds on an asset-weighted

basis; 23 (58%) of the 40 funds in question were in the bottom quartile in this regard.[11] (These are

peer mutual funds. Had collective trusts and commingled funds been included in the analysis, the

contrast would have been even starker.)

97.     FMR, its subsidiaries and affiliates, received tens of millions of dollars in annual fees

for investment advisory and related services provided to and paid for by the Plan. FMR, its

subsidiaries and affiliates, collected estimated fees from the Plan of approximately $50.4 million in

2007, $38.8 million in 2008, $51 million in 2009, $59 million in 2010, and $59 million in 2011.

Assuming similar fees in 2012, the Plan has paid FMR, its subsidiaries and affiliates, approximately

$317.4 million in fees during the proposed class period.[12]

98.     The rampant conflicts of interest and breaches of the duty of loyalty described above

violate ERISA and mandate disgorgement of all fees received from the Plan, directly or indirectly, by

FMR during the Relevant Period, even if the Plan and participants did not suffer investment losses.

But the Plan and participants did suffer such losses.

99.     Due to the Fidelity Funds' poor performance and high fees, the Plan has suffered

millions of dollars a year in losses because Defendants failed to remove or replace the Fidelity Funds

as Plan investment options, thereby causing the Plan to invest billions of dollars in the Fidelity

Funds. This directly resulted in millions of dollars of revenue for FMR and improperly low

investment returns for the Plan.

---

[11] Funds that did not have the capacity to absorb large cash investments over $50 million were
excluded from the peer group.
[12] Net Plan Assets Reported on Plan's Annual Form 5500 Filings x 2010 Weighted Plan Expenses
(estimated for entire investment list based on weighted expenses for investments holding more than
$50 million in plan assets and/or that Bilewicz was invested in).

100.     The cumulative damages suffered by the Plan due to its above-described, imprudent investment in Freedom Funds alone is as much as $45 million over the class period, as compared to lower-cost Vanguard target date funds.

101.     During the proposed class period, Fidelity Funds also significantly underperformed relevant benchmarks and comparable funds during the time that they were offered in the Plan. For example, in 2011, 23 (58%) out of 40 Representative Fidelity Funds were in the bottom half of the annual performance peer group ranking, and 11 (28%) were in the bottom quartile. In 2008, those rankings were even starker, 30 (75%) out of 40 Representative Fidelity Funds were in the bottom half of the annual performance peer group ranking, and 20 (50%) were in the bottom quartile.

## V. ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS

102.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. ERISA § 404(a), 29 U.S.C.§ 1104(a), states, in relevant part, that:

> [A] Fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —
>
> (A)     For the exclusive purpose of
>
>> (i)     Providing benefits to participants and their beneficiaries; and
>>
>> (ii)     Defraying reasonable expenses of administering the plan;
>
> (B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)     By diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D)     In accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

103.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. ERISA § 405, 29

U.S.C. § 1105, states, in relevant part, that:

> In addition to any liability which he may have under any other provision of
> this part, a fiduciary with respect to a plan shall be liable for a breach of
> fiduciary responsibility of another fiduciary with respect to the same plan in
> the following circumstances:
>
> (1)     If he participates knowingly in, or knowingly undertakes to conceal,
>         an act or omission of such other fiduciary, knowing such act or
>         omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(1) in the
>         administration of his specific responsibilities which give rise to his
>         status as a fiduciary, he has enabled such other fiduciary to commit a
>         breach; or
>
> (3)     If he has knowledge of a breach by such other fiduciary, unless he
>         makes reasonable efforts under the circumstances to remedy the
>         breach.

104.     Under ERISA, fiduciaries that exercise discretionary authority or control over the

selection of plan investments and the selection of plan service providers must act prudently and

solely in the interest of participants in the plan when selecting investments and retaining service

providers. Thus, "the duty to conduct an independent investigation into the merits of a particular

investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan

Litig.*, 74 F.3d 420, 435 (3d Cir. 1996). As the Department of Labor explains,

> [T]o act prudently, a plan fiduciary must consider, among other factors, the
> availability, riskiness, and potential return of alternative investments for his or her
> plan. [Where an investment], if implemented, causes the Plan to forego other
> investment opportunities, such investments would not be prudent if they provided a
> plan with less return, in comparison to risk, than comparable investments available
> to the plan, or if they involved a greater risk to the security of plan assets than other
> investments offering a similar return.

DoL Ad. Op. No. 88-16A.

105.     Pursuant to these duties, fiduciaries must ensure that the services provided to the

plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries both in deciding … which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable … .

DoL Ad. Op. 97-15A; DoL Ad. Op. 97-16A

106.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan

participants and beneficiaries. As the Department of Labor has repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

DoL Ad. Op. No. 98-04A; DoL Ad. Op. No. 88-16A.

