UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

LORI BILEWICZ, JASON ARCELAY, )
HASSAN BAAMI, VIRGINIA G. CHERRY, )
CAROL A. CORNER-DOLLOFF, KEVIN )
DESROSIERS, PAUL DINICOLA, ROBERT )
DUGDALE, MARK EVANGELISTA, )
DOMINIC FARINELLA, JOSEPH E. )
FRIEND, ELIZABETH CATHE HARRIS, )
AJUA CYNTHIA JOHNSON, MICHAEL W. )
JONES, KEVIN M. JUDD, SR., ROBERT )
MASSOUD, JASON MORA, JOSEPH L. )
OTERO, PAULA M. PARRISH, DEBORAH )
PONTES, JANET C. PRIFTI, HEATH )  Civil Action No. 13-10636-DJC
RACINE, DARREN J. RILLOVICK, MARY )
J. RUSIECKI, KRISTA SCHEPANOVSKY, )  **ORAL ARGUMENT REQUESTED**
ROBERT VISCONTI, JACQUELINE M. )
WHEELER, and all others similarly situated, )
 )
   Plaintiffs, )
 )
  v. )
 )
 )
FMR LLC, FMR LLC INVESTMENT )
COMMITTEE, and John and Jane Does 1-25, )
 )
   Defendants. )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION
COMPLAINT**

James O. Fleckner (BBO # 641494)
Joseph F. Savage, Jr. (BBO # 443030)
Alison V. Douglass (BBO # 646861)
Abigail K. Hemani (BBO # 650721)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts  02109
Tel.:  617.570.1000

Attorneys for Defendants

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND .................................................................................................4

    I.      Fidelity's Successful and Generous Plan.................................................................4

    II.     The FAC's Allegations .........................................................................................7

ARGUMENT ..........................................................................................................................8

    I.      The FAC Should Be Dismissed Because Plaintiffs' Claims Are Time-
          Barred.........................................................................................................................8

          A.     Count I of the FAC Is Barred by ERISA's Six-Year Statute of
                    Repose............................................................................................... 8

          B.     Counts I and II of the FAC Are Barred by ERISA's Three-Year
                    Statute of Limitations....................................................................... 11

    II.     Count I of the FAC Should Be Dismissed Because It Fails To State a
          Claim for Breach of the Duty of Loyalty...............................................................13

          A.     The Allegation that the Plan Invested Exclusively in Fidelity Funds
                    Does Not Support an Inference of Disloyalty........................................... 15

          B.     The Allegation that the Plan Offered Participants a Broad Choice
                    of Fidelity Investment Options Does Not Support an Inference of
                    Disloyalty. ................................................................................................ 17

          C.     The Allegation that Defendants Failed To Remove or Replace
                    "Poorly Performing" or "Fee-Laden" Funds Does Not Support an
                    Inference of Disloyalty. .......................................................................... 22

          D.     The Allegation that Defendants Used the Plan To "Seed" New
                    Funds Does Not Support an Inference of Disloyalty. .............................. 25

    III.    Count II of the FAC Should Be Dismissed Because It Fails To State a
          Prohibited Transaction Claim. ................................................................................27

    IV.    FMR Should Be Dismissed Because the FAC Does Not Plead that It Was
          a Fiduciary with Respect to Investment Selection..................................................30

    V.     Plaintiffs Lack Constitutional Standing To Bring Claims Concerning
          Funds in which They Did Not Invest......................................................................32

CONCLUSION.....................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Air Sunshine, Inc. v. Carl,*
    663 F.3d 27 (1st Cir. 2011) ............................................................................. 13-14

*Alves v. Harvard Pilgrim Health Care Inc.,*
    204 F. Supp. 2d 198 (D. Mass. 2002) ....................................................................17

*Animal Welfare Inst. v. Martin,*
    623 F.3d 19 (1st Cir. 2010) ...................................................................................32

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................... 3, 13-15, 17, 25, 27

*Beddall v. State Street Bank and Trust Co.,*
    137 F.3d 12 (1st Cir. 1998) .....................................................................................4

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..............................................................................................13

*Bingham v. Mass.,*
    616 F.3d 1 (1st Cir. 2010) ......................................................................................32

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) ..............................................................................................32

*Charlton Mem. Hosp. v. Foxboro Co.,*
    818 F. Supp. 456 (D. Mass. 1993) ........................................................................35

*Conkright v. Frommert,*
    130 S. Ct. 1640 (2010) ............................................................................. 4, 8, 14-15

*David v. Alphin,*
    704 F.3d 327 (4th Cir. 2013) .............................................................................. 8-10

*David v. Alphin,*
    817 F. Supp. 2d 764 (W.D.N.C. 2011) .............................................................. 33-34

*DiFelice v. U.S. Airways, Inc.,*
    397 F. Supp. 2d 758 (E.D. Va. 2005) ................................................................ 18-19, 31

*Dupree v. The Prudential Ins. Co. of Am.,*
    No. 99-8837, 2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) .........................................16, 25, 31

*Edes v. Verizon Commc'ns, Inc.,*
   417 F.3d 133 (1st Cir. 2005) ........................................................................8, 11

*Forsythe v. Sun Life Fin., Inc.,*
   417 F. Supp. 2d 100 (D. Mass. 2006) .................................................................33

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.,*
   493 U.S. 331 (1990) ...........................................................................................32

*Fuller v. SunTrust Banks, Inc.,*
   Civ. A. No. 11-cv-784, 2012 WL 1432306 (N.D. Ga. Mar. 20, 2012) ............ 33-34

*Goldenberg v. Indel, Inc.,*
   741 F. Supp. 2d 618 (D.N.J. 2010) .....................................................................29

*Hecker v. Deere & Co.,*
   556 F.3d 575 (7th Cir. 2009) .................................................. 16-20, 24, 29

*Hunter v. Caliber Sys., Inc.,*
   220 F.3d 702 (6th Cir. 2000) ..............................................................................14

*In re Lernout & Hauspie Sec. Litig.,*
   286 B.R. 33 (D. Mass. 2002) ................................................................................4

*In re Nexium Antitrust Litig.,*
   No. 12-md-02409, 2013 WL 4832176 (D. Mass. Sept. 11, 2013) ........................34

*In re Pharm. Industry Average Wholesale Price Litig.,*
   307 F. Supp. 2d 196 (D. Mass. 2004) ..................................................................27

*In re Polaroid ERISA Litig.,*
   362 F. Supp. 2d 461 (S.D.N.Y. 2005) ..................................................................31

*Leber v. Citigroup, Inc.,*
   No. 07 Civ. 9329, 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) ......................22, 30

*Lewis v. Casey,*
   518 U.S. 343 (1996) ...........................................................................................34

*Lockheed Corp. v. Spink,*
   517 U.S. 882 (1996) ......................................................................................17, 31

*Loomis v. Exelon Corp.,*
   658 F.3d 667 (7th Cir. 2011) ...................................................... 18-21, 24

*Mehling v. N.Y. Life Ins. Co.,*
   163 F. Supp. 2d 502 (E.D. Pa. 2011) ...................................................................30

iii

*Merriam v. Demoulas Super Markets, Inc.*,
    Civ. A. No. 11-10577, 2012 WL 931347 (D. Mass. Mar. 20, 2012)......................................32

*Moench v. Robertson*,
    62 F.3d 553 (3d Cir. 1995)......................................................................................................14

*Pegram v. Herdrich*,
    530 U.S. 211 (2000)............................................................................................................ 30-31

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    632 F.3d 762 (1st Cir. 2011)............................................................................................. 32-35

*Rederford v. U.S. Airways, Inc.*,
    589 F.3d 30 (1st Cir. 2009).....................................................................................................13

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011).................................................................16-18, 20, 24-25, 31

*Schatz v. Republican State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012).....................................................................................................22

*Stargel v. Suntrust Banks, Inc.*,
    --- F. Supp. 2d ----, 2013 WL 4775918 (N.D. Ga. Aug. 7, 2013)...................................... 9-10

*Stegall v. Ladner*,
    394 F. Supp. 2d 358 (D. Mass. 2005) ....................................................................................33

*Taylor v. United Techs. Corp.*,
    No. 3:06-cv-1494, 2009 WL 535779 (D. Conn. Mar. 3, 2009) .............................................24

*Tibble v. Edison Int'l*,
    --- F.3d ----, 2013 WL 3947717 (9th Cir. Aug. 1, 2013).........................................9-10, 18-21

*Tibble v. Edison Int'l*,
    711 F.3d 1061 (9th Cir. 2013) .................................................................................................9

*Tibble v. Edison Int'l*,
    No. CV 07-5359, 2010 WL 2757153 (C.D. Cal. July 8, 2010) .............................................14

*Town of Norwood v. New England Power Co.*,
    23 F. Supp. 2d 109 (D. Mass. 1998) ........................................................................................4

*Tracinda Corp. v. DaimlerChrysler AG*,
    502 F.3d 212 (3d Cir. 2007)....................................................................................................35

*Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*,
    524 F.3d 315 (1st Cir. 2008)....................................................................................................8

*Warth v. Seldin*,
    422 U.S. 490 (1975)..................................................................................32

*Winter v. Chase Bank*,
    Civ. A. No. 12-10109, 2013 WL 980607 (D. Mass. Mar. 12, 2013)......................................13

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    550 F. Supp. 2d 416 (S.D.N.Y. 2008).............................................................. 11-12

STATUTES

15 U.S.C. § 80a-15(a) ......................................................................................29

15 U.S.C. § 80a-15(c) ......................................................................................29

15 U.S.C. § 80a-35(b) ......................................................................................29

26 U.S.C. § 401(m)(2) .......................................................................................5

26 U.S.C. § 415(c)(1)(A) ....................................................................................5

29 U.S.C. § 1002(14)(A) (ERISA § 3(14)(A)) ..............................................................28

29 U.S.C. § 1002(21)(B) (ERISA § 3(21)(B)) ..............................................................28

29 U.S.C. § 1101(b)(1) (ERISA § 401(b)(1)) ..............................................................29

29 U.S.C. § 1104 (ERISA § 404)...........................................................................14

29 U.S.C. § 1104(a)(1)(A) (ERISA § 404(a)(1)(A)) ........................................................14

29 U.S.C. § 1104(a)(1)(D) (ERISA § 404(a)(1)(D)) ........................................................17

29 U.S.C. § 1106 (ERISA § 406)........................................................................28-29

29 U.S.C. § 1106(a) (ERISA § 406(a))..............................................................8, 27-28

29 U.S.C. § 1106(a)(1)(C) (ERISA § 406(a)(1)(C)).........................................................28

29 U.S.C. § 1106(a)(1)(D) (ERISA § 406(a)(1)(D)) ........................................................28

29 U.S.C. § 1108(a) (ERISA § 408(a)).....................................................................28

29 U.S.C. § 1108(b)(2) (ERISA § 408(b)(2)) ..............................................................28

29 U.S.C. § 1108(b)(5) (ERISA § 408(b)(5)) ..............................................................15

29 U.S.C. § 1108(b)(8) (ERISA § 408(b)(8)) ..............................................................15

29 U.S.C. § 1109(a) (ERISA § 409(a)).....................................................................30

29 U.S.C. § 1113(1) (ERISA § 413(1)) .....................................................................8

29 U.S.C. § 1113(2) (ERISA § 413(2)) ...................................................................11

OTHER AUTHORITIES

Cerulli Associates Quantitative Update Retirement Markets 2012 Survey as of Dec. 31,
    2011......................................................................................................................1

