**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

LORI BILEWICZ, *et al.*,                    )
and all other similarly situated,          )
                                            )
    Plaintiffs,                           )
                                            )          Civil Action No. 13-10636-DJC
    v.                                    )
                                            )          ORAL ARGUMENT REQUESTED
FMR LLC; FMR LLC INVESTMENT                 )
COMMITTEE;                                  )
and John and Jane Does 1-25                 )
                                            )
    Defendants.                           )

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>**

## Table of Contents

I.     INTRODUCTION AND BACKGROUND ............................................................... 1

II.    ARGUMENT ...................................................................................................... 3

   A.  LEGAL STANDARDS ..................................................................................... 3

      1.  Pleading Standards ................................................................................. 3

      2.  ERISA Standards .................................................................................... 3

   B.  PLAINTIFFS' CLAIMS ARE TIMELY .......................................................... 5

      1.  Plaintiffs Complain About Conduct Within The Limitations Period. ................ 5

      2.  Plaintiffs Did Not Have Actual Knowledge Of Defendants' Breaches ............ 12

   C.  THE COMPLAINT PLEADS SELF-INTERESTED INVESTMENT DECISIONS IN
       VIOLATION OF ERISA'S DUTY OF LOYALTY. ........................................... 13

      1.  Defendants Limited The Plan To Fidelity Funds That Pay Fees To Fidelity ......... 16

      2.  Defendants chose retail mutual funds over Fidelity's institutional funds. ......... 17

      3.  Defendants Stuffed The Plan With Retail Fidelity Funds To Maximize Fees. ......... 19

      4.  Defendants Used Plan Assets To Seed New Fidelity Funds. ............................. 20

      5.  Defendants Decided To Include Only High-Fee Target Date Funds. .................. 21

      6.  The Plan Has An Inordinate Number Of Overlapping, High-Fee Funds. ............ 21

   D.  PLAINTIFFS HAVE ALLEGED A PROHIBITED TRANSACTION ..................... 22

      1.  The Funds Are Parties In Interest. .......................................................... 23

      2.  Defendants Cannot Establish The Applicable Exemption On Their Motion. ........ 25

   E.  PLAINTIFFS HAVE ARTICLE III STANDING .............................................. 28

   F.  FMR LLC SHOULD NOT BE DISMISSED .................................................... 33

## I.      INTRODUCTION AND BACKGROUND

Twenty-seven current and former employees of FMR LLC ("Fidelity") have sued Fidelity, the FMR LLC Investment Committee ("Investment Committee), and Investment Committee members under ERISA. The Plaintiffs were or are participants in the FMR LLC Profit Sharing Plan ("Plan"), a defined contribution plan. Defendants chose to add to and retain a bloated and bewildering array of approximately 160 or more exclusively Fidelity mutual funds in the Plan consisting largely of high-priced, actively-managed equity funds. First Amended Class Action Complaint ("FAC") ¶¶51-65. Over the relevant period, the six years preceding the original complaint, the Plan paid over $300 million in fees to Fidelity. *Id.* ¶124. Defendants, all fiduciaries of the Plan, repeatedly breached their fiduciary duties by placing the interests of Fidelity ahead of the interests of the Plan and its participants.

During the relevant period, Defendants had many opportunities and many reasons to change the Plan's investments in ways that both favored the Plan's interests over Fidelity's by reducing fees and comported with prevailing standards of care for fiduciaries of mega retirement plans. For example, in 2005, Fidelity began offering institutional funds at substantially lower cost than comparable Fidelity mutual funds to compete for large plan investment business. *Id.* ¶113. Defendants, however, kept their own Plan stocked with retail Fidelity mutual funds, costing the Plan about $28 million a year in additional fees, which Fidelity collected. *Id.* ¶117. In 2009, Fidelity introduced a suite of index-based target date funds. *Id.* ¶102. Defendants likewise limited the Plan's target-date fund selection to only high-priced active-based funds, costing the Plan and participants tens of millions of fees which went straight into Fidelity's pocket, not to mention tens of millions more in underperformance. *Id.* ¶¶102-05. Defendants repeatedly added to the Plan new Fidelity funds with no performance history, violating basic fiduciary principles, to help seed and market Fidelity's new funds. *Id.* ¶¶71-96.

Defendants move to dismiss. They argue:

1.  The statute of limitations bars claims related to Fidelity funds selected for the Plan more than six years ago, even though Plaintiffs complain about Defendants' breaches within the six years preceding the complaint and seek damages, disgorgement and other relief only for those breaches;

2.  A shorter statute of limitations bars claims related to Fidelity funds selected for the Plan more than three years ago because Plaintiffs knew the funds were affiliated with Fidelity, even though none of the other detailed, complex, and comprehensive fact allegations important here were actually known by Plaintiffs;

3.  Plaintiffs failed to state a claim for breach of the duty of loyalty, Count 1, even though Plaintiffs' detailed fact allegations evidence multiple breaches within the relevant period;

4.  Plaintiffs failed to state a prohibited transaction claim, Count 2, even though the argument for dismissal is an affirmative defense that cannot be resolved on the present motion; and

5.  Fidelity is not a fiduciary, even though the summary plan description says Fidelity is the plan administrator, the Investment Committee is indistinct from the company, and Fidelity controlled the committee and all aspects of Plan administration and governance.

Defendants also argue that Fidelity is a generous employer and that the Department of Labor ("DOL") has authorized financial services companies to cause their retirement plans to invest in proprietary mutual funds and that it is a common practice. But Fidelity's compensation arrangements with its employees, including its plan contributions, are driven by the market and are irrelevant to whether it has breached its fiduciary duties.  And the DOL has repeatedly cautioned that complying with a regulatory exemption, here Prohibited Transaction Exemption 77-3, does not excuse fiduciaries from complying with their fiduciary duties. Indeed, in a subsequent advisory opinion the DOL warned that a fiduciary that chooses an affiliated fund to benefit the plan sponsor by, for example, providing seed money, is liable for a breach of the duty of loyalty. DOL AO 98-06A.[1] That is precisely what Plaintiffs allege here.

Finally, Plaintiffs do no allege that Fidelity mutual funds are per se imprudent or that a 100% line-up of 160 Fidelity funds is per se imprudent. Instead, when Fidelity and its management choose

---

[1] Declaration of Gabriel Siegle ("Siegle Decl."), Ex. 4.

investments for its retirement plan and at every turn they make the choice that favors Fidelity, as

detailed in the FAC and below, it creates a strong inference of self-dealing that more than plausibly

states a claim for breach of the duty of loyalty.

## II.     ARGUMENT

## A.     LEGAL STANDARDS

### 1.     Pleading Standards

General pleading standards are familiar so we do not repeat them. But two pleading

principles bear on Defendants' motion. First, the complaint "should be read as a whole, not parsed

piece by piece to determine" whether Plaintiffs have stated a claim.[2] Yet Defendants slice and dice

Plaintiffs' breach of duty claim into little pieces, arguing that various sets of allegations, standing

alone, are not sufficient to state a claim for breach of duty. *See* Defs' Mem. at 13-27. The First

Circuit rejects this kind of "piecemeal" challenge and "balkanized approach" to complaints.[3] Second,

"[n]o matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary

to make out their claims in detail unless and until discovery commences. Thus, … ["we must"] take

account of their limited access to crucial information. If plaintiffs cannot state a claim without

pleading facts which tend systemically to be in the sole possession of defendants, the remedial

scheme of the statute will fail, and the crucial rights secured by ERISA will suffer."[4]

### 2.     ERISA Standards

ERISA was enacted to "to protect the rights of employees in their benefit plans"[5] and to

prevent "misuse and mismanagement of plan assets by plan administrators."[6] The duties charged to

---

[2] *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 103 (1st Cir. 2013) (quoting prior First Circuit authority which quoted *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) with approval).
[3] *Hernandez-Cuevas*, 723 F.3d at 103.
[4] *Braden*, 588 F.3d at 598.
[5] *Charters v. John Hancock Life Ins. Co.*, 583 F.Supp.2d 189, 195 (D. Mass. 2008)
[6] *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985).

ERISA fiduciaries are the highest known to the law.[7] Among the core duties is the duty of loyalty, to act "solely in the interest of participants and beneficiaries."[8] The duty of loyalty applies not just when funds are added to a plan, but on an ongoing basis, as ERISA fiduciaries have a duty to monitor existing plan investment options to ensure they are appropriate for the plan.[9] The plan document itself provides the "Investment Committee shall from time to time determine … whether the shares of an Investment Company once made available under the Plan shall continue to be available." Docket Number ("Doc. No.") 40-1, Plan Doc. at 67, §12.5. Such monitoring applies to each and every investment in the Plan.[10] Thus a self-interested decision to keep an investment option is a freestanding and actionable breach of duty.[11] When examining a breach of duty, courts look to the conduct of the fiduciaries at the time of the decision and evaluate the process employed to make that decision.[12]

Fiduciaries with conflicts of interest are subject to even greater scrutiny. The "presence of conflicting interest imposes on fiduciaries the obligation to take precautions to ensure that their duty of loyalty is not compromised."[13] "Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries."[14]

---

[7] *Glass Dimensions, Inc. v. State Street Bank and Trust Co.*, 931 F.Supp.2d 296 (D. Mass. 2103); *see also Braden*, 588 F.3d at 598.

[8] ERISA § 404(a), 29 U.S.C. § 1104(a).

[9] *Bendaoud v. Hodgson*, 578 F.Supp.2d 257, 271 (D. Mass. 2008); *Stein v. Smith*, 270 F.Supp.2d 157, 167 (D. Mass. 2003); *Howell v. Motorola, Inc.*, 633 F.Supp 552, 567 (7th Cir. 2011) (decision to continue to offer investment is a fiduciary one).

[10] *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423-24 (each available fund must be evaluated on its own); *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 308 n.18 (5th Cir. 2007); *In re Unisys Sav. Plan. Litig.*, 74 F.3d 420, 438-41 (3d Cir. 1996).