107.     The Department of Labor counsels that fiduciaries are responsible for ensuring that

a plan pays reasonable fees and expenses and that fiduciaries need to carefully evaluate differences in

fees and services between prospective service providers:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.
>
> In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not. Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement. Others charge separately for individual services. Compare all services to be provided with the total cost for each provider. Consider whether the estimate includes services you did not specify or want. Remember, all services have costs.
>
> Some service providers may receive additional fees from investment vehicles, such as mutual funds, that may be offered under an employer's plan. For example, mutual funds often charge fees to pay brokers and other salespersons for promoting the

32

fund and providing other services. There also may be sales and other related charges for investments offered by a service provider. Employers should ask prospective providers for a detailed explanation of all fees associated with their investment options.

*Meeting Your Fiduciary Responsibilities* (May 2004) (available at

http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html) (last viewed March 14,

2013).

In a separate publication, the Department of Labor writes:

> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.
>
> * * *
>
> By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

*Understanding Retirement Plan Fees and Expenses* (May 2004) (available at

http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.)

108.    A fiduciary's duty of loyalty and prudence require it to disregard plan documents or

directives that it knows or reasonably should know would lead to an imprudent result, or would

otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an

imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by plan documents to do so.

109.    ERISA prohibits certain transactions with Plans involving parties in interest and fiduciaries because of their significant potential for and risk of abuse. Specifically, ERISA § 406 provides as follows:

(a) Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) Sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) Lending of money or other extension of credit between the plan and a party in interest;

(C) Furnishing of goods, services, or facilities between the plan and a party in interest;

(D) Transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) Acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107 (a) of this title.

(b) Transactions between plan and fiduciary.

A fiduciary with respect to a plan shall not—

(1) Deal with the assets of the plan in his own interest or for his own account,

34

(2) In his individual or in any other capacity act in any transaction
involving the plan on behalf of a party (or represent a party) whose
interests are adverse to the interests of the plan or the interests of its
participants or beneficiaries, or

(3) Receive any consideration for his own personal account from any party
dealing with such plan in connection with a transaction involving the assets
of the plan.

## VI. <u>CLASS ALLEGATIONS</u>

110.    Bilewicz brings this action on behalf of a class defined as:

All participants in the FMR LLC Profit Sharing Plan who invested in any
mutual fund established by FMR LLC or any of its subsidiaries and
affiliates in the Plan from March 20, 2007 to the present. Excluded from
the class are Defendants, Defendants' beneficiaries, and Defendants'
immediate families.

111.    Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or

(b)(3).

112.    The class satisfies the numerosity requirement because it is composed of thousands

of persons, in numerous locations. The Plan has approximately 56,000 participants and/or

beneficiaries, all of which invested in at least one of the Fidelity Funds during the Relevant Time

Period. The number of class members is so large that joinder of all its members is impracticable.

113.    Common questions of law and fact include:

A.    Whether Defendants caused the Plan to offer mutual funds established or

managed by FMR and/or its subsidiaries and affiliates;

B.    Whether Defendants were fiduciaries responsible for monitoring and making

decisions with respect to the investments in the Plan;

C.    Whether Defendants breached their fiduciary duties to the Plan by causing

the Plan to invest its assets in mutual funds offered or managed by FMR

and/or its subsidiaries and affiliates;

35

    D.  Whether the investment decisions made by Defendants were solely in the interests of Plan participants and beneficiaries of the Plan.

    E.  Whether the Plan suffered losses as a result of Defendants' fiduciary breaches.

114.    Bilewicz's claims are typical of the claims of the Class. She has no interests that are antagonistic to the claims of the Class. Bilewicz understands that this matter cannot be settled without the Court's approval. She is not aware of another suit pending against Defendants arising from the same circumstances.

115.    Bilewicz will fairly and adequately protect the interests of the Class. She is committed to the vigorous representation of the Class. Bilewicz's counsel are experienced in class action and ERISA litigation.

116.    A class action is the superior method for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable. The losses suffered by some of the individual members of the Class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights. Moreover, Defendants, as fiduciaries of the Plan, were obligated to treat all Class members similarly as Plan participants pursuant to written plan documents and ERISA, which impose uniform standards of conduct on fiduciaries. Individual proceedings, therefore, would pose the risk of inconsistent adjudications. Bilewicz is unaware of any difficulty in the management of this action as a class action.

117.    This Class may be certified under Rule 23(b).

    A.    23(b)(1). As an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action. Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the

36

Class that would establish incompatible standards of conduct for the defendants opposing the Class, or (B) adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B. 23(b)(2). This action is suitable as a class action under 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class.

C. 23(b)(3). This action is suitable to proceed as a class action under 23(b)(3) because questions of law and fact common to the members of the Class predominate over individual questions, and this class action is superior to other available methods for the fair and efficient adjudication of this controversy. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Bilewicz is aware of no difficulties likely to be encountered in the management of this matter as a class action.