Class Exemption Involving Mutual Fund In-House Plans Requested by the Investment
    Company Institute, 42 Fed. Reg. 18734 (Mar. 31, 1977)..................................16, 29

Department of Labor, What You Should Know About Your Retirement Plan, *available at*
    http://www.dol.gov/ebsa/publications/wyskapr.html .................................................4

Department of Labor, Meeting Your Fiduciary Responsibilities, *available at*
    http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.......................20

Fed. R. Civ. P. 12(b)(1).........................................................................................1, 32

Fed. R. Civ. P. 12(b)(6)...................................................................... 1, 4, 8-9, 13, 32

H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974), *reprinted in* 1974 U.S.C.C.A.N. 5038...............15

CLIFFORD E. KIRSCH, 1 MUTUAL FUNDS AND EXCHANGE TRADED FUNDS REGULATION
    (3d ed. 2011) ........................................................................................................21

Notice of Proposed Rule-Making, Participant Directed Individual Account Plans, 56 Fed.
    Reg. 10724, 10730 (Mar. 13, 1991)....................................................................2, 15

Pensions & Investments' Annual Defined Contribution Money Manager Survey as of
    Dec. 31, 2011 .........................................................................................................1

Russell Investments, *Seven Attributes of an Excellent Defined Contribution Plan*
    (Feb. 2012).............................................................................................................7

United States Bureau of Labor Statistics, Bulletin 2589, Table 71, *available at*
    http://www.bls.gov/ncs/ebs/benefits/2008/home.htm..............................................5

Defendants FMR LLC ("FMR") and FMR LLC Investment Committee (the "Investment Committee" or "Committee") (collectively, "Defendants," and collectively or individually, as the context requires, "Fidelity") submit this Memorandum in Support of Their Motion To Dismiss Plaintiffs' First Amended Class Action Complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## **INTRODUCTION**

The First Amended Class Action Complaint ("FAC") should be dismissed because it fails to state a claim that Fidelity violated the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Plaintiffs, who are current and former participants in Fidelity's 401(k) plan, the FMR LLC Profit Sharing Plan (the "Plan"), claim that Defendants acted disloyally and engaged in transactions prohibited by ERISA by offering a wide range of Fidelity-managed mutual funds—and only Fidelity funds—as investment options under the Plan. In essence, the FAC asserts that Defendants' motive for this longstanding practice was to enrich Fidelity by increasing its mutual fund advisory fees. But the FAC pleads no facts that can sustain a charge of fiduciary disloyalty.

Fidelity is the world's largest manager of retirement assets.[1] Its mutual funds are widely utilized in hundreds of thousands of unaffiliated 401(k) plans.[2] There is no reason why Fidelity's Plan could not—or would not—do the same. Indeed, the United States Department of Labor ("DOL") has expressly authorized financial services company plans to invest in mutual funds affiliated with the sponsoring employer; according to the DOL, it would be "contrary to normal

---

[1] *See, e.g.,* Pensions & Investments' Annual Defined Contribution Money Manager Survey as of Dec. 31, 2011 ("P&I Survey"), *cited at* Fidelity Overview, http://www.fidelity.com/inside-fidelity/about-fidelity/overview (last visited Sept. 27, 2013); Cerulli Associates Quantitative Update Retirement Markets 2012 Survey as of Dec. 31, 2011 ("Cerulli Survey"), *cited at* Fidelity Overview, http://www.fidelity.com/inside-fidelity/about-fidelity/overview (last visited Sept. 27, 2013).

[2] *See* FAC ¶ 36.

business practice for a company whose business is financial management to seek financial management services from a competitor."[3]  It is thus implausible to suggest that offering an all-Fidelity lineup of funds violates ERISA.

Given Fidelity's breadth of product offerings, the Plan is able to provide participants with a full spectrum of high quality mutual funds in which to invest.  The Plan's "investment lineup" includes funds in many different asset classes, with a wide variety of risk profiles and a range of fee structures, including numerous funds with fees far below the level that even the FAC acknowledges to be appropriate.  Not surprisingly, two separate Courts of Appeals have endorsed very similar lineups offered by plan sponsors unaffiliated with Fidelity, affirming the dismissal at the pleading stage of complaints charging that defendants breached their fiduciary duties by offering a large range of Fidelity mutual funds.  Further, given Fidelity's business, one would expect that many of its employees desire a broad range of choices and welcome the ability to construct their own mix of investments from a diverse lineup.  And for those participants with less investment experience, the Plan offers *free* professional investment advisory services.  The decision to offer Fidelity's employees a wide range of options, including the option to have an expert choose investments for them free of charge, provides no basis for Plaintiffs' claim of disloyalty.

Fidelity went above and beyond its obligations to its employees and the Plan in other ways as well.  The public record—ignored by the FAC—demonstrates that Fidelity contributed over *$2.1 billion* of its *own money* to the accounts of Plan participants between 2007 and 2011.  Those employer contributions significantly exceeded the amounts contributed to the Plan by employees, and far surpass the level of employer contributions made by most companies that

---

[3] Notice of Proposed Rule-Making, Participant Directed Individual Account Plans, 56 Fed. Reg. 10724, 10730 (Mar. 13, 1991) (discussing Prohibited Transaction Exemption 77-3).

sponsor 401(k) plans.  Indeed, Fidelity's contributions to the Plan between 2007 and 2011 are approximately *ten times* greater than the amount of "excess" fees that the FAC claims Fidelity received from the Plan.  Because no company would contribute such sums if its intensions vis-à-vis the plan were motivated by financial gain, the FAC's central thesis defies common sense.

Instead, there is an "obvious alternative explanation" for the challenged conduct, *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009):  The Plan offered a broad, diverse investment lineup of Fidelity funds in order to help participants achieve their individualized retirement goals and objectives.  Because the factual allegations do not give rise to any plausible inference of disloyal conduct in the face of such an "obvious alternative," *see id.*, the FAC should be dismissed.

In addition, the FAC suffers from numerous other fatal defects:

- Plaintiffs' claims are barred by ERISA's six-year statute of repose, given the FAC's express allegation that Defendants made the decision to offer a wide array of Fidelity funds more than six years ago.

- Plaintiffs' claims are barred by ERISA's three-year statute of limitations because the only facts that are alleged in the FAC were, without dispute, made available to Plaintiffs more than three years ago.

- Plaintiffs cannot establish a prohibited transaction under ERISA because the conduct complained of—investment in mutual funds advised by Fidelity affiliates—is expressly permitted by the DOL.

- As to defendant FMR, the FAC fails to allege the requisite ERISA fiduciary status.

- Plaintiffs lack standing to sue with respect to funds in which they never invested because they have not pleaded, and could not plead, any personalized injury with respect to those funds.

In light of this multitude of defects, the Court should grant Defendants' motion to dismiss the FAC in its entirety.  Where, as here, a plan lineup appears reasonable on its face, courts do not allow fishing expeditions into the plan fiduciaries' subjective intent or "battles of the experts" regarding whether some hypothetical alternative lineup might have been preferable.

The "guiding principles underlying ERISA" reflect a "'careful balancing' between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Conkright v. Frommert*, 130 S. Ct. 1640, 1643 (2010).  ERISA's "interests in efficiency, predictability, and uniformity" are disserved by "costly litigation" aimed at having courts scrutinize fiduciary decisions that are, on their face, entirely reasonable.  *Id.* at 1643, 1649.

## FACTUAL BACKGROUND[4]

### I.   Fidelity's Successful and Generous Plan

Fidelity is a broadly-diversified financial services company.  As of December 2012, it administered approximately $3.7 trillion in assets, and it provided investment management services for approximately $1.6 trillion in invested assets.  FAC ¶ 36.  Approximately $1 trillion of those assets are managed through retirement plans.[5]  Fidelity manages these assets, and services these retirement plans and other clients, through a workforce of over 40,000 employees, ranging from those who answer customer calls to sophisticated portfolio managers.[6]  Among the benefits Fidelity makes available to its workforce is a 401(k) profit sharing plan, the Plan.  As the "sponsor" or "settlor" of the Plan, FMR designed the Plan to allow participating employees

---

[4] In ruling on a Rule 12(b)(6) motion to dismiss, courts routinely consider ERISA plan documents—even if not expressly referenced in the complaint—as well as public filings containing pertinent information.  *See, e.g.*, *Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 16-17 (1st Cir. 1998); *In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 37 (D. Mass. 2002); *Town of Norwood v. New England Power Co.*, 23 F. Supp. 2d 109, 112 (D. Mass. 1998), *rev'd on other grounds,* 202 F. 3d 408 (1st Cir. 2000).

[5] There are two primary types of employer-sponsored retirement plans, defined benefit plans and defined contribution plans.  As explained by the DOL: "A defined benefit plan, funded by the employer, promises you a specific monthly benefit at retirement," whereas a "defined contribution plan . . . does not promise you a specific benefit amount at retirement.  Instead, you and/or your employer contribute money to your individual account in the plan. . . .  The value of your account depends on how much is contributed and how well the investments perform."  Department of Labor, What You Should Know About Your Retirement Plan, *available at* http://www.dol.gov/ebsa/publications/wyskapr.html.  "The 401(k) plan is a popular type of defined contribution plan."  *Id.*

[6] *See* Fidelity Investments Corporate Fact Sheet, http://www.fidelity.com/inside-fidelity/fidelity-facts/fidelity-corporate-fact-sheet (last visited Sept. 27, 2013).

to "share in [Fidelity's] profits" and "to save and invest funds for their retirement."[7]

Participating employees can elect how much, if any, of their salary to contribute to the Plan.  In addition, Fidelity makes contributions to eligible employees' accounts in the form of both matching contributions and profit-sharing contributions.  Fidelity's contributions to the Plan are exceptionally generous.  Fidelity has traditionally made annual profit-sharing contributions of at least 10% of each eligible employee's total compensation.[8]  Additionally, Fidelity matches eligible employee contributions to the Plan, dollar for dollar, up to 7% of each eligible participant's compensation—a level of match enjoyed by only approximately 2% of 401(k) plan participants nationwide.[9]  In total, Fidelity contributed approximately $2.175 billion to the Plan from 2007 through 2011—averaging over $430 million per year.[10]

Not surprisingly, the Plan is very popular with Fidelity employees:  Between 2007 and 2011, employees contributed over $1.37 billion of their salaries to the Plan and rolled over more than $100 million *into* the Plan from 401(k) plans offered by prior employers.[11]  Further, although participants who have left Fidelity's employ may withdraw their Plan account balances

---

[7] *See* FMR Corp. Profit Sharing Plan Document, as amended (2005 Restatement) ("Plan Document") at FID-LB-MTD2-00001A, § 1.2, attached as Exhibit 1 to the Declaration of Abigail K. Hemani ("Hemani Decl.").

[8] *See* Plan Document at FID-LB-MTD2-00003, § 5.1(c), Hemani Decl. Ex. 1.