[11] *See Dudenhoefer v. Fifth Third Bancorp*, 692 F.3d 410, 420 (6th Cir. 2012); *DiFelice*, 497 F.3d at 423.

[12] *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009); *Glass Dimensions*, 931 F.Supp. at 305.

[13] *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000).

[14] *Leigh v. Engle*, 727 F.2d 113, 125−26 (7th Cir. 1984) (citation omitted); *Howard v. Shay*, 100 F.3d 1484, 1488−89 (9th Cir. 1996) (quoting *Leigh*).

4

## B.     PLAINTIFFS' CLAIMS ARE TIMELY

The Court should summarily deny Defendants' limitations argument without prejudice because it is an affirmative defense[15] that Defendants cannot prove on the pleadings. Thus most ERISA cases, including the cases cited by Fidelity,[16] decided limitations at summary judgment.[17]

That statute of limitations for breaches of duty and prohibited transactions is six years from the last act constituting the breach, or in the cases of omissions, the latest date on which the fiduciary could have cured the breach, except the period is shortened to three years if the plaintiff has actual knowledge of facts and circumstances of the breach or violation.[18]

Defendants make two main arguments on limitations: (1) Plaintiffs' real complaint is about how funds were first selected, which mainly happened more than six years ago, not about certain of Defendants' periodic decisions within the past six years to keep the Plan invested in Fidelity funds for the purpose of benefiting Fidelity; and (2) Plaintiffs knew enough about the alleged breaches to file this complaint more than three years ago. Both arguments fail.

### 1.     Plaintiffs Complain About Conduct Within The Limitations Period.

Defendants breached their duty of loyalty to the Plan by adding and repeatedly deciding to keep Fidelity Funds within the six-year limitations period. FAC ¶152. The First Amended Complaint details Defendants' fiduciary breaches during that period. Specifically, the Investment Committee is responsible for investing plan assets. FAC ¶42. ERISA and the Plan require that the Investment Committee monitor Plan investments and remove improper ones. Doc. No. 40-1Plan Doc. at 67, §12.5; notes 9-11, *supra*. Fidelity not only acted out of self-interest in adding funds, but whenever the

---

[15] *Taylor v. Pension Plan of Pipefitters Local 537 Pension Fund*, 06-12156, 2009 WL 1812794, *5 (D. Mass. June 11, 2009).

[16] *See Tibble v. Edison Int'l*, __ F.3d __, 2013 WL 3947717, *4 (9th Cir. Aug. 1, 2013); *David v. Alphin*, 704 F.3d 327, 330 (4th Cir. 2013).

[17] *See Tibble*, 2013 WL 3947717, at*5 (affirming trial court in part because plaintiffs were allowed to take discovery and present evidence on statute of limitations); *George v. Kraft Foods Global*, 814 F.Supp.2d 832 (N.D. Ill. 2011).

[18] ERISA §413, 29 U.S.C. §1113.

Investment Committee met periodically within the past six years to review the Plan's investments, it put Fidelity's interests ahead of the Plan's when deciding to keep Fidelity funds in the Plan. FAC ¶¶1, 153. Plaintiffs complain about this conduct, not fiduciary conduct many years ago.

The closest controlling authority is *Lewis v. City of Chicago*, 560 U.S. 205, 130 S.Ct. 2191 (2010). The *Lewis* plaintiffs complained about the city's periodic application of a policy that was adopted outside the limitations period, but applied within the limitations period to discriminate against them, giving rise to a new Title VII claim each time. The Seventh Circuit said the claim was untimely because the policy had been adopted too long ago and that continued applications of the policy within the limitations period were a "consequence" of adopting the procedure.[19] A unanimous Supreme Court reversed, saying the Seventh Circuit holding was illogical because, like Plaintiffs here, the plaintiffs only challenged conduct within the limitations period.[20]

Many courts use the same approach in ERISA cases.[21] One court of appeal explained "the flaw" in Defendants' argument as "ignor[ing] the continuing duty under ERISA to review plan

---

[19] *Lewis v. City of Chicago*, 528 F.3d 488, 492 (7th Cir. 2008).

[20] Although conduct outside the limitations period is not actionable, it may nevertheless be relevant for purposes of showing that conduct within the limitations period was the result of unlawful motive. *See Malone v. Lockheed Martin Corp.*, 610 F.3d 16, 22 (1st Cir. 2010).

[21] *See, e.g., Martin v. Consultants & Adm'rs*, 966 F.2d 1078, 1087-88 (7th Cir. 1992) (breach outside limitations period does not bar claims for failure to remove imprudent investments); *Morrisey v. Curran*, 567 F.2d 546, 549 & n.9 (2d Cir. 1977) (claim that trustees who inherited imprudent investments had to replace them within a reasonable amount of time); *Leber v. Citigroup*, No. 07-9329, 2011 WL 5428784, *4 (S.D.N.Y. Nov. 8, 2011) (although investments about which plaintiffs complained were selected for the plan outside the limitations period, plaintiffs' claim that fiduciaries breached their duties to remove investments with high fees within the limitations period was timely); *George v. Kraft Foods Global*, 814 F.Supp.2d 832, 851-52 (N.D. Ill. 2011) (even though ERISA fiduciaries selected funds for 401(k) plan before the limitations period, claims for failure to eliminate those funds within the limitations period were timely in light of a fiduciary's "continuing duty to review plan investments and eliminate imprudent ones"); *Buccino v. Cont'l Assur.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983) ("although the statute of limitations may protect defendants from liability for the initial purchase decision ... , it does not bar suit for defendants' continued failure [during the limitations period] to take steps to terminate" the imprudent investments in the plan). *See also Smith v. City of Boston*, No. 12-10291, 2013 WL 3874733, *2 (D. Mass. July 24, 2013) (following *Lewis*, *supra*, in Title VII case and holding each discriminatory act applying a policy within the limitations period was actionable even though claim challenging adoption of the policy was untimely).

investments and eliminate imprudent ones."[22] Further, a contrary rule would "severely weaken[]" the

continuing duty to review plan investments and fiduciaries "would be left free to engage in repeated

violations."[23] Thus a claim that fiduciaries decided to keep a plan invested in plan sponsor funds is

entirely distinct from a claim that fiduciaries breached their duties when selecting the funds.[24]

Defendants ignore these authorities, citing three cases, *David v. Alphin*, 704 F.3d 327 (4th Cir.

2003), *Tibble v. Edison International*, 2013 WL 3947717, Nos. 10-56406, 10-56415 (9th Cir. Aug. 1,

2013), and *Stargel v. SunTrust Banks, Inc.*, __ F.Supp.2d __, 2013 WL 4775918 (N.D. Ga. Aug. 7,

2013) to assert that Plaintiffs must establish changed circumstances to support a claim that they

breached their duties with respect to funds first chosen outside the limitations period. Defs' Mem. at

8-10.[25] But Plaintiffs have alleged changed circumstances:

- Plaintiffs allege that the Investment Committee kept the Plan in retail Fidelity funds instead of considering lower cost institutional funds. When the Investment Committee made many of its initial investment decisions, Fidelity did not have an institutional funds business. That changed in 2005, when Fidelity created Pyramis to attract large and mega retirement plan business using low cost institutional funds. FAC ¶56. One of Fidelity's largest retirement plan clients, General Motors, shifted from Fidelity mutual funds to Pyramis institutional funds. FAC ¶54.

- Plaintiffs allege that the Investment Committee kept an outdated, confusing, and fee-bloating array of 160 funds or more. This structure was in place more than six years ago when most investments were chosen. But fiduciary practices have changed. Plaintiffs allege that the prevailing view favors fewer choices. FAC ¶¶59-61.

- The Freedom Funds in the Plan, funds of actively managed funds, have been in the Plan for many years. Things changed in 2009 when Fidelity introduced a suite of target date funds using index funds instead of active funds. FAC ¶102. Pyramis too introduced a suite of index-based target date funds since 2005. FAC ¶103. Since then, the index fund variant of the target date funds have generated better returns for

---

[22] *Martin*, 966 F.2d at 1087.

[23] *Id.* at 1088.

[24] *Leber*, 2011 WL 5428784, *4.

[25] The two circuit court opinions affirmed summary judgment rulings, not motions to dismiss. As the Ninth Circuit explained, it affirmed in part because the district court gave plaintiffs an opportunity to develop and present evidence of changed circumstances at summary judgment. *Tibble*, 2013 WL 3947717, *5. Plaintiffs should be afforded the same opportunity here regardless of this Court's ultimate decision on the legal standard.

investors at substantially lower cost. FAC ¶¶102-103.

- Large plans have increasingly migrated to institutional products. FAC ¶¶105, 113-116. Indeed, Pyramis Senior Vice President Mark Friebel said that the Freedom Funds were targeted to smaller plans than the institutional Pyramis target date funds, created some time after 2005 when Pyramis was established. FAC ¶105. In 2007, Friebel predicted that institutional funds would displace mutual funds in the top 200 DC plans. FAC ¶116. The Plan, with assets of between $4 and $11.5 billion during the class period is among the very largest such plans. FAC ¶109. But Defendants decided to keep the Plan invested in retail Fidelity funds.

- Standards of fiduciary care with respect to plan fees have evolved considerably over the past decade.[26] As one commentator observed, developments in litigation, legislation, and regulations in the second half of the last decade "indicate that standards in [the area of plan fees and expenses] are evolving . . . . In response to this new regulatory and civil litigation scrutiny, plan sponsors should gravitate toward lower-cost alternatives for investment products in their plans. This may accelerate a trend that is already apparent among large plan sponsors toward using less expensive alternatives to traditional mutual funds…" *Id.* at 7.[27] Among other things, the Department of Labor has devoted substantial regulatory focus and guidance on fees in 401(k) plans since most of the funds in the Plan were selected.[28]

- Technology has substantially enhanced the attractiveness of institutional products as compared to mutual funds. For example, most institutional funds are now valued daily, just like a mutual fund, which satisfies the reporting requirements of 401(k) plans and participant desire for access to information.[29]

- Understanding of plan participant investment behavior has evolved substantially since Defendants first selected the funds in the Plan. Too many investment choices leads participants to concentrate in equities. FAC ¶62. Concentrating in actively managed equities of course benefited Fidelity to the tune of high fees. *Id.*

- Most recently, and after Plaintiffs filed their amended complaint, Fidelity announced

---

[26] Laurence E. Cranch, Daniel A. Notto, *Evolving Fiduciary Standards for Defined Contribution Plan Sponsors: The Impact of New Thinking About Employee Participation and Investment Selection* (June 2007). These authors said in 2007 that "(w)ithout question, we are experiencing a period of rapid change and improving knowledge regarding optimal methods for the long-term investment of retirement assets held in DC plans, as well as dramatic changes in the economic, demographic and regulatory landscapes affecting retirement savings."*Id.* at 1.