## VII. CLAIMS FOR RELIEF

### COUNT I

**Breach of Duty of Loyalty**
**(Violation of § 404(a)(1)(A) of ERISA)**

118. Bilewicz repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

119. Defendants are bound by ERISA's duty of undivided loyalty.

120. Any form of self-dealing is a clear breach of the duty of undivided loyalty.

121. ERISA § 404(a)(1) requires that in discharging his or her fiduciary duties, a

37

fiduciary act with an "eye single" to the interests of the plan's participants and beneficiaries.

122.    Defendants violated their duties of undivided loyalty to the Plan in three ways.

123.    First, Defendants violated the duty of loyalty by causing the Plan to invest exclusively in Fidelity Funds. It is completely implausible that a retirement plan investment option menu comprised of over 160 funds from a single fund family resulted from an unconflicted due diligence process.

124.    Second, Defendants violated the duty of loyalty by failing to remove or replace poorly performing and heavily fee-laden Fidelity Funds from the Plan's investment options menu.

125.    Third, Defendants violated the duty of loyalty by using Plan assets to seed new Fidelity Funds – a strategy that directly benefited Defendants while, as explained above, it directly harmed Bilewicz and the Plan.

126.    In taking the above actions, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the Plan and for the exclusive purpose of providing benefits to Plan participants and their beneficiaries and defraying reasonable expenses of administering the Plan. Instead, Defendants acted for the purpose of benefitting FMR through the revenues out of the Plan provided to FMR subsidiaries.

127.    Defendants therefore breached their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

128.    As a direct and proximate result of these breaches, the Plan and class members lost millions of dollars in the form of higher fees and lower returns on their investments than they would have otherwise experienced.

129.    Pursuant to ERISA § 502(a) (2) and 409(a), 29 U.S.C. § 1132(a) (2) and 29 U.S.C. § 1109(a), the Defendants are liable to disgorge all fees received from the Plan, directly or indirectly,

and profits thereon, and restore all losses suffered by the Plan caused by their breaches of the duty of loyalty.

**COUNT II**

**Prohibited Transactions**
**(Violation of § 406 of ERISA, 29 U.S.C. § 1106)**

130.     Bilewicz repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

131.     Count II is alleged only with respect to Fidelity Funds added to the Plan within the Relevant Period. Defendants caused the Plan to add Fidelity Funds during the Relevant Period as investment options when they knew or should have known those transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation and a transfer of assets of the Plan to a party in interest.

132.     As Plan sponsor, FMR, and its subsidiaries, are parties in interest.

133.     As detailed above, Defendants added multiple Fidelity Funds to the Plan during the Relevant Period, thus causing the Plan to engage in multiple prohibited transactions.

134.     As a direct and proximate result of these prohibited transaction violations, the Plan, paid millions of dollars in unjustifiably high investment management and other fees that were prohibited by ERISA and suffered millions of dollars in losses thereby.

135.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received by FMR and its subsidiaries from the fees paid by the Plan to FMR and its subsidiaries and as well as appropriate equitable relief.

**VIII. DEMAND FOR JURY TRIAL**

136.     Bilewicz demands a jury trial on all claims so triable.

39

## IX. **PRAYER FOR RELIEF**

WHEREFORE, Bilewicz prays for relief as follows:

1.     A declaration that the Defendants breached their fiduciary duty of loyalty under ERISA;

2.     A declaration that the Defendants violated ERISA § 406 and participated in prohibited transactions;

3.     An order compelling the disgorgement of all investment advisory fees paid and incurred, directly or indirectly, to FMR subsidiaries and affiliates by the Plan, including disgorgement of profits thereon;

4.     An order compelling the Defendants to restore all losses to the Plan arising from Defendants' violations of ERISA;

5.     An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

6.     Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's investments in Fidelity Funds;

7.     An order certifying this action as a class action, designating the Class to receive the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent required by law;

8.     An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

9.     An order awarding Bilewicz and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

40

10.     An order awarding such other and further relief as the Court deems equitable and just.

Dated: March 19, 2013

Respectfully submitted,

/S/ John Roddy
John Roddy, BBO No. 424240
Elizabeth Ryan, BBO No. 549632
BAILEY & GLASSER LLP
125 Summer Street
Suite 1030
Boston, MA 02110
Tel: (617) 439-6730
Fax: (617) 951-3954

Garrett W. Wotkyns
Michael C. McKay
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
8501 North Scottsdale Rd., Suite 270
Scottsdale, AZ 85253
Tel: (480) 428-0142
Fax: (866) 505-8036

Peter Mougey
Laura Dunning
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7121
Fax: (850) 436-6147

Gregory Y. Porter
Gabriel Siegle
BAILEY & GLASSER LLP
910 17th Street, NW
Suite 800
Washington, DC 20006
Tel: (202) 463-2101
Fax: (202) 463-2103

Joseph C. Peiffer, Esq.
Daniel Carr
FISHMAN HAYGOOD PHELPS
WALMSLEY WILLIS & SWANSON
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170-4600
Tel: (504) 586-5259
Fax: (504) 586-5250

*Attorneys for Plaintiff Bilewicz*