[9] *See* 2011 FMR LLC Profit Sharing Plan Form 5500 (Oct. 15, 2012) ("2011 Form 5500") at FID-LB-MTD2-00008, Hemani Decl. Ex. 2; United States Bureau of Labor Statistics, Bulletin 2589, Table 71, *available at* http://www.bls.gov/ncs/ebs/benefits/2008/home.htm.  For certain highly-compensated employees, Fidelity's profit-sharing and matching contributions may be limited by tax laws.  *See, e.g.*, 26 U.S.C. §§ 401(m)(2), 415(c)(1)(A).

[10] *See* 2007 FMR LLC Profit Sharing Plan Form 5500 (Oct. 15, 2008) ("2007 Form 5500") at FID-LB-MTD2-00015, Hemani Decl. Ex. 3; 2008 FMR LLC Profit Sharing Plan Form 5500 (Oct. 15, 2009) ("2008 Form 5500") at FID-LB-MTD2-00022, Hemani Decl. Ex. 4; 2009 FMR LLC Profit Sharing Plan Form 5500 (Oct. 15, 2010) ("2009 Form 5500") at FID-LB-MTD2-00030, Hemani Decl. Ex. 5; 2010 FMR LLC Profit Sharing Plan Form 5500 (Oct. 15, 2011) ("2010 Form 5500") at FID-LB-MTD2-00043, Hemani Decl. Ex. 6; 2011 Form 5500 at FID-LB-MTD2-00007, Hemani Decl. Ex. 2.  The Form 5500 for 2012 is not yet available.

[11] 2007 Form 5500 at FID-LB-MTD2-00015, Hemani Decl. Ex. 3; 2008 Form 5500 at FID-LB-MTD2-00022-00023, Hemani Decl. Ex. 4; 2009 Form 5500 at FID-LB-MTD2-00030-00031, Hemani Decl. Ex. 5; 2010 Form 5500 at FID-LB-MTD2-00043-00044, Hemani Decl. Ex. 6; 2011 Form 5500 at FID-LB-MTD2-00007, FID-LB-MTD2-00009, Hemani Decl. Ex. 2.

and roll them over to another retirement arrangement, as of the end of December 2011, over

14,000 of those retired or separated participants had decided to retain their assets in the Plan.[12]

      The Plan is entirely participant-directed, meaning that each participant can allocate the

employee and employer contributions in her Plan account into any investment option in the

lineup that has been made available under the Plan.  These options include a broad array of more

than 160 "retail" mutual funds advised by Fidelity affiliates.[13]  The use of Fidelity's mutual

funds is specified in the governing document ("Plan Document").[14]  The Fidelity mutual funds

that are made available include both index funds (*i.e.*, funds that are designed to track the

performance of a specified index) and actively-managed funds (*i.e.*, funds with advisors who use

their expertise to attempt to beat the fund's benchmark); funds that invest in a full range of asset

categories, including stocks, bonds, commodities, and treasury notes; domestic and international

funds; funds that carry different levels of risk and potential reward; and funds that have a range

of investment management fees, including ten funds with fees of 25 basis points (0.25% of the

assets invested) or less per year.[15]

      Fidelity also offers several different programs for participants who desire assistance with

fund selection.  For example, Fidelity offers online financial planning tools to assist participants

---

[12] *See* FAC ¶ 47 (noting that the Plan had 55,862 participants as of Decembers 31, 2011); Fidelity Corporate Fact Sheet, http://www.fidelity.com/inside-fidelity/fidelity-facts/fidelity-corporate-fact-sheet (last visited Sept. 27, 2013) (noting that Fidelity has approximately 41,000 employees).

[13] *See* FAC ¶ 59.  All of the mutual funds offered by Fidelity to the Plan are "retail," in that they are registered for public sale.  As the FAC effectively concedes, Fidelity offers Plan participants the least expensive share class available for each retail fund.  *See* note 32, *infra*.  In addition, during the Relevant Period the Plan has always offered at least one collective investment trust managed by Fidelity's affiliate, Pyramis Global Advisors.  *See* 2011 Form 5500 at FID-LB-MTD2-00010, Hemani Decl. Ex. 2 (listing Pyramis Aggressive Equity Fund).

[14] *See* FAC ¶ 50; Plan Document at FID-LB-MTD2-00004-00005, §§ 12.2, 12.5, Hemani Decl. Ex. 1 (limiting investment options to "Investment Companies"); *id.* at FID-LB-MTD2-00001B, § 2.50 (defining "Investment Companies" to include "any regulated investment company or unit investment trust managed by the Management Company, and any common or collective trust fund available only to employee plan trusts that satisfy the requirements of the Code"); *id.* at FID-LB-MTD2-00002, § 2.53 (defining the "Management Company" as Fidelity).

[15] *See* App. A.

in retirement decision-making, and even offers a free portfolio advisory service, Fidelity

Retirement Plan Manager, that will select appropriate funds for participants if they so desire.[16]  If

a participant does not make any fund selection, her assets are defaulted into the age-appropriate

"Freedom Fund," a "lifecycle" fund managed to provide an appropriate mix of equity, fixed-

income and other asset classes for her age group.[17]  As a result of the design, funding and

operation of the Plan, Fidelity's employees are doing far better than most in accumulating assets

for retirement:  The average participant account balance in the Plan is more than twice the

national average.[18]

## II.    The FAC's Allegations

Plaintiffs, current and former Plan participants, purport to bring their claims on behalf of

"[a]ll participants in the [] Plan who invested in any mutual fund established by FMR [] or any of

its subsidiaries and affiliates in the Plan from March 20, 2007 to the present."  FAC ¶ 137.  The

FAC alleges that FMR, the Committee, and unspecified individual Committee members are

ERISA fiduciaries, and that they breached their fiduciary obligations by seeking to enrich

Fidelity at the expense of Plaintiffs and other Plan participants.  *See* FAC ¶¶ 37, 42-43, 129, 149-

54.  The FAC does not plead any direct factual allegation of wrongful intent.  Instead, the FAC

asks the Court to *infer*, based on the nature of the investment options made available, that

Defendants must have been acting disloyally.  Specifically, Count I of the FAC alleges that

Defendants (i) "caus[ed] the Plan to invest exclusively in Fidelity Funds;" (ii) caused the Plan to

---

[16]  *See* FMR LLC, Choosing Your Investments Brochure ("Choosing Your Investments") at FID-LB-MTD2-00056-00057 (Feb. 2008), Hemani Decl. Ex. 8.  After 2008, the Fidelity Retirement Plan Manager was renamed Portfolio Advisory Services at Work ("PAS-W").

[17]  *See* FMR LLC Profit Sharing Plan Summary Plan Description ("Summary Plan Description") at FID-LB-MTD2-00051 (Dec. 1, 2008), Hemani Decl. Ex. 7; FAC ¶¶ 97-98.

[18]  *Compare* 2011 Form 5500 at FID-LB-MTD2-00006A, FID-LB-MTD2-00007 (average Plan balance, determined by plan assets divided by number of participants, of approximately $152,000) *with* Russell Investments, *Seven Attributes of an Excellent Defined Contribution Plan* at 1 (Feb. 2012) (national average plan account balance is $71,000) (cited in FAC ¶¶ 52, 59, 61, 64).

7

offer too many investment options to participants; (iii) "fail[ed] to remove or replace" higher-fee options "from the Plan's investment options menu;" and (iv) "us[ed] Plan assets to seed new Fidelity Funds." *Id.* ¶¶ 150-52.  In Count II, the FAC alleges that, between March 20, 2007 and the present, each time Defendants added a new Fidelity fund to the plan lineup, they engaged in a prohibited transaction under ERISA § 406(a), 29 U.S.C. § 1106(a).  *Id.* ¶ 158.

## ARGUMENT

### I.    The FAC Should Be Dismissed Because Plaintiffs' Claims Are Time-Barred.

The FAC should be dismissed as untimely under ERISA's six-year statute of repose and its three-year statute of limitations.[19]

#### A.    Count I of the FAC Is Barred by ERISA's Six-Year Statute of Repose.[20]

ERISA § 413(1) provides a six-year statute of repose that begins to run upon "the last action which constituted a part of the breach or violation."  29 U.S.C. § 1113(1).  This provision bars challenges to conduct occurring before that period, whether or not known to plaintiffs. Because Count I of the FAC, alleging breach of fiduciary duty, challenges decisions that allegedly date back 15 years or more, this count is time-barred.

Two Courts of Appeals recently have held that breach of fiduciary duty claims like this one, which challenge plan lineups established more than six years prior to suit, are barred by ERISA's six-year statute of repose.[21]  First, in *David v. Alphin*, 704 F.3d 327 (4th Cir. 2013), the

---

[19] "Affirmative defenses, such as the statute of limitations, may be raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), provided that the facts establishing the defense [are] clear on the face of the plaintiff's pleadings."  *Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 320 (1st Cir. 2008).

[20] Because Count II of the FAC, charging prohibited transactions, is expressly limited only to funds added to the Plan lineup on or after March 20, 2007, *see* FAC ¶ 158, Defendants have not moved to dismiss this count for failure to comply with ERISA's six-year statute of repose.

[21] The First Circuit has followed the same approach in similar contexts.  *See, e.g.*, *Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133, 139-40 (1st Cir. 2005) (ERISA claim accrued when employees were hired and classified as to be paid through third-party payroll, not each time they received a third-party payroll check as a result of the allegedly wrongful classification).

Fourth Circuit addressed a case in which plaintiffs claimed, just as they do here, that defendants breached their fiduciary duties under ERISA by including proprietary funds in the plan lineup. The district court dismissed plaintiffs' claims as untimely because the decision to include proprietary funds was made more than six years before plaintiffs filed their complaint, and the Fourth Circuit affirmed. *Id.* at 342. According to the Fourth Circuit, it made no difference that the proprietary funds remained as investment options during the repose period, and that participants continued investing in them during those six years. *Id.* Because the decision to add the proprietary funds to the plan lineup was made more than six years before plaintiffs filed suit, the claims were time-barred. *Id.* Similarly, in *Tibble v. Edison Int'l*, --- F.3d ----, 2013 WL 3947717 (9th Cir. Aug. 1, 2013), the Ninth Circuit, sitting *en banc*, held that plaintiffs could not maintain claims relating to decisions to include retail mutual funds in a plan lineup because those decisions were made more than six years before plaintiffs filed suit. *Id.* at *4-5.[22]

The logic of the Fourth and Ninth circuits in *David* and *Tibble* has been applied to dismiss claims identical to those brought here at the pleadings stage. For example, in *Stargel v. SunTrust Banks, Inc.*, --- F. Supp. 2d ----, 2013 WL 4775918, (N.D. Ga. Aug. 7, 2013), plaintiffs alleged that defendants violated their duty of loyalty by selecting for a plan, and then failing to remove or replace, certain proprietary funds that allegedly performed poorly and charged high fees. Because it was clear from the face of the complaint in *Stargel* that the decision to add the proprietary funds to the plan lineup had been made more than six years prior to suit, the court granted defendants' Rule 12(b)(6) motion to dismiss the breach of fiduciary duty claim as time-barred. *Id.* at *8. With respect to plaintiffs' allegations that defendants should have removed or replaced these funds during the class period, the court explained:

---

[22] The *en banc* decision followed a panel decision that likewise held that the plaintiffs' claims were time-barred. 711 F.3d 1061, 1068-69 (2013). The *en banc* court adopted in full this portion of the panel decision. *See* 2013 WL 3947717, at *4-5.