[27] *See also* Siegle Decl. Ex. 10, Collective Trusts Funds – Are they right for your plan? (April 23, 2013) (describing lower costs of institutional funds as compared to mutual funds and trend for large defined contribution plans to invest in institutional funds); Siegle Decl. Ex. 12, Getting Ahead of the CIT Boom: Aligning Capabilities to Capture DC Market Share (April 2012) (same).

[28] *See, e.g.,* FAC ¶¶134-35 (describing DOL publications).

[29] Siegle Decl. 13, Bob Wallace, The Resurgence of Collective Trust Funds in the U.S. Market (2010), at 1.

it had created ten exchange traded sector funds with very low fees—12 basis points. Siegle Decl. Ex. 1. The fees for these ETFs are only 14-15% of the equivalent Fidelity retail sector funds in the Plan. Siegle Decl. Ex. 2. We do not know whether the Investment Committee will consider including in the Plan these much less expensive alternatives, but this is yet another example of a change in circumstances.

These more than sufficient allegations aside, the changed circumstances standard of *Tibble* and the other cases cited by Defendants cannot be squared with the Supreme Court's decision in *Lewis*, which none of the cases even mention.

First, the *Tibble* court mistakenly applied a "continuing violation" theory of limitations to the claim that fiduciaries failed to remove imprudent plan investments.[30] The "continuing violations" theory says that where a series of acts are part of a continuing course of conduct, so long as at least some of the acts occurred within the limitations period there is still liability for the acts outside the limitations period.[31] Plaintiffs do not make that argument here. Rather, as in *Lewis*, which did not rely on a continuing violation theory, Plaintiffs seek relief solely for acts within the six years prior to the filing of the complaint. Thus Plaintiffs seek to remedy fees paid by the Plan *within* the limitations period. Those fees are collected daily, weekly, or monthly, depending on the fund. *See, e.g.*, Doc. No. 25-14 (Contrafund prospectus), at FID-LB-00797 (management fee paid to Fidelity monthly). These are discrete, new harms within the past six years, not lingering effects of an old decision or a continuing violation.[32] But for Defendants' decisions to keep retail Fidelity funds in the Plan, lower fees would have been paid.

---

[30] *Tibble*, 2013 WL 3947717, at *4; *see McNamara v. City of Nashua*, 629 F.3d 92, 96 (1st Cir 2011) ("few areas in limitations law [are] more confusing than the permutations on the phrase 'continuing violations.'").

[31] *See Malone*, 610 F.3d at 22 n.12.

[32] Thus, the court's analysis in *Edes v. Verizon Comm's, Inc.*, 417 F.3d 133, 139 n.8, does not apply. *Edes* did not decide whether continuing violation theory applied to ERISA, but, instead, explained that the doctrine would not rescue the plaintiff in that case because he complained about lingering effects from an initial misclassification and sued under ERISA §510, 29 U.S.C. §1110. Here, in contrast, Defendants have a duty to remove or replace Plan investments if circumstances so dictate. And it is the circumstances prevailing when the Defendants decided to keep plan investments that matter, not the circumstances prevailing at the time of initial selection.

Second, the *Tibble* court's concern that allowing plaintiffs to complain about investment conduct within the limitations period would "expose present Plan fiduciaries to liability for decisions made by their predecessors–decisions which may have been made decades before and as to which institutional memory may no longer exist,"[33] was flatly rejected by the Supreme Court in *Lewis*:

> The City and its *amici* warn that our reading will result in a host of practical problems for employers and employees alike. Employers may face new disparate-impact suits for practices they have used regularly for years. Evidence essential to their business-necessity defenses might be unavailable (or in the case of witnesses' memories, unreliable) by the time the later suits are brought.
>
>          \*\*\*
>
> In all events, it is not our task to assess the consequences of each approach and adopt the one that produces the least mischief. Our charge is to give effect to the law Congress enacted. By enacting §2000e–2(k)(1)(A)(i), Congress allowed claims to be brought against an employer who uses a practice that causes disparate impact, whatever the employer's motives and whether or not he has employed the same practice in the past. If that effect was unintended, it is a problem for Congress, not one that federal courts can fix.

560 U.S. at 220. By the same token, Congress decided that fiduciaries should be subject to suit for breaches of duty. Courts have uniformly held that ERISA fiduciaries' decisions to keep bad investments may be breaches of duty. Plaintiffs have alleged that within the past six years Defendants breached such duties to the Plan by acting out of self-interest and that the Plan paid substantial fees as a result. Whether or not the current fiduciaries or their predecessors made similar decisions in the past is beside the point for purposes of the statute of limitations. The cases cited by Defendants do not even mention *Lewis* and cannot be squared with it.

Moreover, the *Tibble* court's concern about "expos[ing] present [p]lan fiduciaries to liability for decisions made by their predecessors" is ameliorated by one of the basic principles of fiduciary liability: the conduct of a fiduciary is measured by what the fiduciary did (or did not do) under the circumstances then prevailing. *See* note 12, *supra*. Thus requiring a plaintiff to prove or plead that

---

[33] 2013 WL 3947717, at \*5.

circumstances have changed makes no sense. A plaintiff is required to prove what the current fiduciaries did wrong under the circumstances confronting those fiduciaries. A plan participant's challenge to a fiduciary's decision to keep a plan investment is to *that* fiduciary's conduct based on what that fiduciary knew or should have known and what that fiduciary did or should have done at the time the fiduciary made the decision. It is not a challenge to what a different fiduciary did ten years ago. All that matters here is why the fiduciaries kept the investment during the past six years.

There are likely to be many different circumstances between the time of initial selection and the alleged fiduciary breach, further rendering *Tibble*'s concern a straw-man. For example, the performance histories of the subject funds will have changed. Some of the portfolio managers have changed. Formerly competitive fees for a given fund may now be excessive as compared to current investments available in the market, even if the fees for the given fund have not changed. *Cf.* FAC ¶123 (in 2010 78% of 40 Fidelity funds held by the plan, covering 57% of Plan assets, charged fees higher than 50% of peer funds). The Plan is more than four times larger than it was a decade ago and has more bargaining power.[34] Thus, *Tibble* simply errs in holding that present plan fiduciaries may be exposed to liability for decisions made by predecessors.[35]

Finally, the rule of *Lewis* and similar ERISA decisions does not defeat the statute of repose. Six years after an investment is chosen, claims about that decision are time-barred. Subsequent decisions within the limitations period to keep the investment are not. This rule protects plan participants from suffering present harms from present breaches, encourages fiduciaries to zealously and loyally monitor plan investments, and protects plan fiduciaries by providing finality and repose for decisions made outside the limitations period. Moreover, requiring proof of changed circumstances would weaken ERISA standards, as the DOL, the agency charged with enforcing

---

[34] Compare Siegle Decl. Ex. 5, 2000 5500 at 25 ($2.3 billion in net asssets) *with* Siegle Decl. Ex. 6, 2012 5500 at 14 ($9.9 billion in net assets).

[35] *Tibble*, 2013 WL 3947717, at *5.

ERISA has explained in various amicus briefs.[36]

## 2. Plaintiffs Did Not Have Actual Knowledge Of Defendants' Breaches.

Defendants argue that Plaintiffs had "actual knowledge" of their claims more than three years ago. Defs' Mem. at 11-13. They rely on a single district court opinion from another circuit, summarily affirmed on alternative grounds, to argue that when documents provided to plaintiffs convey the essential facts of the claim, actual knowledge is established. *Id.* (citing *Young v. Gen Motors Inv. Mgmt. Corp.*, 550 F.Supp.2d 416, 419 (S.D.N.Y. 2008). In *Young*, the court explained that plan participants were regularly provided with prospectuses and quarterly account statements that "clearly disclosed the fees and expenses."[37] Here, however, none of the materials delivered to participants set out the fees for the Plan funds. Instead, the documents provided to participants told them where they could get more information about fees.[38] In other words, the documents provided to Plaintiffs put them, at most, on constructive notice about available information.[39] Constructive knowledge is not actual knowledge.[40] Further, "determining the meaning of complex financial transactions may take some time; mere knowledge of facts that something was awry does not always mean there is actual knowledge of a violation."[41] *Id.* (citations omitted).

The complex research, calculations, and analyses presented in the complaint are such that even if the documents actually provided to participants had detailed fees and expenses, such

---

[36] *See* Siegle Decl. Exs. 7-9.

[37] *Id.* at 420.

[38] *See generally* Doc. No. 25-8, Profit Sharing Plan section of Summary Plan Description; Doc. No. 25-9, Investment Brochure.

[39] The documents actually provided to Plan participants do not satisfy the applicable disclosure regulation. *See* 29 C.F.R. §2550.404a-5(d) and Appendix. Further, they do not explain that a fiduciary is responsible for choosing Plan investments, or identify the fiduciary. *See generally* Doc. No 25-8, Profit Sharing Plan section of Summary Plan Description; Doc. No. 25-9, Investment Brochure. Given that fiduciary status is an essential element of a claim for breach of fiduciary duty, these documents did not provide Plaintiffs with actual knowledge of the claims they assert in this action.

[40] *Edes v. Verizon Comm's, Inc.*, 417 F.3d 133, 141 (1st Cir. 2005).