> The Amended Complaint . . . recites no facts which, if proven, would establish a new, independent breach of fiduciary duty which is different from the original time-barred breach.  There is simply no allegation that anything changed after selection of the [funds].  There is no allegation which asserts a drop in performance or a rise in advisory fees during the Class Period.  Accordingly, any argument that a new breach of fiduciary duty occurred during the class period is based on pure speculation, which is insufficient.

*Id*.

Here, it is clear from the face of the FAC that the challenged conduct—the decision to offer a lineup consisting almost exclusively of a large and diverse array of Fidelity retail mutual funds—was made long before March 20, 2007.  The FAC expressly asserts that Fidelity "has kept the investment management practices of the Plan stuck in the 1990's . . . ."  FAC ¶ 61.  Similarly, the FAC alleges that the practice of "seeding" funds with Plan assets had begun by at least 1999.  *See* FAC ¶¶ 71-72, 74.  In addition to these concessions in the FAC itself, the public record demonstrates that the conduct about which Plaintiffs complain occurred more than six years before they filed suit:  As demonstrated by the Plan's annual Form 5500s, 138 of the 145 mutual funds in which Plaintiffs allegedly invested were added to the Plan lineup prior to March 20, 2007.[23]

That the funds may have remained part of the lineup into the limitations period is of no moment because the FAC fails to allege any "new, independent breach of fiduciary duty" with respect to these funds that occurred during the Relevant Period.  *Stargel*, 2013 WL 4775918 at *8; *see also David*, 704 F.3d at 340-42; *Tibble*, 2013 WL 3947717 at *4-5.  It alleges neither "a

---

[23] *See generally* FAC ¶¶ 8-34 (alleging that named Plaintiffs invested in a total of 145 different mutual funds, once typographic errors and fund name changes are taken into account); 2006 FMR LLC Profit Sharing Plan Form 5500 (Sept. 14, 2007) ("2006 Form 5500") at FID-LB-MTD2-00118-00112, Hemani Decl. Ex. 9 (showing that all of the mutual funds in which Plaintiffs allegedly invested were added to the Plan lineup before 2007 with the exception of the Asset Manager 30% Fund, Conservative Income Bond Fund Institutional Class, Global Commodity Stock Fund, Government Income Fund, Large Cap Core Enhanced Index Fund, Mid Cap Enhanced Index Fund, and Institutional Prime Money Market Portfolio).

drop in performance [n]or a rise in advisory fees." *Stargel*, 2013 WL 4775918 at *8. Because the challenged aspects of the Plan lineup are not alleged to have changed during the six years prior to suit, Plaintiffs' breach of fiduciary duty claim is barred by ERISA's statute of repose.

**B.      Counts I and II of the FAC Are Barred by ERISA's Three-Year Statute of Limitations.**

ERISA § 413(2) precludes claims that are filed more than "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113(2). In applying this provision, courts have "focused on whether documents provided to plan participants sufficiently disclosed the alleged breach of fiduciary duty, not whether the individual plaintiffs actually saw or read the documents." *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419 (S.D.N.Y. 2008), *aff'd on other grounds*, 325 Fed. App'x 31 (2d Cir. 2009); *see also Edes*, 417 F.3d at 142 ("[W]e do not think Congress intended the actual knowledge requirement [of ERISA's statute of limitations] to excuse willful blindness by a plaintiff.").

Applying this precedent, courts have dismissed as time-barred ERISA breach of fiduciary duty claims similar to this one. For example, in *Young* the court granted defendants' motion to dismiss an ERISA breach of fiduciary duty claim challenging the defendants' decision to include Fidelity funds in the plan lineup. 550 F. Supp. 2d at 419. The court explained that, because it was "undisputed that Plaintiffs had actual knowledge that the Plans offered the Fidelity Funds as investment options" more than three years before they filed suit, and because information concerning "the fees and expenses associated with the Fidelity Funds" indisputably had been made available to participants contemporaneously, plaintiffs' claims were time-barred. *Id.*

Here, the FAC challenges Fidelity's practice of making a broad range of Fidelity mutual funds available as Plan investment options—a practice that the FAC admits has existed for far

longer than three years. *See* FAC ¶¶ 61, 71-72, 74. The FAC does not, and consistent with good faith pleading could not, deny the incontrovertible—that the Plan lineup was fully disclosed to all participants, and that Plaintiffs knew more than three years ago what funds were offered in the Plan, which is how they were able to select funds for themselves.[24] The FAC also does not— and could not—allege that defendants failed to inform Plan participants about the fees and performance associated with these funds at the time they initially invested.[25] And it does not— and could not—allege that any of the named Plaintiffs joined the Plan during the three-years immediately preceding suit. *See* FAC ¶¶ 8-34.

Instead, anticipating the statute of limitations problem, the FAC asserts in a conclusory fashion that Plaintiffs only "discovered their claims shortly before commencing this action" because, until that time, they lacked information "regarding the substance of the deliberations— if any—of Defendants concerning the Plan's menu of investment options." FAC ¶ 35. This assertion is beside the point and a concession to the obvious limitations problem. Plaintiffs' claims are not premised on any factual allegation concerning Defendants' deliberations. (Nor do Plaintiffs claim to have any insight into that deliberative process now.) Rather, the FAC is based *entirely* on the nature of the Plan lineup—which indisputably was known to Plaintiffs at the time

---

[24] *See, e.g.*, 2006 Form 5500 at FID-LB-MTD2-00118-00122, Hemani Decl. Ex. 9 (listing funds offered to Plan); *see also* Summary Plan Description at FID-LB-MTD2-00052, Hemani Decl. Ex. 7 (referring participants to the "Choosing Your Investments brochure" that is "included in the Profit Sharing Plan enrollment information and is available on NetBenefits®"); Choosing Your Investments at FID-LB-MTD2-00058-00114, Hemani Decl. Ex. 8 (listing and describing all funds offered to Plan participants).

[25] *See, e.g.*, Summary Plan Description at FID-LB-MTD2-00052, Hemani Decl. Ex. 7 ("You are encouraged to familiarize yourself with the investment goals, risk level and any applicable administrative fees of each option before making any investment decisions. You may request information about the available investment options, including fund Prospectuses and the Choosing Your Investments brochure, via NetBenefits or by calling HR Solutions at 800-835-5099 (TDD 888-343-0860)."); Choosing Your Investments at FID-LB-MTD2-00116, Hemani Decl. Ex. 8 ("Before investing in any mutual fund, please carefully consider the investment objectives, risks, charges and expenses. For this and other information, call or write Fidelity for a free prospectus. Read it carefully before you invest."). Additionally, throughout this period, information about the fees and performance of each fund has been available on both Fidelity's website and the Securities and Exchange Commission's website. *See* Fidelity Fund Screener, https://www.fidelity.com/fund-screener/research.shtml (last visited Sept. 27, 2013); Securities and Exchange Commission, http://www.sec.gov/edgar/searchedgar/mutualsearch.html (last visited Sept. 27, 2013).

they invested.  Accordingly, the FAC is time-barred, and both Counts I and II should be dismissed.

## II.  Count I of the FAC Should Be Dismissed Because It Fails To State a Claim for Breach of the Duty of Loyalty.

The FAC also fails to state a claim for breach of fiduciary duty (Count I) because its allegations do not give rise to a plausible inference that, in deciding on the nature of the Plan's investment lineup, Defendants were motivated by a desire to serve their own interests instead of the interests of the Plan.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Rederford v. U.S. Airways, Inc.*, 589 F.3d 30, 35 (1st Cir. 2009) (same); *Winter v. Chase Bank*, Civ. A. No. 12-10109, 2013 WL 980607, at *2 (D. Mass. Mar. 12, 2013) (Casper, J.) (same).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

Factual allegations that are merely "consistent with" unlawful conduct are insufficient to state a plausible claim where "more likely explanations" or "obvious alternative explanations" of lawful conduct exist.  *Iqbal*, 556 U.S. at 682.  Thus, for example, the First Circuit reversed a district court's denial of a motion to dismiss where an airline claimed that FAA inspectors had delayed inspections of its aircraft in retaliation for protected First Amendment activity, given the "obvious alternative explanation" that the delay had been due to the airline's failure to submit the request for inspection correctly.  *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 37 (1st Cir. 2011).  The First Circuit concluded:  "As between [this] 'obvious alternative explanation[]' for the delays,

and the 'purposeful, invidious discrimination [Air Sunshine] asks us to infer, discrimination is

not a plausible conclusion.'" *Id*. (quoting *Iqbal*, 556 U.S. at 682).

      In order to determine whether a claim is "plausible," a court must consider the allegations

in the context of the applicable substantive law—here, ERISA.  Count I of the FAC charges

Defendants with breaching the duty of loyalty established by ERISA § 404(a)(1)(A), 29 U.S.C.

§ 1104(a)(1)(A).  This duty focuses on the fiduciary's motivation: "a breach of th[e] duty [of

loyalty] requires some showing that the fiduciaries' decisions were *motivated by* a *desire to serve

the interests of [the company] over those of the beneficiaries*."  *Tibble v. Edison Int'l*, No. CV

07-5359, 2010 WL 2757153, at *24 n.19 (C.D. Cal. July 8, 2010) (emphasis added), *aff'd*, 711

F.3d at 1068-69, *aff'd en banc*, 2013 WL 3947717.  Thus, to survive dismissal, a claim for

disloyalty must allege facts plausibly suggesting an improper motive, rather than an "obvious

alternative explanation" for the conduct.  *Iqbal*, 556 U.S. at 682.

      Additionally, in assessing whether or not a plan fiduciary has breached his obligations

under ERISA § 404, 29 U.S.C. § 1104, courts are mindful that some degree of deference

generally is due to the fiduciary's interpretation of his obligations under the ERISA plan.  *See,

e.g.*, *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 711-12 (6th Cir. 2000); *Moench v. Robertson*, 62

F.3d 553, 565 (3d Cir. 1995).  As the Supreme Court has recognized, in enacting ERISA,

"Congress sought to create a system that is [not] so complex that administrative costs, or

litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place."

*Conkright*, 130 S. Ct. at 1649 (internal quotation marks omitted; alterations in original).

Accordingly, courts must avoid superimposing their own views upon reasonable decisions

reached by plan fiduciaries.  *Id*.

As explained below, the facts alleged here do not give rise to any plausible inference of improper motivation. Instead, there is an "obvious alternative explanation," *Iqbal*, 556 U.S. at 682, for the conduct alleged: That the Plan's investment lineup was intended to offer Fidelity employees a wide array of choices so that they could determine the best path for meeting their own retirement goals and objectives. Accordingly, Count I of the FAC should be dismissed.

### A.     The Allegation that the Plan Invested Exclusively in Fidelity Funds Does Not Support an Inference of Disloyalty.

The FAC first asks the Court to infer that "Defendants" acted disloyally because they "caus[ed] the Plan to invest exclusively in Fidelity Funds." FAC ¶ 150. But the allegation that the Plan lineup consisted exclusively of Fidelity funds provides no support for such an inference.