[41] *Id. See also Maher v. Strachan Shipping Co.*, 68 F.3d 951, 956 (5th Cir. 1995) (mere knowledge of selection not enough to convey actual knowledge for prudence or loyalty claim; plaintiff must be aware of the process used by the fiduciary to select the product).

information by itself would not have conveyed actual knowledge.[42] As one court explained, "[m]erely pointing to communications which provided information about the [f]unds' structure, investment strategy, fees, and performance is not enough to provide Plaintiffs with actual knowledge of the breach of fiduciary duty that Plaintiffs are alleging. At best, these disclosures may have merely suggested to Plaintiffs that 'something was awry' with respect to the [f]unds."[43]

To be sure, Plaintiffs knew that there were many, and exclusively, Fidelity funds in the Plan. But those facts, by themselves, are not enough to state a claim for relief (as Defendants themselves argue), let alone to convey actual knowledge of fiduciary misconduct. Further, one cannot have actual knowledge of excessive fees without reference to benchmark fee data. The facts alleged in the First Amended Complaint were developed after extensive review of industry publications, *see, e.g.*, FAC ¶¶52, 53, the behavior of other retirement plans, *id.* ¶¶54, 59-60, 107-119, surveys, *id.* ¶¶55, 59-60, recent publications on behavioral finance, *id.* ¶62, complex fee computations, *id.* ¶64, mutual fund profitability, *id.* ¶67, detailed analysis of fund inception dates and the commensurate investment of plan monies, including multiple financial calculations, *id.* ¶¶69-93, and comparisons between certain funds and relevant benchmarks, *id.* ¶¶101-03. These allegations include the kind of complex, expert analyses that are often necessary to acquire actual knowledge of financial transactions and investments.[44] Defendants cannot possibly argue that this information was actually known to Plaintiffs more than three years ago.

## C.   THE COMPLAINT PLEADS SELF-INTERESTED INVESTMENT DECISIONS IN VIOLATION OF ERISA'S DUTY OF LOYALTY.

Count 1 of the Amended Complaint alleges that Defendants repeatedly made investment decisions for the Plan with Fidelity's own interests paramount, in violation of ERISA's absolute duty

---

[42] *Tibble v. Edison International*, 711 F.3d 1061 (9th Cir. 2013); *Stargel*, 2013 WL 4775918.

[43] *Kraft Foods Global*, 814 F.Supp.2d at 851.

[44] *See Kling v. Fidelity Management Trust Co.*, 323 F.Supp.2d 132, 136 (D. Mass. 2004); *see also Caputo v. Pfizer*, 267 F.3d 181, 193 (2d Cir. 2001); *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992).

of loyalty to act "solely in the interests of the participants and beneficiaries." 29 U.S.C. §1104(a)(1).

An inference of self-dealing arises because time and again Defendants selected and decided to keep

plan investment options that favored Fidelity's fee-generating interests over other, widely accepted

alternative choices. Defendants (1) limited the Plan to retail Fidelity funds; (2) used only retail

mutual funds rather than Fidelity's in-house, cheaper, and institutional-client focused Pyramis funds;

(3) stuffed the Plan with an extraordinary number of retail funds, approximately 160, with the direct

result of maximizing Fidelity fees; (4) included new retail funds with no performance record and that

were so unpopular in the retail market that the Plan amassed a huge percentage of the those funds'

assets; (5) included as the Plan's default, Fidelity's remarkably expensive retail actively managed

target date Freedom Funds rather than offering the much cheaper index-based Freedom Funds or

Pyramis' institutional client alternative; and (6) filled this bloated fund array with an extensive

selection of abnormally high-fee retail fund options.

Defendants attack the compelling inference of a breach of the duty of loyalty by breaking the

complaint into its component parts and suggesting that, viewed separately, there might be an

alternative explanation, consistent with the duty of loyalty, for each individual decision, but as the

Eight Circuit explained in *Braden* the "complaint must be read as a whole, not parsed piece by piece

to determine whether each allegation, in isolation, is plausible,", and in any event "[i]t is not

[Plaintiffs'] responsibility to rebut these possibilities in [their] complaint."[45] Further, Plaintiffs are not

required to "plead specific facts explaining precisely how the defendant's conduct was unlawful" and

it is "sufficient for plaintiff to plead facts indirectly showing unlawful behavior."[46]

This strategy is further undermined by Defendants' reliance on cases that either were

decided *after* discovery on a motion for summary judgment or at trial, or that concern the duty of

---

[45] *Braden*, 588 F.3d at 595-596.
[46] *Braden*, at 595.

prudence with no allegations of self-dealing. Defendants lean heavily on *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) and *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011), *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011), and the aforementioned *Tibble*, but they all concern substantive allegations of imprudence with no suggestion of self-dealing, and the objective prudence, or even the good faith, of a fiduciary's conduct has never excused self-dealing.[47] To be sure, explanations other than self-dealing for any one of Defendants' self-promoting choices are possible, but when viewed together, when over and over Defendants chose the option that favors Fidelity's interests over other widely accepted alternatives, it is more than plausible that Defendants in fact acted out of a conflict of interest.

Defendants also argue that their investment decisions are entitled to deference, Defs' Mem. at 14, citing *Muench v. Robertson*, 62 F.3d 553, 565 (3d Cir. 1995). But *Muench* and its progeny are concerned with deference to a fiduciary's decision in the context of investing in the stock of the employer. *Muench* and its progeny adopted this deferential standard because ERISA exempts employer stock from the duty to diversify, which signaled Congressional intent to encourage employee ownership. *See* ERISA §404(2), 29 U.S.C. §1104(2). It would be extraordinary, unfounded, and unprincipled to extend fiduciary deference to acts of self-dealing, and Defendants cite no authority for the proposition.

Defendants' suggestion that self-dealing is implausible because "Fidelity has voluntarily contributed over two billion dollars of its own money to the Plan" merits singular mention. Defs' Mem. at 27. It would be news to Fidelity's employees that their retirement benefits are corporate charity. To the contrary, when the market demands that Fidelity make these substantial contributions to attract desired employees, Fidelity's self-dealing is all the more plausible as an attempt to recoup, through stealth means, a portion of this labor expense as fees. Were the

---

[47] *See, e.g., Leigh v. Engle*, 727 F.2d 113, 124 (7th Cir. 1984).

employees to invest in non-Fidelity funds, Fidelity would recover nothing at all.

### 1.     Defendants Limited The Plan To Fidelity Funds That Pay Fees To Fidelity

The Plan includes approximately 160 funds, the number varying over time, all managed by Fidelity. ¶57. There are many, non-Fidelity reasonably priced and well-managed investment options in the marketplace. ¶51. Not one is included in the Plan. This single fund-family design is unusual, and found among only 10% of 401(k) plans. ¶52. This fact, by itself, may not prove that Defendants sought to benefit Fidelity, but when Fidelity chooses to limit the Plan to Fidelity funds, generating millions of fees for Fidelity, it supports an inference of a breach of the duty of loyalty.

The cases Fidelity cite say nothing to the contrary. The *Dupree v. The Prudential Insurance Company of America*, No. 99-8337, 2007 WL 2263892 (S.D. Fla. Aug. 10, 2007), decision is findings of fact and conclusions of law following a bench trial. Fidelity's emphasis-added quotation from *Dupree* regarding an inference of disloyalty from the mere presence of funds affiliated with the plan sponsor, Defs' Mem. at 14, is, to put it mildly, misleading. The court was not speaking to a complaint. Instead, it based its conclusions on voluminous trial evidence displaying a record of diligence and investment choices made free from conflict and concluded that, against this factual record, the mere presence of affiliated funds was not sufficient to prove, not plead, a breach of loyalty. *Hecker* and *Renfro* are prudence cases, with no allegations and no discussion of self-dealing. The *Hecker* plan, instructively, had only 26 Fidelity funds and also included a brokerage window with access to *2,500* funds managed by other companies.[48] Indeed, cases dismissing complaints alleging only imprudent investment selection often distinguish cases alleging conflicts.[49]

Defendants also argue that the Plan made them offer only mutual funds managed by Fidelity, Defs' Mem. at 17, and that they are duty-bound to follow the Plan, quoting ERISA §404(a)(1)(D). Their partial quote of the statute is highly misleading. In full, the provision says a

---

[48] *Hecker*, 556 F.3d at 578.
[49] *Renfro*, 671 F.3d 314; *Laboy v. Bd. Of Trustees of Bldg Servs*, 513 Fed.Appx 78 (2d Cir. 2013).

fiduciary "shall discharge his duties . . . in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with*" ERISA. 29 U.S.C. §1104(a)(1)(D) (emphasis added). The omitted emphasized language is critical because courts have uniformly held that plan terms are not a get out of jail free card. Instead, if following a plan term is a prohibited transaction or a breach of prudence or loyalty or a violation of some other substantive rule, the statute forbids the plan fiduciary from following the term.[50] Moreover, Fidelity and its corporate siblings are the Plan sponsor *and* the Plan administrator *and* the Investment Committee *and* the advisor to the mutual funds, so the distinction between the Plan document and the Defendants' investment decisions places form over substance and does nothing to rebut the inference of self-dealing. Moreover, this same Plan term permitted investments in nonregistered institutional funds, whether or not affiliated with Fidelity. FAC ¶50. Thus, it cannot provide cover for having restricted the Plan to virtually an all-Fidelity mutual fund line up.[51] Indeed, we suspect that an independent outside fiduciary would never agree to take control over plan investments were its hands tied in this fashion. After all, how could it be independent if it had to follow the commands of a conflicted party to invest in that party's products?

### 2.   Defendants chose retail mutual funds over Fidelity's institutional funds.

The Plan is filled entirely with Fidelity's retail mutual funds but for one product from Fidelity's in-house Pyramis institutional fund manager. Fidelity established Pyramis specifically to compete for retirement plan business, yet that business does not include in more than trivial part Fidelity's own Plan. FAC ¶113. Pyramis does not offer retail mutual funds, instead providing commingled funds which invest the assets of multiple plans, and separately managed accounts which

---

[50] *See, e.g., Herman v. NationsBank Trust Co.,* 126 F.3d 1354 (11th Cir. 1997).