Not only do financial services companies routinely utilize their own investment products for their plans, but this practice is expressly allowed by Congress and the DOL. As the DOL explains, it would be "contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor." Notice of Proposed Rule-Making, Participant Directed Individual Account Plans, 56 Fed. Reg. at 10730. For this very reason, when ERISA was enacted, Congress created express exemptions to the "prohibited transaction" rules described below in Section III—provisions that were designed to protect against self-dealing and conflicts of interest—to allow plans sponsored by banks and insurance companies to offer their own products to their plan participants. *See* ERISA § 408(b)(5), (8), 29 U.S.C. § 1108(b)(5), (8).[26] The DOL extended this congressional authorization to plans sponsored by mutual fund advisors and their affiliates through Prohibited

---

[26] *See* H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5094 ("[I]t would be contrary to normal business practice for a bank to invest its plan assets in another bank."); *id.* ("[I]t would be contrary to normal business practice to require the plan of an insurance company to purchase its insurance from another insurance company."); *id.* at 5096 (allowing "banks, trust companies, and insurance companies" to continue their "common practice" of investing their plans' assets in their own pooled investment funds).

Transaction Exemption ("PTE") 77-3.  In so doing, the DOL recognized that making proprietary

mutual fund investments available to employees of mutual fund companies is "in the interests of

plans and of their participants and beneficiaries" and "protective of the rights of participants and

beneficiaries of Plans."  Class Exemption Involving Mutual Fund In-House Plans Requested by

the Investment Company Institute, 42 Fed. Reg. 18734, 18735 (Mar. 31, 1977).[27]

Conformity with a commonplace practice that has been condoned by the responsible

regulator and by Congress creates no inference of wrongdoing.  As explained by one court in a

case much like this one, that defendants "followed such a practice—the very result Congress

[and the DOL] intended to approve by enacting the[se] exemptions—*does not give rise to an*

*inference of disloyalty*."  *Dupree*, 2007 WL 2263892, at *45 (emphasis added).

Moreover, two Courts of Appeals have endorsed plan lineups consisting almost

exclusively of Fidelity mutual funds, affirming dismissal on the pleadings of claims similar to

those raised here.  First, in *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009), the Seventh

Circuit affirmed dismissal of claims that defendants breached fiduciary duties to participants in a

very large plan by offering only Fidelity mutual funds.  *Id.* at 583.  The court recognized that

there is "no statute or regulation prohibiting a fiduciary from selecting funds from one

management company."  *Id.* at 586.  Second, in *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir.

2011), the Third Circuit affirmed dismissal of a complaint alleging that defendants "breached

[their] fiduciary duties [of prudence and loyalty] in composing the mix and range of investment

options" in another very large plan simply because 67 of the 73 investment options were Fidelity

---

[27] Fidelity is, of course, not the only financial services company that offers its proprietary products to the employees participating in its plan.  *See, e.g.*, *Dupree v. The Prudential Ins. Co. of Am.*, No. 99-8837, 2007 WL 2263892, at *46 (S.D. Fla. Aug. 7, 2007).  Indeed, even Russell Investments—the fund manager on whose publication the FAC relies for evidence of "best practices" in plan management, *see* FAC ¶ 61—offered exclusively its own investment products to its plan participants during the relevant time period.  *See* 2009 Russell Retirement Plan Form 5500 at FID-LB-MTD2-00126, Hemani Decl. Ex. 10; 2010 Russell Retirement Plan Form 5500 at FID-LB-MTD2-00128, Hemani Decl. Ex. 11; 2011 Russell Retirement Plan Form 5500 at FID-LB-MTD2-00130, Hemani Decl. Ex. 12.

mutual funds.  *Id.* at 318, 326.  As the Third and Seventh Circuits recognized, where, as here, a breach of fiduciary duty claim is premised entirely on alleged facts concerning the nature of a plan lineup, no breach can be inferred from the decision to offer Fidelity mutual funds.  *See id.* at 327-28; *Hecker*, 556 F.3d at 586-87.  This is especially true where, as here, Plaintiffs are asking the Court to infer not that the fiduciaries acted imprudently, but that their choices could only have been the result of *disloyalty*.

Finally, as the FAC concedes, the operative Plan Document expressly *precluded* the Plan from offering mutual funds other than those managed by Fidelity.[28]  The fiduciary duty provisions of ERISA require all fiduciaries to act "in accordance with the documents and instruments governing the plan."  *See* 29 U.S.C. § 1104(a)(1)(D), ERISA § 404(a)(1)(D).[29]  In the face of a Plan Document that prohibits the use of non-Fidelity mutual funds, the decision to comply with that directive is an "obvious alternative explanation" for the Plan lineup.  *Iqbal*, 556 U.S. at 682.

**B.    The Allegation that the Plan Offered Participants a Broad Choice of Fidelity Investment Options Does Not Support an Inference of Disloyalty.**

The FAC also asks the Court to infer disloyalty from the fact that Plan participants were offered a large number of investment options.  FAC ¶ 150.  But offering a diverse array of funds from which to choose does not give rise to an inference of disloyalty.

---

[28] *See* FAC ¶ 50; note 14, *supra*.  These Plan terms were established by Fidelity in its capacity as sponsor and settlor of the Plan.  As described below in Section IV, the employer sponsoring a plan does not act as an ERISA fiduciary in designing, establishing, or amending the terms of the plan it sponsors, and therefore is not constrained by ERISA's fiduciary obligations in determining the terms of such plan.  *See, e.g.*, *Lockheed Corp. v. Spink*, 517 U.S. 882, 889-891 (1996) (a plan sponsor "act[s] not as a fiduciary but as a settlor" when it establishes an employee benefit plan).

[29] *See also Alves v. Harvard Pilgrim Health Care Inc.*, 204 F. Supp. 2d 198, 210 (D. Mass. 2002) ("[T]here can be no breach of fiduciary duty where an ERISA plan is implemented according to its written, nondiscretionary terms."), *aff'd by,* 316 F.3d 290, 291 (1st Cir. 2003) (describing the district court's opinion as "admirable").

ERISA is a flexible statute, allowing a wide range of fiduciary practices; there is no statutory requirement that one size fits all.  *See*, *e.g.*, *DiFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 758, 773 (E.D. Va. 2005) ("fiduciaries are entitled to substantial latitude[,] and their judgments must not be assessed using 20/20 hindsight"); *Renfro*, 671 F.3d at 322 ("The fiduciary standard is flexible" and draws context from "the character and aims of the particular type of plan." (internal quotations omitted)).  In light of this flexible standard, no court has ever suggested—much less held—that offering participants a large number of investment options implies a breach of fiduciary duty.  To the contrary, "[b]ecause participant choice is the centerpiece of what ERISA envisions for defined-contribution plans," *Tibble*, 2013 WL 3947717 at *19, offering a "broad range of investment alternatives" is *encouraged*.  *See Hecker*, 556 F.3d at 587 (quoting 29 C.F.R. § 2550.404c-1(b)(1)(ii)); *see also Renfro*, 671 F.3d at 318, 329 (affirming dismissal where plan lineup included 73 funds); *Loomis v. Exelon Corp.*, 658 F.3d 667, 673 (7th Cir. 2011) (noting "the absence from ERISA of any rule that forbids plan sponsors to allow participants to make their own choices").

To support its position that offering too many choices is nefarious, the FAC first cites to one industry commentator who suggests that, while it was commonplace in the 1990s to offer "a vast array of investment options," the supposed "best practices" for plan investment have changed since the 1990s, and "excellent plans" no longer offer as many choices.  FAC ¶ 61.  But this commentator is not purporting to address plans designed for employees of financial services firms, some of whom may desire greater investment choice.  And in any event, ERISA does not mandate that plan fiduciaries follow the subjective views of "best practices" advanced by Plaintiffs' hand-selected "expert."  Instead, the statute allows plan fiduciaries to follow a range of reasonable alternative courses tailored to the needs of their own individual plan and

participant base.  *See Hecker*, 556 F.3d at 586 ("nothing in [ERISA] requires plan fiduciaries to include any particular mix of investment vehicles in their plan"); *DiFelice*, 397 F. Supp. 2d at 773.

Second, the FAC alleges that "too many fund choices leads plan participants to over concentrate in equities, to their detriment."  FAC ¶ 62.  But this is precisely the "sort[] of paternalistic argument[] [that] ha[s] had little traction in the courts."  *Tibble*, 2013 WL 3947717 at *19 (rejecting argument that "union did not know what was in its members' best interest" when it "requested 'forty name-brand retail mutual funds for inclusion in the Plan'"); *see also Loomis*, 658 F.3d at 673 (rejecting as "paternalistic" plaintiff's argument that participants' choices should be limited).  Moreover, the FAC does not allege that any participants in *this* Plan—let alone any of the Plaintiffs—actually did "overinvest" in equities.[30]  Nor could it, given that Fidelity offers a free portfolio advisory service to assist each of its employees in achieving an appropriate asset allocation for his or her goals and objectives.[31]

Third, the FAC contends that too many choices resulted in diffusion of the Plan's assets and prevented the Plan from taking advantage of breakpoints in fees schedules.  FAC ¶¶ 63-64.  This, too, is unsupported.  The FAC does not, and could not, identify any fund offered to Plan participants that provided for breakpoints that the Plan was unable to access.[32]  Instead, the FAC

---

[30] The FAC also fails to allege how an overinvestment in equities would benefit Fidelity at the participants' expense: Although the FAC asserts that "Defendants" make more money from managing actively-managed funds, *see* FAC ¶ 62, it does not allege any correlation between equity funds and actively-managed funds.  Nor could it.  The least expensive funds offered under the Plan are equity funds designed to track the S&P 500 and other equity indices.  *See* App. A.

[31] Choosing Your Investments at FID-LB-MTD2-00055-00056, Hemani Decl. Ex. 8.

[32] To the contrary, the FAC apparently concedes that Plan participants were offered the least expensive share class available to fund investors.  *See* FAC ¶ 102 (alleging with respect to Freedom Funds that "K Shares [were] selected by the Plan Fiduciaries for inclusion in the Plan."); Fidelity Contrafund Prospectus at FID-LB-MTD2-00133-00134 (March 1, 2011), Hemani Decl. Ex. 13 ("Class K shares generally are available only to employer-sponsored retirement plans (including profit sharing, 401(k), 403(b), 457(b), and similar plans) for which an affiliate of FMR provides recordkeeping services. . . . Fidelity Contrafund shares have higher expenses than Class K shares.").

suggests that such breakpoints might have been available had the Plan offered other types of investment vehicles—including commingled trusts and separate accounts—instead of mutual funds. *Id.* But the allegation that plans should offer such alternative investment vehicles instead of mutual funds already has been squarely rejected by three Circuit Courts of Appeals. *See Loomis*, 658 F.3d at 675 (affirming dismissal of complaint alleging that very large plan should have offered separate accounts and commingled trusts instead of mutual funds); *Tibble*, 2013 WL 3947717 at *19 (rejecting argument that it is imprudent for very large plans to offer mutual funds instead of commingled pools or separate accounts); *Renfro*, 671 F.3d at 326-27 (affirming dismissal of complaint alleging that very large plan should have insisted on better fee structure than that offered by mutual funds).[33]

For example, in *Loomis*, the Seventh Circuit affirmed dismissal of claims that a very large plan "should have arranged for access to 'wholesale' or 'institutional' investment vehicles," as opposed to mutual funds, so that the plan "could exercise 'buying power' by negotiating lower fees." 658 F.3d at 670, 672. The Seventh Circuit quoted from its *Hecker* decision, where it noted: "The fact that it is possible that some other funds might have had even lower [expense] ratios is beside the point; nothing in ERISA requires [a] fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Id.* at 670 (quoting *Hecker,* 556 F.3d at 586). It explained that mutual funds offer unique benefits:

---

[33] These decisions are entirely consistent with DOL guidance, which makes clear that "[f]ees are just one of several factors fiduciaries need to consider in deciding on . . . plan investments." Meeting Your Fiduciary Responsibilities, *available at* http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html (last visited Sept. 27, 2013). Notably, although the FAC quotes heavily from this publication, *see* FAC ¶ 134, it omits this particular sentence— despite the fact that it is the very first sentence of the passage quoted in the FAC. Nor does the FAC contain any allegation comparing the Plan's fees (reflected in the mutual funds' expense ratios) to the services provided to the Plan, which is also a relevant factor under the DOL guidance.