[51] Defendants cite *Alves v. Pilgrim Health Care, Inc.,* for the proposition that there cannot be a breach if the fiduciary follows the plan. If that is what *Alves* stands for, it is wrong. ERISA says a fiduciary should follow the plan only insofar as it is consistent with ERISA. 29 U.S.C. §1104(a)(1)(D). If following the plan violates a prohibited transaction rule or another fiduciary duty, a fiduciary must not follow the plan, as discussed above.

invest the assets of a single plan. Both types of investments are managed with a particular strategy, just like mutual funds, but offer lower costs and fees, among other advantages. *Id.* ¶¶113, 115. These fees may be roughly half what a mutual fund charges. *Id.* ¶114. For these reasons, investment experts, including Pyramis' own vice-president, project that commingled funds and separate accounts will displace mutual funds in large plans, such as the Plan. *Id.* ¶¶115-16.

Moving Plan investments to Pyramis analogs would have saved the Plan approximately $28 million annually in fees, all of which would have come out of Fidelity's pocket. *Id.* ¶117. Defendants chose instead to keep the Plan in retail mutual funds, instead of a widely accepted and lower cost alternative approach for mega plans. Cases addressing the prudence of institutional funds, Defs' Mem. at 20-21, are again irrelevant, as Plaintiffs complain about self-dealing. Those courts were concerned with whether prudence mandated particular investment options, not whether the defendants engaged in self-dealing when selecting among a range of options, prudent or otherwise. The *Loomis* decision, in particular, states that the plaintiffs "did not contend that the funds the [defendant] selected had any control over it" and "there is no reason to think that [the defendant] chose these funds to enrich itself at participants' expense."[52] Further, in the *Loomis* case the court noted that the plan had a mix of mutual funds and institutional funds,[53] suggesting that the defendants had in fact considered such offerings. The significance of limiting the Plan, with but one exception, to Fidelity mutual funds is that that it favored Fidelity's own interests and deviated from common industry practice, supporting an inference of self-dealing.[54]

---

[52] *Loomis*, 658 F.3d at 671; *see also Renfro*, 671 F.3d at 327 (contrasting the allegations in *Braden* of self-dealing).

[53] *Loomis*, 658 F.3d at 671.

[54] Even in the context of imprudent investment selection claims, several courts have held that failing to consider institutional investment options does in fact state a claim (and may prove a breach). *Braden*, 588 F.3d at 596-97 (reversing ruling on motion to dismiss); *Tibble v. Edison Int'l*, 711 F.3d 1061 (9th Cir. 2013) (affirming trial judgment that fiduciaries breached duty of prudence by failing to

### 3.   Defendants Stuffed The Plan With Retail Fidelity Funds To Maximize Fees.

The average number of fund options in the largest defined contribution plans is 22, just a fraction of the approximately 160 in the Plan. ¶59. The long-term trend among plans has been to reduce the number of options from a kitchen-sink array exemplified by Fidelity to a small-menu of carefully chosen investment options. ¶¶60-61. There are sound, pro-participant reasons for this shift. An increased number of funds leads participants to overinvest in equity funds, which, among other negative consequences, charge higher fees than index and bond funds. ¶62. Including more funds also means that the aggregate plan investment in any given fund will be less, and that investments may not reach break points in the fee schedules in those funds. ¶63.

Fidelity, though, chooses to include a massive number of funds, favoring its own interests over those of participants: more indirect evidence of self-dealing. Because all the funds are retail Fidelity funds, the extra revenue from over-investment in equities flowed to Fidelity. ¶62. The loss of aggregate investment leverage, and lower break points, also inured to the benefit of Fidelity. The Plan offered a remarkable total of approximately 77 overlapping large cap and sector equity funds. ¶64. The asset-weighted average fee paid on those 77 funds was 72 basis-points, but if a loyal-fiduciary had consolidated those funds into a single diversified large-cap option they would have been able to negotiate a fee of 20 basis-points or less, saving participants $15 million annually. *Id.*

Defendants suggest that an alternative explanation for this panoply of funds is that employees of financial firms "may desire greater choice" Defs' Mem. at 18. That is unsupported speculation. If this was truly Fidelity's intent, it would have offered a brokerage window, as in the Fidelity platform plan at issue in *Hecker*.[55] Regardless, it is not Plaintiffs' burden to rebut such

---

consider lower cost institutional share classes); *see also Tussey v. ABB, Inc.*, 2012 WL 1113291 (W.D. Mo. 2012) (fiduciaries for a large plan have a duty to leverage bargaining power of plan).
[55] *Hecker*, 556 F.3d at 578.

possibilities.[56]

### 4.     Defendants Used Plan Assets To Seed New Fidelity Funds.

Defendants added dozens of newly-established Fidelity mutual funds to the Plan, funds

which necessarily had no track record by which to evaluate their quality. FAC ¶66. Fourteen of these

funds were added the calendar year they were created, and twenty-one more the calendar year after

they were established. *Id.* ¶71. Fiduciaries typically do not add newly founded funds to a plan

because of the lack of a performance record and associated uncertainty about risk and volatility, *id.*

¶68, but for Fidelity, because they were Fidelity funds, there was an upside: funds generally need at

least $50 million under management to attain profitability so any sums invested by a Plan participant

would help push a new Fidelity fund into the black, *id.* ¶67.

Fidelity achieved the desired result. The Amended Complaint details 19 funds that were

added to the Plan within a year following their establishment and for which the Plan supplied at least

5% of assets. *Id.* ¶¶75-93. In some of these funds, the Plan supplied more than 20% of assets, *id.*

¶¶85, 87, 91, including more than 30% in one fund, *id.* ¶88. This seeding of new funds is strong

indirect evidence of self-dealing because the typical practice of fiduciaries is to avoid a greater than

5% stake in any fund. *Id.* ¶73. Defendants exceeded this threshold 19 times for newly-established

funds. Once again, Defendants chose a course of action that favored Fidelity's own interests,

offering funds with no track record that needed seed money to be profitable, over the typical

fiduciary policy of avoiding new funds and an excessive stake in any particular fund.

Defendants' retort that seeding through the Plan is "implausible" because the company has

$1.6 trillion under management, Defs' Mem. at 25-26, flat contradicts the allegations of the

complaint, and must be disregarded for purposes of the motion to dismiss. As noted above, the

complaint expressly alleges, in detail, that the Plan did, in fact, seed with substantial investments 19

---

[56] *Braden*, 588 F.3d at 596.

of the 35 newly-established funds, a better than 50% success rate.

**5.      Defendants Decided To Include Only High-Fee Target Date Funds.**

Fidelity's target date Freedom Funds are in the Plan. These fund-of-funds invest largely in Fidelity actively managed funds, which results in the Freedom Funds having a correspondingly high 54 basis point management fee. FAC ¶101. Even within the Fidelity universe of funds, however, there are much lower cost target date fund options. Fidelity offers an index-fund based set of Freedom Funds with a fee of only *9* basis points. *Id.* ¶103. These funds are not offered in the Plan. Pyramis, too, offers a suite of target-date funds with a fee of only *15* basis points. *Id.* ¶104. A Pyramis vice president explained how the retail Freedom Funds are designed for smaller plans than the Pyramis target date funds. *Id.* ¶105. Yet these, too, are not offered in the Plan. Once again, Defendants made investment decisions that earned Fidelity millions in fees at the expense of the Plan and its participants.

**6.      The Plan Has An Inordinate Number Of Overlapping, High-Fee Funds.**

In 2010, for example, the Plan invested more than $50 million in each of 40 retail mutual funds. *Id.* ¶123. The majority of those funds, 23 out of 40, charge higher fees than 75% of their peers, and the vast majority, 31 out 40, charge higher than average fees among their peers. *Id.* This comparison, if anything, understates the high-fee bias of the Plan, because the peer fund limitation excludes institutional funds with lower fees. *Id.* Defendants' decision to keep these high-fee funds favors Fidelity's interests over those of participants.

In sum, Defendants chose, in one instance after another, to include and retain funds in the Plan that favored Fidelity rather than installing other, widely accepted funds that offered benefits to participants but, undeniably, would have hurt Fidelity's bottom line. Defendants chose to limit the Plan to Fidelity funds; to include in the Plan with but one exception high-fee retail mutual funds rather than use Fidelity's lower cost institutional alternatives; to pack the Plan with approximately

21

160 funds resulting in the over-investment in high-fee Fidelity equity funds and high-fees generally relative to what could have been secured with the leverage of larger investments in fewer funds; to include new funds with no track record to seed such funds with substantial start-up capital, thereby accelerating the timeline for those funds' profitability; to offer only high-fee actively managed target date funds rather than Fidelity's in-house lower cost alternatives; and to persist with high-fee funds generally that exceed, and often far exceed, the fees of their peers. Although there might be some participant-friendly justification for any one of these decisions, when viewed as a whole, *see Braden*, 588 F.3d at 595, these repeated Fidelity-favoring choices support a strong inference that the Plan is managed with Fidelity's interests paramount, in breach of Defendants' duty of loyalty.