"retail" funds, being open to the public, give participants the benefits of competition.  A pension plan that directs participants into privately held trusts or commingled pools (the sort of vehicles that insurance companies use for assets under their management) lacks the mark-to-market benchmark provided by a retail mutual fund.  It can be hard to tell whether a closed fund is doing well or poorly, or whether its expenses are excessive in relation to the benefits they provide.  It can be hard to value the vehicle's assets (often real estate rather than stock or bonds) when someone wants to withdraw money, and any error in valuation can hurt other investors.

*Id.* at 671-72.[34]

Many of the other allegations raised in the FAC are simple variations on this same theme. For example, the FAC alleges that "peer mega plans have moved away from mutual funds to less expensive commingled and single client investment funds," FAC ¶¶ 101, 112-13;[35] that Defendants should have transitioned the Plan's investment options from mutual funds to separate accounts and commingled trusts managed by Fidelity's affiliate, Pyramis, *id.* ¶¶ 113-19; and that Plan participants would have paid less in fees if they had been offered target date funds managed by Pyramis, instead of the Fidelity Freedom Funds, *see id.* ¶¶ 101, 103-05.  But none of these allegations can give rise to an inference of disloyalty.  Instead, as recognized by the Third, Seventh and Ninth Circuits, there is nothing problematic—let alone disloyal—about choosing to offer mutual funds.

---

[34] *See also Tibble*, 2013 WL 3947717 at *19 ("[m]utual funds . . . have a variety of unique regulatory and transparency features" that make them "easy to track via newspaper or internet sources").  Additionally, mutual funds benefit from having an independent board of trustees, SEC oversight, mandatory and uniform disclosure obligations, and from all of the other protections that go along with being one of the most extensively regulated industries in America.  CLIFFORD E. KIRSCH, 1 MUTUAL FUNDS AND EXCHANGE TRADED FUNDS REGULATION, § 1:4:1 (3d ed. 2011) ("A mutual fund is one of the most regulated types of companies in the United States.").

[35] The FAC defines a "mega plan" as one with more than $1 billion in assets.  FAC ¶ 56.

**C. The Allegation that Defendants Failed To Remove or Replace "Poorly Performing" or "Fee-Laden" Funds Does Not Support an Inference of Disloyalty.**

The FAC also asks the Court to infer disloyal intent because Defendants allegedly "fail[ed] to remove or replace poorly performing and heavily fee-laden Fidelity Funds." FAC ¶ 151. To the extent that the FAC suggests that mutual funds should have been replaced by commingled trusts and separate accounts, that claim fails for the reasons discussed above. *See* Argument § II.B, *supra*. And, to the extent that the FAC alleges that funds should have been removed from the Plan lineup because they performed worse or cost more than non-Fidelity mutual funds, such allegations are wholly conclusory and, thus, insufficient to state a claim. *See, e.g.*, *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (conclusory and speculative allegations fail to state a claim); *see also Leber v. Citigroup, Inc.*, No. 07 Civ. 9329, 2010 WL 935442, at *14 (S.D.N.Y. Mar. 16, 2010) (holding that "plaintiffs' allegation that the committee defendants breached duties of prudence and care by selecting affiliated mutual funds that 'substantially under-performed similar products available from unaffiliated investment managers' is supported by nothing beyond plaintiffs' bare assertion," and, thus, could not support a claim for breach of fiduciary duty).

*First*, the FAC fails adequately to allege that the funds offered to Plan participants performed poorly. Although the FAC includes several conclusory statements that the funds "underperformed" during the Relevant Period,[36] there are no factual allegations to support this conclusion. Indeed, the FAC does not identify any specific fund that was a consistent "poor performer." Instead, the only alleged fact in the FAC concerning fund performance is Plaintiffs'

---

[36] *See, e.g.*, FAC ¶ 126 ("Due to the Fidelity Funds' poor performance and high fees, the Plan has suffered millions of dollars a year in losses because Defendants failed to remove or replace the Fidelity Funds as Plan investment options . . . ."); *id.* ¶ 128 ("During the proposed class period, Fidelity Funds also significantly underperformed relevant benchmarks and comparable funds during the time that they were offered in the Plan.").

contention that, for a subset of 40 funds hand-selected by Plaintiffs, 23 had performance in the "bottom half" of their peer group in 2008 and 30 had "bottom half" performance in 2011.  *See* FAC ¶¶ 123, 128.  But, even assuming these allegations are true, they say nothing about whether those funds should have been removed from the Plan lineup—let alone whether it was disloyal to elect to add them Plan lineup in the first place.  At any given time, half of all mutual funds are in the "bottom half" of their peer group.  And, because performance fluctuates, the majority of funds have been in the "bottom half" at some point in time.  If the mere inclusion of a fund in the bottom half of its peer group sufficed to state a claim for disloyalty, few plan fiduciaries would *not* be subject to suit.[37]

*Second*, the FAC fails to allege facts demonstrating that any of the Plan's funds charged excessive fees, let alone that Plaintiffs personally were charged more than the fair value of the services they received.  Instead, the FAC contains misleading assertions about fees.  For example, FAC Figure 1 purports to show the effect of a 125 basis point fee on a "typical employee invested in a retirement plan," but makes no reference to the fees for funds in the Plan, let alone funds in which Plaintiffs actually invested.  FAC ¶ 122.[38]

---

[37] Nor would such a rule make logical sense: Just as a baseball team that finishes in the bottom half of the league one year may finish on top the next, so, too, a fund that performs poorly one year may well outshine its peers in the future.  Indeed, although Plaintiffs elect to focus on 2008 and 2011, publicly-available data demonstrate that in the intervening years—2009 and 2010—each and every one of the ten funds with the most Plan assets outperformed its benchmark.  *See* App. B (showing that 9 of the 10 funds outperformed their benchmarks in both years and that one fund essentially matched its benchmark in 2009 and outperformed it in 2010).

[38] The public record documents that only *two* of the many Fidelity mutual funds offered to the Plan in 2011 had expense ratios (*i.e.*, total fund expenses) of 125 basis points or more, whereas *ten* had expense ratios *below* 25 basis points.  *Compare* App. A (listing ten funds offered by the Plan with expense ratios of 25 bps or below), *with* Fidelity Mt. Vernon Street Trust Prospectus at FID-LB-MTD2-00137 (Jan. 28, 2012), Hemani Decl. Ex. 14 (130/30 Large Cap Fund has a bps of 128), *and* Fidelity Investment Trust Prospectus at FID-LB-MTD2-00140 (Dec. 30, 2011), Hemani Decl. Ex. 15 (Emerging Europe, Middle East, and Africa Fund has a bps of 135).  Notably, none of the named Plaintiffs is alleged to have invested in either of these two higher-fee funds.  *See* FAC ¶¶ 8-34.  More broadly, it should be noted that in 2011 participants allocated over $1.21 *billion* in Plan assets in the ten funds with expense ratios below 25 bps, but allocated less than $16 *million* to the two specialty funds with expense ratios of 125 bps or more.  *See* App. A; 2011 Form 5500, at FID-LB-MTD2-00010-00013, Hemani Decl. Ex. 2.  Moreover, according to Morningstar, an independent entity, the ten funds with the most Plan assets all charge average or below average fees.  *See* App. C (excepting the money market fund, whose fees are not rated by Morningstar).  These

Moreover, several Circuit Courts of Appeals have held as a matter of law that plans indistinguishable from this one do not charge excessive fees.  As explained by the Seventh Circuit, where a plan "offer[s] participants a menu that includes high-expense, high-risk, and potentially high-return funds, together with low-expense index funds that track the market, and low-expense, low-risk, modest-return bond funds[,] [i]t has left choice to the people who have the most interest in the outcome, and it cannot be faulted for doing this."  *Loomis*, 658 F.3d at 673-74.  Similarly, the Third Circuit has observed that courts cannot infer a flawed investment selection process from allegations that the plan contained "funds with a variety of risk and fee profiles, including low-risk and low-fee options."  *Renfro*, 671 F.3d at 327.  Indeed, the Third and Seventh Circuits have affirmed dismissals of breach of fiduciary duty claims based on plan lineups including Fidelity mutual funds with expense ratios ranging from 10 to 121 basis points, *id.* at 319, and 7 to 100 basis points, *Hecker*, 556 F.3d at 586, respectively—virtually identical to the expense ratio range of 5 to135 basis points at issue here.

The FAC also improperly asks this Court to draw an inference of disloyalty from the alleged fact that "88% of the Plan's mutual funds were actively managed Fidelity Funds" that generate "increased fee revenue" for Fidelity, as compared to comparable index funds.  FAC ¶ 62; *see also id.* ¶¶ 100-06.  Although the FAC provides certain cherry-picked examples of circumstances in which actively-managed funds allegedly underperformed their benchmarks, *id.* ¶¶ 101-03, it does not suggest that there is anything imprudent—let alone disloyal—about offering actively-managed funds.  Nor could it.  *See, e.g.*, *Taylor v. United Techs. Corp.*, No. 3:06-cv-1494, 2009 WL 535779, at *10 (D. Conn. Mar. 3, 2009) (rejecting plaintiff's argument based on the supposition "that actively-managed mutual funds generally underperform passive

---

public data, therefore, rebuts any inference that unsuspecting participants were steered to the higher-priced funds on the lineup.

index funds"). Moreover, given the breadth of funds offered under the Plan, even if 88% of the

160-plus funds were actively-managed, participants still had approximately 20 index funds from

which to choose.

In short, because Fidelity employees were offered "funds with a variety of risk and fee

profiles, including low-risk and low-fee options," *Renfro*, 671 F.3d at 327, Plaintiffs' allegations

of underperformance and excessive fees cannot give rise to any inference of disloyalty.

> **D. The Allegation that Defendants Used the Plan To "Seed" New Funds Does Not Support an Inference of Disloyalty.**

Finally, the FAC suggests that the Court should infer disloyalty because "Defendants"

allegedly "us[ed] Plan assets to seed new Fidelity Funds." FAC ¶ 152. But the allegations

concerning "seeding" do not plausibly support Plaintiffs' claim.

*First*, the FAC fails to offer any reason why Fidelity—one of the nation's largest fund

managers, with approximately $1.6 trillion in assets under management—would have needed to

rely on the investment of assets from its own Plan in order to successfully establish new funds.