**D.      PLAINTIFFS HAVE ALLEGED A PROHIBITED TRANSACTION**

Count II of the Amended Complaint alleges that Defendants engaged in prohibited transactions in violation of §406 of ERISA, 29 U.S.C. §1106, by adding proprietary funds to the Plan during the relevant period when such transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation and a transfer of assets of the Plan to a party in interest. FAC ¶¶158-160.[57]

ERISA prohibits transactions between a plan and those persons designated as "parties-in-interest" regardless of the fairness of the transaction or the benefit to the plan. ERISA §406(a)(1)(A)-(E). Such transactions are viewed as being inherently risky and subject to abuse and

---

[57] Although Plaintiffs have characterized their 406 claim as a claim under §406(a), the facts alleged also support a claim under §406(b) which prohibits certain plan transactions where a fiduciary acts out of self- interest or in the interests of a person adverse to the plan. Dismissal would therefore be improper where the Court can sustain the claim on a different legal theory. *See, Fitzgerald v. Codex Corp.,* 882 F.2d 586, 589 (1st Cir. 1989) (noting the near abolishment of the "theory of pleadings" doctrine and holding that "it is not necessary that a legal theory be pleaded in the complaint if plaintiff sets forth 'sufficient factual allegations to state a claim showing that he is entitled to relief' under some viable legal theory."); *Morales-Vallellanes v. Potter*, 339 F.3d 9, 14 (1st Cir. 2003) (complaint states a claim even if it fails to identify a legal theory or points to the wrong legal theory, as long as relief is possible under any set of facts that could be established consistent with the allegations).

are *per se* ERISA violations.[58] Unless a fiduciary conclusively establishes that an exemption applies, the fiduciary is specifically prohibited from causing a plan to engage in a transaction involves the furnishing of goods, services or facilities between a plan and a party in interest or the transfer or use of plan assets for the benefit of a party in interest. ERISA §406(a)(1)(A), (C). Strict adherence to the conditions and requirements of the prohibited transactions exemptions is required in order to ensure that Congress' goal of preventing abuse is not undermined.[59]

### 1.      The Funds Are Parties In Interest.

Defendants argue no prohibited transaction because the Fidelity funds in the plan are not parties in interest. Specifically, they contend that mutual funds are "expressly excluded" from the definition of "party in interest" pursuant to ERISA §3(21)(B), 29 U.S.C. §1002(21)(B). Defs' Mem. at 28. This argument fails for several reasons.

First, it is inconsistent with Defendants' own statements in official filings with the Department of Labor. Specifically, the annual Form 5500 for the Plan for each year of the class period lists all of the Fidelity Mutual Funds in which the Plan is invested and states, as to such funds, that "[a]ll investments are a party in interest to the Plan." *See, e.g.*, Doc. No. 40-2 at 17 (2011); Doc. No. 40-3 at 16 (2007); Doc. No. 40-4 at 17 (2006). Each Form 5500 is certified as complete and accurate by the Trustee for the Plan, Fidelity Management Trust Company, and is signed by the plan administrator under penalty of perjury. *Id.* at 1 of each 5500.

Second, Defendants misstate the statutory provision supposedly excluding mutual funds from the definition of party in interest and mischaracterize the holding of the sole case on which they rely. ERISA §3(21)(B) is not a *per se* exclusion of mutual funds from the definition of party in

---

[58] *Donovan v. Cunningham*, 716 F.2d 1455, 1464-65 (5th Cir. 1983) (purpose of §406 "was to make illegal *per se* the types of transactions that experience had shown to entail a high potential for abuse.").

[59] *See, e.g. Reich v. Hall Holding Co.*, 990 F. Supp. 955, 966-67 (N.D. Ohio 1998) *aff'd sub nom. Chao v. Hall Holding Co., Inc.*, 285 F.3d 415 (6th Cir. 2002).

interest. Rather, it says that a plan's investment in a particular mutual fund does not, *by itself,* cause

the investment company to be deemed a fiduciary or party in interest. Thus, a non-Fidelity mutual

fund is not a party in interest simply by virtue of the Plan's investment in that fund. Plaintiffs do not

contend, however, that the funds at issue are parties in interest because the Plan invests in them.

Instead, as Defendants concede in their 5500 reports, the mutual funds in which the Plan invests are

parties in interest because they are affiliated  with the plan sponsor, Fidelity, which is itself a

fiduciary, the employer of plan participants, and which established and manages for a fee each of the

funds in which the Plan invested. FAC ¶¶36-40. The case cited by Defendants holds that the

exemption for mutual funds from the definition of party in interest does not exempt the actual

transactions in which plans invest in the mutual funds.[60] In other words, although an employee

benefit plan's investment in a mutual fund does not, by itself, make the mutual fund a party in

interest, the act of investing in a mutual fund that is otherwise affiliated with a fiduciary is a

prohibited transaction.[61]

Finally, Defendant's broad interpretation of §1002(b)(21), if credited, would render

superfluous an exemption for transactions involving affiliated mutual funds under PTE 77-3. If

transactions involving mutual funds are always immune from a prohibited transaction claim because

mutual funds fall outside of the definition of interested parties, there would be no need for a

separate exemption, in the form of PTE 77-3, to cover affiliated mutual fund transactions where

certain conditions are met. The fund industry asked for the exemption, and the Department of

Labor granted it. Presumably, both the industry and DOL are not in the habit of seeking and

granting, respectively, superfluous exemptions. The correct interpretation, of course, is that

---

[60] *Goldenberg v. Indel, Inc.* 741 F.Supp.2d 618, 633 (D. N.J. 2010). *See also, Boeckman v. A.G. Edwards, Inc.* 461 F.Supp.2d 801 (S.D. Ill. 2006).

[61] The §406(a) claim was dismissed in *Goldenberg* not because the funds involved were mutual funds but because "the statute's provision for extending fiduciary obligations to affiliates does not apply to having a common corporate parent," *i.e.* corporate siblings. *Id.* at 633.

otherwise unaffiliated mutual funds do not become interested parties simply because the Plan has

invested in them, but affiliated funds are parties in interest whether or not they are investment

companies covered by the Investment Company Act of 1940 (*i.e.,* mutual funds). Thus, when a

fiduciary knowingly causes the plan to engage in a transaction involving the furnishing of goods,

services or facilities between the plan and such fund or the transfer or use of plan assets for the

benefit of such fund, it is a prohibited transaction under 406(a) unless the defendant can establish

that the conditions of an exemption have been satisfied.

### 2.      Defendants Cannot Establish The Applicable Exemption On Their Motion.

Defendants also argue that Count 2 should be dismissed because the complaint fails to allege

facts establishing that Prohibited Transaction Exemption 77-3 does not apply. Defs' Mem. at 29.

But an exemption to the prohibited transactions rules is an affirmative defense.[62] As such, it is

Defendants' burden to allege and prove that all of the conditions of the exemption have been

satisfied.[63] Plaintiffs are not required to plead facts rebutting an affirmative defense such as

compliance with PTE 77-3.[64] Their failure to do so, therefore, cannot be the basis for a motion to

dismiss. Unless the facts establishing an affirmative defense are "clearly indicated" on the face of the

complaint, a decision on the defense must await, at a minimum, a motion for summary judgment.[65]

In *Braden*, the Eighth Circuit considered whether a motion to dismiss a prohibited

---

[62] *Braden*, 588 F.3d at 601; *Harris v. Amgen, Inc.,* 10-56014, 2013 WL 5737307, *17-18 (9th Cir. Oct. 23, 2013); *Howard v. Shay,* 100 F.3d 1484, 1488 (9th Cir. 1996); *Elmore v. Cone Mills Corp.,* 23 F.3d 855, 864 (4th Cir. 1994) (en banc).

[63] *See, e.g. Marshall v. Snyder,* 572 F.2d 894, 900 (2d Cir.1978) ("The settled law is that in [prohibited self-dealing transactions] the burden of proof is always on the party to the self-dealing transaction to justify its fairness [under a statutory exception].")

[64] *Jones v. Bock,* 549 U.S. 199, 211–12 (2007) (holding that a plaintiff need not plead the absence of an affirmative defense, even a defense like exhaustion of remedies, which is "mandatory")

[65] *See Harris v. Amgen*, 2013 WL 5737307, at 18, *citing* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure §1357 (3d ed.2004); *Jones v. Bock* at 215 (also citing Wright & Miler for the rule that affirmative defenses must appear on the face of the complaint); *Fuller v. SunTrust Banks, Inc.* 52 Employee Benefits Cas. 2525, at *6 (N.D. Ga. 2012) (rejecting request for dismissal based upon PTE 77-3 where it could not be determined from the face of the complaint that the funds at issue were offered on terms no less favorable than those offered to other shareholders.)

transaction claim under ERISA §406 could be granted based on the plaintiff's failure to plead facts

establishing that the transactions at issue were not exempted. The district court dismissed the

prohibited transaction claim on that basis, concluding that the plaintiff had failed to plead facts

raising a plausible inference that transactions were not exempted by ERISA §1108. 588 F.3d at 601.

The Court of Appeal reversed, stating: "This was wrong because the statutory exemptions

established by §1108 are defenses which must be proven by the defendant."[66] The vast majority of

courts are in accord with the conclusion and analysis in *Braden*.[67]

Defendants rely upon *Mehling v. New York Life Ins. Co.,* 163 F.Supp.2d 502, 510 (E.D. Pa.

2001) and *Leber v. Citigroup, Inc.* 48 Employee Benefits Cas. 2418 at *10 (S.D. N.Y., 2010) to support

their argument. The cases are out of step with the majority of courts addressing the issue, as

---

[66] *Id.* (citations omitted); *Lowen v. Tower Asset Mgmt., Inc.* 829 F.2d 1209, 1215 (2nd Cir. 1987); *Donovan v. Cunningham,* 716 F.2d 1455, 1467-68 (5th Cir. 1983), *cert. denied,* 467 U.S. 1251 (1984). *See also Braden,* 588 F.3d at 602-603 (providing additional reasons for its holding).