The asserted theory simply is not plausible. Instead, there is a "common sense," "obvious

alternative explanation," *Iqbal*, 556 U.S. at 679, 682, for the addition of these funds to the Plan

lineup: A wide array of Fidelity funds provided the greatest participant choice. *See Dupree*,

2007 WL 2263892, at *39 (the fact that the plan provided money for new Prudential investment

products does not give rise to an inference that these products were added to the plan lineup for

the purpose of benefitting Prudential).

*Second*, given that there were more than 160 investment options available to Plan

participants, it defies logic that Defendants would believe they could "seed" a handful of smaller

funds by adding them to the Plan lineup. Defendants had no ability whatsoever to direct any

Plan assets to the newer or smaller funds; they simply made those funds available for participants

to select if they so desired.  The participants had *complete discretion* to choose whether to invest in the small number of new investment options, or to remain invested in the much larger number of established funds.  And, in fact, most participants did not select these newer and smaller funds.  Indeed, between 2007 and 2011, Plan participants maintained, in total, less than 2% of their Plan assets in the 9 funds allegedly "seeded" during that time period.[39]

*Third*, the FAC fails to make any factual allegations from which one could infer that the Plan lineup included funds that were too new or too small.  The FAC asserts—with no credible support—that it is inherently problematic for a plan to include funds that have fewer than $75 million in assets under management, or where the plan investments comprise more than 5% of the fund's total assets.[40]  But, even if Plaintiffs' asserted bright line rules were appropriate, the facts alleged here do not evidence that the Plan's investment options regularly failed to comply with them.  Of the nine funds identified in the FAC that were added to the Plan since March 2007, fewer than half allegedly had less than $75 million in assets under management and only two allegedly had Plan assets that accounted for 5% or more of total fund assets during the year in which they were first introduced to the Plan.  FAC ¶¶ 75-83.  Moreover, according to the FAC Plaintiffs only invested in—and, thus, only have standing to assert a claim with respect to—four of these funds.[41]

---

[39] *See* FAC ¶¶ 75-83; 2008 Form 5500 at FID-LB-MTD2-00024-00025, Hemani Decl. Ex. 4; 2009 Form 5500 at FID-LB-00032-00041, Hemani Decl. Ex. 5.

[40] *See* FAC ¶ 68.  In support, the FAC relies on one web-based publication by a self-proclaimed "independent accredited fiduciary."  *Id.*  There is no basis in ERISA for one such supposed "expert" to establish a test by which all fiduciaries must comply.  *See* Argument § II.B, *supra.*  Moreover, the FAC does not address how these considerations might differ where, as here, (1) the Plan offers more than 160 different options, many of which are extremely large and well-established funds, (2) the Plan sponsor is a mutual fund company, with numerous employees who are sophisticated about the markets and may wish to invest in more novel products, and (3) the Plan sponsor provides free advisory services to assist less sophisticated participants in avoiding whatever unwanted risks might be posed by investing in a smaller or less established fund.

[41] *See* Argument § V, *infra*; *see also* FAC ¶¶ 8-34, 72.  Further, because all 19 allegedly "seeded" funds identified in the FAC were added to the Plan lineup before 2009, Plaintiffs' "seeding" claims fall outside of the three-year limitations period.  *See* FAC ¶¶ 75-93; *see also* Argument § I.B, *supra.*

\*       \*       \*

In sum, the FAC's disloyalty claim is belied by both the public record and "common sense." *Iqbal*, 556 U.S. at 679.  Plaintiffs ask this Court—without any alleged proof of bad intent—to infer that the decision to offer a broad array of Fidelity mutual funds to Fidelity employees participating in the Plan was motivated by a desire to enrich Fidelity at the expense of the Plan and its participants.  That inference is implausible.  Congress and the DOL have expressly authorized the practice of offering proprietary investment products to plans sponsored by financial services companies like Fidelity, and every plan attribute criticized in the FAC has been endorsed by one or more courts.

Moreover, Plaintiffs' theory makes no economic sense.[42]  Since 2007, Fidelity has voluntarily contributed over two billion dollars of its own money to the Plan—approximately *10 times* more than the alleged excessive fees.  *See* FAC ¶ 111.  If Fidelity were motivated by its own financial gain, it could have simply contributed less to the Plan.  Instead, the "obvious alternative explanation" for the challenged conduct is that it was intended to offer a wide range of investment options and tools that would allow each of Fidelity's employees to accumulate wealth for retirement in the manner best suited to his or her own objectives.  *Iqbal*, 556 U.S. at 682.  This goal is not only legal, it is laudable.  Count I should be dismissed.

**III.    Count II of the FAC Should Be Dismissed Because It Fails To State a Prohibited Transaction Claim.**

Count II of the FAC, asserting a violation of ERISA § 406(a), 29 U.S.C. § 1106(a), also fails to state a claim.  The FAC alleges that, each time the Investment Committee added a new Fidelity mutual fund to the Plan lineup, that decision constituted a prohibited transaction under

---

[42] Courts regularly reject liability theories that "make[] no economic sense."  *See, e.g.*, *In re Pharm. Industry Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 213 (D. Mass. 2004) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

ERISA § 406(a).[43]  The FAC is incorrect, for at least two independent and dispositive reasons:

(1) the addition of a Fidelity fund to the Plan lineup does not constitute a transaction with a

"party in interest" that is prohibited by ERISA § 406(a); and (2) in any event, through PTE 77-3,

the DOL expressly exempted the investment of a plan in proprietary mutual funds from the scope

of ERISA § 406, 29 U.S.C. § 1106.

      *First*, the FAC does not allege an essential element of a claim under ERISA § 406(a).

According to the FAC, adding new Fidelity mutual funds violates § 406(a)(1)(C) and (D)

because it "constitute[s] a direct or indirect furnishing of services between the Plan and a party in

interest for more than reasonable compensation and a transfer of assets from the Plan to a party

in interest."  FAC ¶ 158.  But while, as the Plan sponsor, FMR falls within the definition of a

"party in interest" for purposes of ERISA § 406, *see* ERISA § 3(14)(A), 29 U.S.C.

§ 1002(14)(A), the mutual funds in which the Plan is invested are expressly excluded from this

definition, *see* ERISA § 3(21)(B), 29 U.S.C. § 1002(21)(B).[44]  Accordingly, inclusion of the

funds on the Plan lineup cannot violate ERISA § 406(a).  Similarly, because the fees paid to

Fidelity's affiliates for managing the mutual funds are paid by the mutual funds themselves—and

---

[43] ERISA §§ 406(a)(1)(C) and (D) prohibit a fiduciary, except as provided in ERISA § 408, from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect— (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."  29 U.S.C. §§ 1106(a)(1)(C) and (D).  ERISA § 408(a) authorizes the DOL to promulgate exemptions from Section 406, including class exemptions, that are, among other things, "in the interests of the plan and of its participants and beneficiaries, and [] protective of the rights of participants and beneficiaries of such plan."  29 U.S.C. § 1108(a).  ERISA § 408(b)(2) exempts "[c]ontracting or making reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."  29 U.S.C. § 1108(b)(2).

[44] "If any money or other property of an employee benefit plan is invested in securities issued by an investment company registered under the Investment Company Act of 1940 [a/k/a a mutual fund], such investment shall not by itself cause such investment company or such investment company's investment adviser or principal underwriter to be deemed to be a fiduciary or a party in interest as those terms are defined in this subchapter, except insofar as such investment company or its investment adviser or principal underwriter acts in connection with an employee benefit plan covering employees of the investment company, the investment adviser, or its principal underwriter.  Nothing contained in this subparagraph shall limit the duties imposed on such investment company, investment adviser, or principal underwriter by any other law."  29 U.S.C. § 1002(21)(B).

not by the Plan[45]—such payment also does not constitute a prohibited transaction. *See Hecker*, 556 F.3d at 584 ("Once the fees are collected from the mutual fund's assets and transferred to one of the [service provider's] entities, they become [the service provider's] assets—again, not the assets of the Plans."). Applying these provisions, the United States District Court for the District of New Jersey dismissed a virtually identical prohibited transaction claim, reasoning that mutual funds are not themselves parties in interest even where, like here, a mutual fund is affiliated with a party in interest. *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 633 (D.N.J. 2010).

*Second*, no prohibited transaction occurred because the DOL provides an exemption to all of ERISA § 406, PTE 77-3, which expressly permits the challenged conduct: "the acquisition and sale of shares of a . . . 'mutual fund' by an employee benefit plan which covers employees of the mutual fund or the mutual fund's investment advisor . . . ."[46] PTE 77-3 includes four conditions, each of which is met under the allegations here.[47] The FAC does not allege that the Plan paid any advisory fees, redemption fees or sales commissions to Fidelity, nor does it allege that the Plan was treated differently than any other investor in the mutual funds. To the contrary,

---

[45] Under the mutual fund structure imposed by the Investment Company Act of 1940, a fund pays fees to its adviser as agreed to by the mutual fund's directors and/or shareholders, and an express cause of action is granted under that separate statute as to the fees paid by mutual funds. *See generally* 15 U.S.C. §§ 80a-15(a), (c); 80a-35(b). ERISA expressly provides that the assets of mutual funds, which are used to pay the funds' advisory fees, are not considered to be ERISA plan assets. *See* ERISA § 401(b)(1), 29 U.S.C. § 1101(b)(1). And the FAC expressly acknowledges that the investment advisory fees at issue are paid by the mutual funds, as reflected in the funds' expense ratios (along with other fund expenses, including record keeping fees, custody fees, and fees for accounting services). *See, e.g.*, FAC ¶ 123. The FAC challenges no fees other than the ones paid by the mutual funds.

[46] Class Exemption Involving Mutual Fund In-House Plans Requested by the Investment Company Institute, 42 Fed. Reg. at 18735.

[47] The four conditions are that "(a) The plan does not pay any investment management, investment advisory or similar fee to such investment adviser, principal underwriter or affiliated person . . . (b) The plan does not pay a redemption fee in connection with the sale by the plan to the investment company of such shares . . . (c) . . . the plan does not pay a sales commission . . . [and] (d) All other dealings between the plan and the investment company, the investment adviser or principal underwriter for the investment company, or any affiliated person of such investment adviser or principal underwriter, are on a basis no less favorable to the plan than such dealings are with other shareholders of the investment company." *Id.*

the FAC assumes (correctly) that Plan participants were offered the lowest cost share class of each mutual fund available to any investor. *See* note 32, *supra*.

Where, as here, the facts alleged demonstrate that a defendant's decision to make proprietary funds available to plan participants falls within PTE 77-3, courts have dismissed prohibited transaction claims. *See, e.g.*, *Mehling v. N.Y. Life Ins. Co.*, 163 F. Supp. 2d 502, 510-11 (E.D. Pa. 2011) (dismissing claim because "[p]laintiffs do not allege that the fees paid by the Plans are not in compliance with the requirements of PTE 77-3, or that the Plans have had dealings with the [f]unds on terms that are less favorable than are offered to other shareholders"); *Leber*, 2010 WL 935442, at *10 (dismissing claim because, "even in the light most favorable to plaintiffs, the complaint asserts nothing more than that defendants purchased shares in an affiliated mutual fund, a transaction to which 'the restrictions of section [] 406 . . . shall not apply'").

For each of these two, independent reasons, Count II of the FAC should be dismissed.[48]

## IV.   FMR Should Be Dismissed Because the FAC Does Not Plead that It Was a Fiduciary with Respect to Investment Selection.