[67] *See, e.g. Glass Dimensions, Inc. v. State Street Bank & Trust,* 290 F.R.D. 11, 16 (D. Mass. 2013) (holding that Defendants bear the burden of proof to establish compliance with the conditions of Prohibited Transaction Exemption 2006-16); *Howard v. Shay,* 100 F.3d at 1488 (holding that a fiduciary engaging in a self-dealing transaction has a heavy burden of showing fairness to the Plan); *Elmore v. Cone Mills Corp.,* 23 F.3d 855, 864 (4th Cir. 1994) (en banc) (stating that defendant bears the burden of establishing that an otherwise prohibited transaction was for adequate consideration); *Lowen v. Tower Asset Mgmt., Inc.* 829 F.2d. at 1215 (a fiduciary charged with a violation of Section 406(b)(3) must prove by a preponderance of the evidence that the transaction in question fell within an exemption); *Goldenberg v. Indel, Inc.,* 741 F. Supp. 2d 618, 632 (D.N.J. 2010) (rejecting the argument, on a motion to dismiss, that the mention of an exemption in the Complaint, without pleading all of the facts necessary to establish the defense, shifts to the Plaintiff the burden to plead those facts); *Krueger v. Ameriprise Fin., Inc.,* 11-02781, 2012 WL 5873825 (D. Minn. Nov. 20, 2012) (rejecting Defendant's contention that the Plaintiffs' prohibited transaction claims should be dismissed based upon the failure to allege that the Plan's offering of affiliated mutual funds and collective trusts fell outside the prohibited transaction exemptions under §408 and PTE 77-3); *Shirk v. Fifth Third Bankcorp,* No. 05-049, 2008 WL4449024, at *15 (S.D. Ohio Sept. 26, 2008) (finding that "whether or not Defendants actually complied with PTE 77-3 is a factual question that cannot be resolved on a motion to dismiss."); *In re Regions Morgan Keegan ERISA Litigation,* 692 F.Supp.2d 944, ___ (W.D. Tenn. 2010) (concluding that it would be inappropriate on a motion to dismiss to determine whether PTE 77-3 should apply to exempt Defendants from a prohibited transaction claim).

discussed above, and have been criticized by other courts.[68] *Mehling* and *Leber* are also inconsistent with the general rule, followed in the First Circuit as in most jurisdictions, that places the burden of proving affirmative defenses on the party asserting them.[69]

Defendants are also wrong when they say that the facts alleged in the complaint demonstrate that their decision to make proprietary funds available to plan participants falls within PTE 77-3. The Complaint contains no facts, for example, establishing that all dealings between the plan and the investment company are on terms no less favorable than such dealings with other investors.. Proving this element of the affirmative defense requires an inquiry into facts not available to Plaintiffs and necessitates discovery. By way of example, the Contrafund Prospectus states that "From time to time, FDC may offer special promotional programs to investors who purchase shares of Fidelity funds. For example, FDC may offer merchandise, discounts, vouchers, or similar items to investors who purchase shares of certain Fidelity funds during certain periods." Doc. No. 25-14, at 13. Plaintiffs do not know without whether such discounts and other favorable terms were made available to other investors but not to the Plan. If they were, then the exemptions requirement that "all other dealings between the plan and the investment company be on no less favorable terms than such dealings with other shareholders of the investment company," was not satisfied. As another example, it is common for mutual funds to waive investment minimums for retirement plan investors.[70] Whether the Fidelity Funds waived such minimums for other investors, but not the Plan is another fact question not suitable for resolution now.

---

[68] *See, e.g. Krueger,* 2012 WL 5873825 (D. Minn. Nov. 20, 2012) (criticizing *Mehling* for failing to distinguish any precedent identifying §408 and PTE 77–3 exemptions as affirmative defenses and *Leber* as inconsistent with the holding in *Braden*); *Goldenberg,* 741 F.Supp.2d at 632 (holding that *Mehling* was not persuasive authority to depart from "well-reasoned precedent" determining that §408 provides an affirmative defense); *Shirk,* 2008 WL 4449024, at *15–16 (declining to follow *Mehling* and finding that compliance with PTE 77-3 cannot be determined on a motion to dismiss).

[69] *See Caban Hernandez v. Philip Morris USA, Inc.,* 486 F.3d 1, 8 (1st Cir. 2007); *U.S. Liab. Ins. Co. v. Selman,* 70 F.3d 684, 691 (1st Cir. 1995).

[70] *See Tibble v. Edison Int'l,* No. 07-5359, 2010 WL 2757153, *29 (C.D. Cal. July 8, 2010).

E.      **PLAINTIFFS HAVE ARTICLE III STANDING**

Defendants argue that Plaintiffs' claims "must be significantly curtailed in scope under Rule 12(b)(1) because Plaintiffs lack constitutional standing to seek redress for funds in which they did not invest." Defs' Mem. at 32.[71]  As a threshold matter, those plaintiffs who are current participants in the Plan continue to suffer injury from Defendants' ongoing breaches of fiduciary duty and have standing to seek class-wide injunctive relief designed to redress Defendants' ongoing self-dealing practices described in the complaint. Such relief, which may include enjoining Defendants from limiting Plan investments to proprietary funds, removing Defendants from any positions of trust with respect to the Plan and the appointment of independent fiduciaries to administer the plan, among other remedies, is not fund-specific and does not, therefore, raise any fund-by-fund standing issues.

Even as to non-injunctive relief, moreover, standing does not turn on which funds the named plaintiffs invested in. Plaintiffs seek redress for a common course of illegal conduct engaged in by all Defendants that harms all Plaintiffs and all class members in a like manner, regardless of which funds they invested in. The Defendants managed the Plan with their own interests paramount, tainting all decisions regarding the addition and retention of funds in the Plan.  Plaintiffs were harmed by this conduct in multiple ways, including those identified in Part II.C, supra, and thus satisfy the Article III standing requirements to sue to redress that harm. In similar contexts, namely where plaintiffs who invested in some, but not all, of the funds, or were participants in one plan, but not all plans affected by the unlawful conduct, courts have said this issue is properly one for class certification, not standing.

---

[71] As the Supreme Court has held, there are three basic elements of constitutional standing: (1) the plaintiff must suffer an injury in fact; (2) that is fairly traceable to the defendant's conduct; and (3) redressable by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Defendants do not state which of these elements Plaintiffs have allegedly failed to satisfy or how.

Defendants rely principally on the First Circuit's decision in *Plumbers' Union Local No. 122 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011), arguing on the basis of that authority that "Plaintiffs lack standing to assert any claim with respect to funds in which they did not invest." *Nomura* did not so hold. To the contrary, the Court of Appeal in *Nomura* expressly acknowledged that "in a properly certified class action, the named plaintiffs regularly litigate not only their own claims but also claims of other class members based on transactions in which the named plaintiffs played no part."[72] The problem in *Nomura*, and the reason why the Court limited the scope of the plaintiffs' claims to the funds in which they invested, was that each of the eight funds involved were defendants in the case and the named plaintiffs had no claims against six of those defendants.[73] As the *Nomura* court explained, most courts hold that the named plaintiffs must themselves possess claims against each defendant in order to have standing to assert claims against that defendant.[74] It does not follow from that requirement, however, that the named plaintiffs must have a claim as to each fund when the funds are not defendants.

The concerns expressed in *Nomura* are not present here. All of the named Plaintiffs have claims against all of the named Defendants, as do the members of the putative class. Moreover, all of the named plaintiffs have a significant interest in recovering for the alleged wrongful conduct engaged in by defendants as it affected all plaintiffs and proposed class members. Thus, *Nomura's* standing analysis has no applicability here. Several courts have rejected this fund-by-fund standing analysis advanced by Defendants with their misreading of *Nomura*. In *Glass Dimensions, Inc. v. State Street,* 285 F.R.D. 169, 174 (D. Mass. 2012), an ERISA case challenging the securities lending fees

---

[72] *Nomura*, 632 F.3d at 769

[73] *Id.* The claims in *Nomura* were not claims under ERISA but claims for violation of sections 11, 12(a)(2) and 15 of the Securities Act of 1993, 15 U.S.C. §§77k(a), 77*l*(a)(2) and 77*o*, based upon misrepresentations made by each of the defendant funds in their respective registration statements and prospectuses.

[74] *Id.* at 770.

charged by State Street for each of 260 lending funds it managed, Defendants argued, based on *Nomura,* that Plaintiff lacked standing to sue on behalf of the 257 funds in which it did not invest. The Court rejected this argument, distinguishing both *Nomura* and the case on which it relies, *Barry v. St. Paul Fire & Marine Ins. Co.,* 555 F.2d 3 (1st Cir. 1977) aff'd, 438 U.S. 531, 98 S. Ct. 2923, 57 L. Ed. 2d 932 (1978), based upon the fact that, unlike in *Nomura* and *Barry* the harm suffered by the plaintiff, was fairly traceable to each defendant named in the present suit.[75] The Court then stated:

> This court finds, therefore, that Plaintiff has established constitutional standing with respect to the 257 funds that it did not purchase. Relevant First Circuit precedent, as discussed above, indicates that a potential class representative is only required to establish constitutional standing with respect to each defendant, which Plaintiff does here. Once a plaintiff establishes his own standing, the question of whether a plaintiff will be able to represent the putative class, "depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure."

*Id.* at 175 (footnote omitted).

In *Fallick v. Nationwide Mutual Insurance Co.,* 162 F.3d 410, 421 (6th Cir. 1998), the district court dismissed on standing grounds claims brought on behalf ERISA-regulated health insurance plans to the extent that the plaintiff sought relief for plans other than the one in which he was a participant or beneficiary. The Sixth Circuit reversed, finding that the district court's analysis "confuses the issue of a plaintiff's standing under Article III vis-a-vis a defendant with the relationship between a potential class representative and absent class members, which is governed by Rule 23 of the Federal Rules of Civil Procedure."[76] The Court further stated:

> Threshold individual standing is a prerequisite for all actions, including class actions. [Citations] A potential class representative must demonstrate individual standing vis-as-vis the defendant; he cannot acquire such standing merely by virtue of bringing a class action. See *Brown v. Sibley,* 650 F.2d 760, 770 (5th Cir.1981). As this Court has made clear, however, "once an individual has alleged a distinct and palpable injury to himself he has standing to challenge a practice even if the injury is of a sort shared by

---

[75] *Glass Dimensions*, 285 F.R.D. at 174-75.

[76] *Id.*

> a large class of possible litigants." *Senter v. General Motors Corp.*, 532 F.2d 511, 517 (6th Cir.1976). Once his standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure.

*Id.* at 423.[77]

    In *Braden,* the Eighth Circuit summarized the rule that requires the rejection of Defendant's

standing argument in this case:

> Article III generally requires injury to the plaintiff's personal legal interests, but that does not mean that a plaintiff with Article III standing may only assert his own rights or redress his own injuries. To the contrary, constitutional standing is only a threshold inquiry, and "so long as Article III is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others." In such a case, a plaintiff may be able to assert causes of action which are based on conduct that harmed him, but which sweep more broadly than the injury he personally suffered."