The claims against FMR also should be dismissed because the FAC fails to allege that FMR had a fiduciary obligation with respect to the selection of investment options.[49]

As explained by the Supreme Court: "In every case charging breach of ERISA fiduciary duty, the threshold question is . . . whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v.*

---

[48] Even if Plaintiffs' prohibited transaction claim were viable—which it is not—the scope of this claim would need to be significantly curtailed. Notably, "Count II is alleged only with respect to Fidelity Funds added to the Plan within the Relevant Period"—which Plaintiffs define as March 20, 2007 through the present. FAC ¶ 158. According to the FAC, Plaintiffs only owned seven mutual funds added to the Plan lineup since 2006. *See* note 23, *supra*. Thus, at most Plaintiffs have standing to raise their prohibited transaction claim with respect to these seven funds. *See* Argument § V, *infra*.

[49] Both counts of the FAC seek relief available only from plan fiduciaries. *See* FAC ¶¶ 156, 162 (invoking ERISA § 409(a), 29 U.S.C. § 1109(a), which applies only to "[a]ny person who is a fiduciary with respect to a plan").

*Herdrich*, 530 U.S. 211, 226 (2000).  Here, although the FAC charges FMR with several fiduciary obligations vis-à-vis the Plan, none of them relate to the conduct about which Plaintiffs complain—the selection of Plan investment options.  For example, the FAC alleges that FMR is an ERISA fiduciary because "FMR or its subsidiaries . . . provided trustee, record-keeping, and administrative services to the Plan."  FAC ¶ 37.  But the FAC does not allege any breach relating to the provision of trustee, record-keeping, or administrative services provided by FMR or its affiliates.  *See, e.g., Renfro*, 671 F.3d at 324 (Fidelity's trustee functions do not equate to fiduciary responsibility for investment selection).

Similarly, although the FAC alleges that FMR acts as a fiduciary when it "appoints, monitors and removes the members of the FMR Investment Committee," FAC ¶ 38, it does not allege that FMR breached this fiduciary obligation in any way.  *See, e.g.*, *Dupree*, 2007 WL 2263892, at *36 (dismissing claims where there is no suggestion that monitoring fiduciaries "acted inappropriately in appointing or monitoring [committee] members").[50]  Instead, the FAC's sole focus is the allegedly improper selection of investment options for the Plan.  And, because the FAC concedes that it is the Investment Committee—and not FMR—that had fiduciary "responsib[ility] for selecting, evaluating, monitoring, and maintaining the Plan's investment options," FAC ¶ 42, its claims against FMR should be dismissed.[51]

---

[50] *See also In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 473 (S.D.N.Y. 2005) ("ERISA does not attach liability for investment decisions to fiduciaries whose roles were limited to appointing, retaining and removing other fiduciaries.").

[51] Moreover, the fact that FMR may have employed members of the Investment Committee, and that it sponsors the Plan, does not give rise to any fiduciary responsibility over the conduct alleged here.  FAC ¶¶ 39-41.  It is well settled that an employer sponsoring a plan is not an ERISA fiduciary absent specific conduct bringing it within ERISA's fiduciary definition.  *See, e.g.*, *Lockheed*, 517 U.S. at 889-891 (plan sponsors are only fiduciaries "when fulfilling certain defined functions" (internal quotations omitted)).  Nor can FMR be held liable because it employs individual members of the Investment Committee:  there is no doctrine of *respondeat superior* with respect to ERISA fiduciary duty claims.  *See DeFelice*, 397 F. Supp. 2d at 780.

## V.    Plaintiffs Lack Constitutional Standing To Bring Claims Concerning Funds in which They Did Not Invest.

To the extent any aspect of Plaintiffs' claims survive Defendants' Rule 12(b)(6) motion, they must be significantly curtailed in scope under Rule 12(b)(1) because Plaintiffs lack constitutional standing to seek redress for funds in which they did not invest.

Whether a plaintiff has Article III standing is a "threshold question in every federal case," *Warth v. Seldin*, 422 U.S. 490, 498 (1975), because, where a plaintiff lacks constitutional standing, courts lack subject matter jurisdiction.  *See Animal Welfare Inst. v. Martin*, 623 F.3d 19, 25 (1st Cir. 2010).  To satisfy Article III's case and controversy requirement, a plaintiff must establish that she "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct."  *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 335 (1990) (internal quotations omitted).[52]  Even at the motion to dismiss stage, the burden is on the plaintiff to make this showing.  *Bingham v. Mass.*, 616 F.3d 1, 5-7 (1st Cir. 2010) (affirming dismissal for lack of standing).

The case law makes clear that Plaintiffs lack standing to assert any claim with respect to funds in which they did not invest.  In the Supreme Court's words:  "[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."  *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982).  Applying this principle, the First Circuit held in *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011), that, although plaintiffs had standing to assert securities law claims with respect to the two trusts that issued the certificates they had purchased, they lacked constitutional

---

[52] *See also Merriam v. Demoulas Super Markets, Inc.*, Civ. A. No. 11-10577, 2012 WL 931347, at *3 (D. Mass. Mar. 20, 2012) (dismissing ERISA lawsuit for failure to establish constitutional standing, including injury-in-fact).

standing to raise claims concerning six other, similar trusts whose certificates plaintiffs had not

acquired.  *Id.* at 771.  It made no difference that the same defendant was accused of the same

wrong as to each of the eight trusts.  As the Court explained:  "Although Nomura Asset is a

properly named defendant, the named plaintiffs have no stake in establishing liability as to

misconduct involving the sales of th[]e certificates" in which plaintiffs did not invest.  *Id.*

Applying the same principles the First Circuit employed in *Nomura*, courts in this district

have held that investors in one mutual fund cannot seek to recover for violations pertaining to

mutual funds they did not own.  *See Stegall v. Ladner*, 394 F. Supp. 2d 358, 363 (D. Mass. 2005)

(purchaser of single mutual fund lacked constitutional standing to sue investment company for

claims involving other mutual funds; purchaser was not permitted "to bootstrap claims arising

out of investment decisions made in relation to other funds in which he was not a participant");

*see also Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 118 (D. Mass. 2006) (no standing

to sue on behalf of mutual funds that plaintiffs did not own or had only formerly owned).

Moreover, in *Fuller v. SunTrust Banks, Inc.*, Civ. A. No. 11-cv-784, 2012 WL 1432306

(N.D. Ga. Mar. 20, 2012), the court dismissed for lack of standing virtually identical ERISA

claims to those brought here.  There, plaintiff brought a putative class action involving breach of

fiduciary duty and prohibited transaction claims against a plan sponsor, SunTrust Bank, and

various other parties alleging that the defendants violated ERISA by offering plan participants

investment options consisting of proprietary mutual funds.  *Id.* at *1.  In ruling on defendants'

motion to dismiss, the court held that plaintiff lacked standing to raise her claims with respect to

the fund in which she did not invest.  *Id.* at *8.  The court explained that dismissal for lack of

standing was required because the complaint did "not describe[] how the offering of a fund in

which [plaintiff] did not invest caused her a non-speculative injury."  *Id.*  Similarly, in *David v.*

*Alphin*, 817 F. Supp. 2d 764 (W.D.N.C. 2011), *aff'd*, 704 F.3d 327, the court dismissed, for lack

of standing, claims virtually identical to those asserted in this case because the plaintiff had not

invested in any funds added to plan during the applicable limitations period. *Id.* at 781. Under

these authorities, named Plaintiffs lack standing to assert claims concerning any funds offered by

the Plan in which they did not invest.

Plaintiffs undoubtedly will argue that defendants' standing argument is no longer relevant

because the filing of the FAC changed the landscape of this action from a case involving one

named plaintiff who owned only 14 funds to a case involving 26 named plaintiffs who owned

145 funds. They will suggest that, because defendants do not dispute that Plaintiffs have

standing to bring their claims against Defendants with respect to these 145 funds, the Court may

defer until class certification proceedings the question of whether Plaintiffs also have standing to

sue with respect to funds that they did not own. But such an argument would be untenable. As

the Supreme Court has made clear, standing is a threshold, jurisdictional issue, and "even named

plaintiffs who represent a class must allege and show that they personally have been injured" by

the conduct charged. *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotations and citations

omitted). Further, the First Circuit's decision in *Nomura* expressly rejects the notion that courts

may defer addressing constitutional standing issues until the Rule 23 stage of a case. *See also In

re Nexium Antitrust Litig.*, No. 12-md-02409, 2013 WL 4832176, at *24-25 (D. Mass. Sept. 11,

2013) (recognizing that, under *Nomura*, courts may not wait until class certification proceedings

to address an argument that named plaintiffs lacks standing to litigate on behalf of a class). It

made no difference in *Nomura* that plaintiffs indisputably had standing to bring some portion of

their claims against the same defendants—the Court treated the standing issues as threshold

questions and addressed them at the outset. *Nomura*, 632 F.3d at 771.

Moreover, even if this Court could defer addressing Defendants' standing argument, from a case management standpoint it would make no sense to do so because the Court's decision on standing will have a significant impact on the scope of any claims that survive this motion. For example, because Plaintiffs concede that their prohibited transaction claim is limited to funds added to the Plan lineup on or after March 20, 2007, and because Plaintiffs owned only seven funds that were added to the Plan lineup during this period, should Plaintiffs' prohibited transaction claim survive this motion then a ruling for Defendants on standing grounds would substantially narrow the scope of this claim.[53]  Moreover, if this action proceeds, then Defendants will file an early summary judgment motion on the ground that at least 15 of the 26 named Plaintiffs have signed agreements releasing Fidelity and its affiliates from, among other things, any "claims under the Employee Retirement Income Security Act . . . ."  And once these 15 named Plaintiffs are appropriately dismissed from the case, the number of funds in which named Plaintiffs invested will be substantially reduced.

## CONCLUSION

For the foregoing reasons, the FAC should be dismissed with prejudice.[54]

---

[53] *See* note 23, *supra*; FAC ¶ 158.

[54] Although Defendants' motion to dismiss the initial complaint filed in this action also incorporated a motion to strike Plaintiffs' jury demand, in light of the strength of Defendants' arguments for dismissal of the FAC, Defendants have elected not to burden the Court with a motion to strike at this time.  Should this action survive dismissal, however, Defendants reserve the right to move to strike Plaintiffs' demand for a jury trial at an appropriate point in the proceedings.  *See Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 226-27 (3d Cir. 2007) ("[A] court has the discretion to permit a motion to strike a jury demand at any time . . . ." (internal quotations omitted)); *Charlton Mem. Hosp. v. Foxboro Co.*, 818 F. Supp. 456, 457-60 (D. Mass. 1993) (in ERISA case, granting motion to strike jury demand filed after the court had ruled on defendant's motion to dismiss).

Respectfully submitted,

FMR LLC,

By its attorneys,

/s/ James O. Fleckner
James O. Fleckner (BBO # 641494)
Joseph F. Savage, Jr. (BBO # 443030)
Alison V. Douglass (BBO # 646861)
Abigail K. Hemani (BBO # 650721)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts  02109
Tel.:  617.570.1000
Fax.:  617.523.1231

Dated: October 1, 2013

LIBA/2431318

## <u>CERTIFICATE OF SERVICE</u>

I, James O. Fleckner, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 1, 2013.

/s/ James O. Fleckner