588 F.3d at 591-92.

    Each of the named plaintiffs in this case has individual standing to pursue the breach of the

duty of loyalty claim asserted in the Amended Complaint. All suffered an injury in fact from the

alleged conduct that is fairly traceable to the Defendants' conduct and is redressable by the court.

This is sufficient to satisfy Article III standing requirements. As the case law establishes, therefore,

their ability to represent class members who invested in funds other than those in which Plaintiffs

---

[77] *See, also, Sutton v. Med. Serv. Ass'n of Pennsylvania,* CIV. A. 92-4787, 1993 WL 273429, at *4 (E.D. Pa. July 20, 1993) (rejecting defendants' argument in ERISA benefits class action that plaintiff lacked standing to represent a class "composed of members of plans of which he is not himself a member."); *Cent. States SE and SW Areas Health and Welfare Fund v. Merck–Medco Managed Care, L.L.C, 504 F.3d 229, 241* (2nd Cir.2007) (holding in a proposed ERISA class action that "only one of the named Plaintiffs is required to establish standing in order to seek relief on behalf of the entire class" and citing 1 Alba, Conte & Herbert B. Newberg, Newberg on Class Actions §2:6 n.3 (4th ed. 2002), for the proposition that once a named plaintiff demonstrates individual standing as against each defendant, the inquiry shifts to a class action analysis); *Braden, supra,* at 592, (reversing district court's determination that employee seeking class-wide for breach of fiduciary duty under ERISA lacked constitutional standing to assert claims based on breaches that occurred prior to his participation in the plan); *In re Nexium (Esomeprazole) Antitrust Litigation,* 2013 WL4832176 , at *24 (rejecting argument that plaintiffs only had standing to pursue claims against defendants under the laws of the states in which they made reimbursements for drug purchases).

invested is properly determined on class certification.

Although Defendants' cite other cases besides *Nomura* in support of their standing argument, those cases are of no moment.  *Stegall v. Ladner*, 394 F.Supp.2d 358 (D. Mass. 2005) contains only a superficial analysis of the standing issue and does not consider the distinction between individual Article III standing and the scope of the claims that can be pursued through Rule 23 certification. Also, as in *Nomura,* the defendants in *Stegall* included persons against whom the plaintiff had no claim, including the directors, advisors and affiliates of each of thirty-three funds, only one of which plaintiff had invested in.[78] Moreover, the court relied heavily on the holding in *In re Eaton Vance Corp. Sec. Litig.* 219 F.R.D. 38, 41 (D. Mass. 2003), in which, as in *Nomura,* the court's dismissal of claims pertaining to particular funds was based on the plaintiffs' inability to state a claim against each defendant.[79]

*Forsythe v. Sun Life Financial, Inc.,* 417 F.Supp.2d 100, 118 (D. Mass. 2006), another case on which Defedants rely, did not even involve an Article III analysis. That court's conclusion that the plaintiffs could not pursue claims on behalf of shareholder of the sixty funds in which they were not invested was based upon an analysis of statutory standing under section 36(b) of the Investment Company Act, which limits enforcement actions to the SEC and current "security holders." Notably, the court distinguished the plaintiffs' authorities on the basis that they dealt with injuries alleged under ERISA or securities laws other than 36(b).[80] The same is true for *Fuller v. Sun Trust Bank, Inc.,* in which the claim the court dismissed on standing grounds pertained to a specific fund in which the plaintiff had never invested.[81]

---

[78] *Stegall*, 394 F.Supp.2d, at 360.
[79] *Id.* at 363.
[80] *Sun Life*, 417 F. Supp.2d at 118.
[81] No. 1:11 -784, 2012 WL 1432306 (N.D. Ga. Mar. 20, 2012). Defendants are also mistaken in their assertions that this Court lacks authority to consider class certification issues before addressing Article III standing and that the showing necessary to establish standing is the same at all stages of

## F.  FMR LLC SHOULD NOT BE DISMISSED

Defendants seek to dismiss Fidelity as a Defendant, asserting that Plaintiffs have not established its fiduciary status with respect to the unlawful conduct alleged. But Plaintiffs allege throughout the Amended Complaint that Fidelity was a fiduciary and that it, along with its co-defendants, engaged in the discretionary acts that comprised the alleged wrongful conduct for which Plaintiffs seek relief. FAC ¶¶1, 37–41, 59, 63, 66, 69–96, 104, 117–119, 124, 149–154, 158, 160. By way of example, Plaintiffs specifically allege that Defendants, which includes Fidelity, "selected for the Plan and repeatedly failed to remove or replace proprietary mutual funds' for reasons designed to benefit FMR and to the exclusion of other funds (*id.* ¶1), "selected and maintained an excessive number of funds in the plan" (*id.* ¶59), added unproven, newly minted funds to the Plan as a means of seeding its own untested funds (*id.* ¶72), and failed to consider adding institutional funds to the Plan (*id.* ¶104). These allegations establish that Fidelity exercised discretion in the investment of plan assets and, therefore, acted as a fiduciary with respect to the alleged unlawful conduct.

The Amended Complaint also alleges that Fidelity appointed and had responsibility for monitoring and removing the Investment Committee.  *Id.* ¶38. Defendants contend that this is insufficient because no breach of that duty is alleged. But the Court is required to make all reasonable inferences in favor of Plaintiffs. Given the extensive allegations about the improper and unlawful investment decisions made by Defendants, the allegation that Fidelity, if not making the investment decisions itself, failed adequately to monitor and remove those who were making those

---

the proceedings The Supreme Court has twice held that class certification issues may be "logically antecedent to the existence of any Article III" issues and may be addressed before considering whether a justiciable case or controversy is presented. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 592 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999). It has also held that the plaintiffs' burden of establishing the elements of standing will vary at each stage of the proceedings "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.* with the manner and degree of evidence required at the successive stages of the litigation. Thus, at the pleading stage general factual allegations of injury resulting from the defendant's conduct may suffice. *Lujan*, 504 U.S. at 561.

decisions, certainly can be, and should be, inferred.[82]

Moreover, the Investment Committee is not itself a separate legal entity, but an internal construct of Fidelity comprised exclusively or principally of Fidelity's own employees. As such, Fidelity is responsible for the unlawful investment decisions described in the Amended Complaint, not under the doctrine of *respondent superior*, but simply because the decisions are those of Fidelity, made through one of its duly-constituted governance committees and its employees. *See, Goldenberg v. Indel,* 741 F. Supp.2d 618, 628 (D. N.J. 2010) (noting that most Circuits to have considered the issue find that employee-employer agency applies to ERISA fiduciary duties and that "without some theory of agency, an investment corporation would never be held liable for breaches of fiduciary duty since corporate liability is always ultimately a question of imputing liability to the entity based on the conduct of a human being.")

Finally, to the extent that Plaintiffs' allegations regarding the actions of Fidelity and its role in the selection of funds in which the Plan invested are not more detailed, it is due to the limited access Plaintiffs have to information about the Plan's fiduciary governance. For example, the summary plan description identifies Fidelity as the plan administrator and Fidelity Management Trust Company as the Plan's trustee. *See* Siegle Decl. Exhibit 3, Administrative section of Summary Plan Description at 217. The summary plan description does not identify the Investment Committee or say some entity other than Fidelity is responsible for choosing Plan investments. *See generally id.*; Doc. No 25-8, Profit Sharing Plan section of Summary Plan Description. The same is true of the investment brochure provided to Plan participants. *See* Doc. No. 25-9. Further, the summary plan description in naming Fidelity as the plan administrator appears to conflict with the Plan document, which names a

---

[82] *See Mehling v. New York Live Ins. Co.*, 163 F.upp.2d 502, 509-510 (E.D. Penn. 2001) (holding that duty to appoint and monitor activities of other fiduciaries, including investment activities, is sufficient, at least for Rule 12(b)(6) purposes, to establish that plan sponsor exercised discretionary control over plan assets).

"Retirement Committee." Doc. No. 25-1, at FID-LB-00060. Given this conflicting evidence, it is premature to dismiss Fidelity on the basis of its fiduciary status. As the Court in *Braden* noted, "if plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer."[83]

Dated: October 29, 2013

Respectfully submitted,

|  |  |
|---|---|
|  | /S/ Gregory Y. Porter |
| Garrett W. Wotkyns | Gregory Y. Porter |
| Michael C. McKay | Gabriel Siegle |
| SCHNEIDER WALLACE | BAILEY & GLASSER LLP |
| COTTRELL KONECKY LLP | 910 17th Street, NW |
| 8501 North Scottsdale Rd., Suite 270 | Suite 800 |
| Scottsdale, AZ 85253 | Washington, DC 20006 |
| Tel: (480) 428-0142 | Tel: (202) 463-2101 |
| Fax: (866) 505-8036 | Fax: (202) 463-2103 |
| | |
| Peter Mougey | Joseph C. Peiffer, Esq. |
| Laura Dunning | Daniel Carr |
| LEVIN, PAPANTONIO, THOMAS, | FISHMAN HAYGOOD PHELPS |
| MITCHELL, RAFFERTY & PROCTOR | WALMSLEY WILLIS & SWANSON |
| 316 S. Baylen Street, Suite 600 | 201 St. Charles Avenue, Suite 4600 |
| Pensacola, FL 32502 | New Orleans, LA 70170-4600 |
| Tel: (850) 435-7121 | Tel: (504) 586-5259 |
| Fax: (850) 436-6147 | Fax: (504) 586-5250 |
| | |
| John Roddy, BBO No. 424240 | *Attorneys for Plaintiffs* |
| Elizabeth Ryan, BBO No. 549632 | |
| BAILEY & GLASSER LLP | |
| 125 Summer Street | |
| Suite 1030 | |
| Boston, MA 02110 | |
| Tel: (617) 439-6730 | |
| Fax: (617) 951-3954 | |

---

[83] 588 F.3d at 598.

**<u>Certificate of Service</u>**

I hereby certify that the foregoing was filed and served upon counsel of record using the

United States District Court for the District of Massachusetts CM/ECF system on October 29,

2013.


/S/ Gregory Y. Porter
Gregory Y. Porter